EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OTIS GRANT, | § | CIVIL ACTION NO. 4:16-CV-03529 |
| PLAINTIFF | § | |
| V. | § | JUDGE KENNETH HOYT |
| HARRIS COUNTY, | § | |
| DEFENDANT. | § | JURY TRIAL DEMANDED |

**PLAINTIFF'S THIRD AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

**I.     Preliminary Statement**

1.     This is a lawsuit for employment violations brought to secure relief for retaliation, harassment and discrimination on the basis of disability brought within the Americans with Disability Act of 1990 ("ADA") as amended by ADA Amendments Act (ADAAA), 42 USC § 12101 et seq.

**II.    Parties**

2.     During all times mentioned in this petition, Grant was an employee with a known disability (diabetes) covered by the ADA and ADAAA.  Grant is a resident of Fort Bend County, Texas.

3.     During all times mentioned in the petition, Defendant, Harris County, was and is still an employer, was and is a local governmental entity under the laws of the state of Texas.  **III. Jurisdiction**

4.     Grant received his right to sue notice on February 22, 2016, from the U. S.

Department of Justice. All conditions precedent were met prior to bringing this lawsuit.

5. Declaratory, injunctive and equitable relief is sought pursuant to the ADA and ADAAA.

6. Compensatory damages are sought pursuant to the ADA and ADAAA.

7. Costs and attorney's fees may be awarded pursuant the ADA and ADAAA.

## IV. Venue

8. This action properly lies in the Southern District of Texas, Houston Division, pursuant to 28 U.S.C.§ 1391(b) because the unlawful employment practices were committed in this judicial district.

## V. Factual Statement

9. Grant was employed by Defendant as a Juvenile Supervision Officer ("JSO") from 2005 to 2013. During his employment, he received satisfactory to good performance evaluations.

10. For the first five years of employment, Grant did not have any problems with Defendant. However in or about August or September 2011, Grant requested a reasonable accommodation due to his disability (diabetes). Many employees including Samuel knew Grant suffered from diabetes and some had seen his abnormally swollen legs. Specifically, Grant asked that he be permitted to elevate his feet and sit down for periods of time during work hours to reduce swelling in his ankle. He also requested JSO assignments that did not require a lot of walking or standing due to the swelling in his feet.

11. Prior to Anthony Samuel ("Samuel") assuming the role as his direct supervisor, Grant's prior supervisor(s) had permitted him to work in areas that did not require a lot of walking and standing due to significant swelling in his leg.

12. When Samuel became his supervisor, he permitted Grant to continue similar assignments and seemed very accommodating. This all changed after Grant reported Samuel to Samuel's supervisor, Aaron Beasley. Grant had observed Samuel being openly hostile to and discriminating against African employees for a while. Samuel told Grant that he was going to get JSO Epkin (African) fired. Ultimately Samuel was successful at getting Epkin fired and continued his hostile treatment of African employees.

13. In or about August 2011, after Grant spoke with Beasley about Samuel's treatment of African employees, Beasley said he would talk to Samuel. Soon after his talk with Samuel, Samuel began harassing and retaliating against him. Samuel started assigning Grant to floors that required him to walk and stand.

14. Beasley's alleged talk with Samuel only made it worse for Grant. Nothing was done to correct the problem. As such, Grant reported the retaliation to HR in writing. Rather than take remedial measures to correct the harassment, retaliation and discrimination, HR began to retaliate as well. It permitted Grant's supervisors, Samuel, Beasley and Gisselle Jones (now Robinson) to continue the retaliation, discrimination and harassment.

15. In response to his December 2011 written complaint, HR Representative, Bianca Malveaux allegedly conducted an investigation of the complaint. Malveaux did not make notes during the alleged investigation or request any statements from any of the witnesses in which she allegedly spoke with during the claimed investigation. Her report was void of any verifiable facts and actually included other claims about Grant that were new for him (i.e., sleeping on the job; being a lazy employee; and difficult to work with). HR Director, Matthew Shelton, oversaw the alleged investigation.

16. In the retaliation, discrimination and harassment written complaint by Grant

in December 2011, Grant discussed JSO's with disabilities who had been assigned to duties that accommodated them. To his knowledge, these employees had not engaged in protected activity. duties that accommodate their disability.

17. A number of write-ups citing Grant for alleged violations of policy were given to him in 2012, shortly after HR received his complaint. In 2012 alone, Grant received an unprecedented six (6) write-ups, some were a violation of the FMLA by punishing Grant for allegedly not calling-in four hours before his shift for FMLA. The written reprimands for not calling in within the four-hour time-period was a blatant violation of the FMLA. Grant had been told in writing to call-in as soon as practical (as the law requires). Thus even if he called-in outside of the four hour window, Grant called in as soon as practical. Nevertheless, he was disciplined in April 2012. The FMLA write-ups would later be used in part as incidents to ultimately suspend without pay and to terminate him.

18. In addition to the alleged violation of the call-in policy, Defendant began to strictly scrutinize the observation reports of juveniles who he supervised. Prior to reporting Samuel, Grant had not been disciplined for FMLA call-in (which he had been exercising for years) and alleged discrepancies with his observation reports. Typically informal counseling was not included in the employee's file, but with Grant, Defendant included it and made it a part of the overall reason(s) to terminate him.

19. After the suspension in October 2012, Grant filed an EEOC Charge in November 2012, citing the suspension and the continued retaliation and harassment since reporting Samuel. He also stated in the Charge that he had been denied a reasonable accommodation under the ADA.

20. By November 2012, Defendant clearly had sufficient information to confirm what it already knew that Grant needed an accommodation to reduce the swelling in his legs, feet and

ankles. For a little over a year by this time, Samuel and other supervisors had assigned Grant to floors that required substantial walking and standing on cement floors.

21. Notwithstanding the EEOC Charge, Defendant still did nothing to correct its unlawful actions or accommodate Grant in either permitting him to elevate his feet and take breaks periodically or assigning him to JSO stations that did not require much walking or standing.

22. Defendant was already on notice about Grant's diabetes which caused chronic swelling of the feet, ankles and legs. As stated previously (before reporting Samuel), Grant had been approved for FMLA for years for diabetes. It was noted on multiple FMLA certification forms by his physician, that his diabetes caused feet, ankle and leg swelling (i.e., edema) that required him to be off at times.

23. To eliminate any excuse for not accommodating him, Grant's physician wrote a letter to Defendant requesting a similar accommodation in March 2013. Defendant's ADA policy did not require a physician's note. However making sure he had all bases covered, Grant told his physician a letter may be helpful. It was not. Defendant ignored the letter and did not readily grant the accommodation.

24. An EEOC investigator came to Defendant's facilities to understand the reasons no accommodation had been granted. Near this time, Defendant appeared to approve the elevation of the legs and breaks every 15 minutes. It refused to adjust his floor assignments. As late as July 2013, HR Director Shelton, claimed he needed more information to assess the accommodation. Yet, he did not request any additional information from Grant or his physician.

25. In the summer of 2013, Samuel placed grant on Samuel's Facebook page and insinuated that Grant was not working. Samuel even commented on his post after another employee posted a comment. The picture showed Grant's feet elevated on a break. The Facebook post placed

Grant in a bad light.

26. Grant reported the harassment to HR. After an investigation, Samuel was terminated. HR Shelton who met with Grant about the findings stated that he believed that firing Samuel would end his problems, clearly inferring that Shelton was fully aware that Samuel was harassing and retaliating against Grant for some time. Rather than look at prior write-up in light of Samuel's unethical and blatant violation of policy, Shelton did nothing and approved the termination of Grant a few months later.

27. The accommodation that Grant requested did not prohibit him from fulfilling the essential functions of a JSO. As stated many JSO's were assigned to duties that accommodated their disability while still working as a JSO. Moreover, the accommodation requested by Grant and his doctors were not overly burdensome for Defendant. Grant could have easily been placed in areas where he had been prior to reporting Samuel.

28. Though Defendant claimed Samuel was terminated, Samuel abruptly resigned without notice and cause on the day he was supposed to be terminated. Defendant accepted his resignation and rewarded Samuel. He would not have to disclose to future employers that he had been terminated by Defendant.

29. In October 2013, Grant was on constant watch of a resident when his supervisor, an admitted friend of Samuel, accused Grant of changing a code on the form. At the time of the incident, Grant did not know it was a problem. It was noted by JSO Supervisor Alfred. Alfred told Grant to write an exception report. Grant complied. He explained his pen malfunctioned during a time entry and he corrected the mistake. Thinking it was no problem or unlike many employees who had errors on observation logs, Grant worked for at least three weeks with no allegation of wrongdoing for the mistake.

30.     In mid- November 2013, Defendant called Grant into the office and told him that he had falsified a document and terminated him.  Though falsification of the document is considered misconduct, Defendant did not contest Grant's unemployment as it had others who it believed had engaged in misconduct before termination.

31.     To bolster the termination, it added a violation of the use of the electronic device policy.  Subsequently, Defendant admitted that regardless of the violation of the use of an electronic device, it would have made the same decision.  This rendered this policy merely additional pretext to unlawful discrimination, harassment and retaliation in case a lawsuit was filed.  Defendant admitted that it believed a lawsuit would be filed.

32.     Regardless, Johnson and other employees (including supervisors) had violated this policy many times.  No employee was terminated solely for this violation. Grant kept his phone on him because he was constantly accused of things that were merely incidents used to build a file to terminate him.  To support the discrimination, harassment and retaliation, he believed it was in his best interest to keep it near in case a conversation needed to be recorded or a picture showing other violations needed to be taken.  Grant was only trying to gather evidence to show discrimination, retaliation and harassment in case of termination or other adverse actions. No residents were included in any of Grant's recordings.

33.     After he was terminated, Defendant filed a second EEOC Charge and incorporated allegations in the first charge to show the continual nature of the retaliation and harassment.

34.     Defendant's reasons for terminating him are pretextual and manufactured to conceal unlawful discrimination, harassment and retaliation.

35.     If Defendant had not discriminated and retaliated against Grant, he would have

received a pay, pay increases, well as other employment benefits.

36. Grant has no plain, adequate, or complete remedy at law to redress the wrongs experienced and is now suffering and will continue to suffer irreparable injury from the treatment by Defendant unless he is reinstated and/or in lieu of reinstatement compensated for future lost employment benefits.

37. Grant suffered, is now suffering, and will continue to suffer emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary losses as a direct result of Defendant's discrimination, harassment and retaliation.

38. Grant will suffer future pecuniary losses as a direct result of Defendant's discrimination, harassment and retaliation.

39. Defendant intentionally engaged in discrimination and retaliation against Grant with malice or reckless indifference to his rights under the ADA and ADAAA as amended.

## VI. Cause of Action

40. Grant incorporates as if re-alleged herein paragraphs 1 through 39.

41. If Defendant had not engaged in protected activity, Defendant would not have suspended, terminated, or subjected Grant to a hostile work environment (harassment). In doing so, Defendant violated the ADA and ADAAA.

42. Because Defendant was put on notice of the ongoing retaliation and discrimination and because it failed to promptly investigate and remedy or correct the harassment, Defendant violated the ADA and ADAAA.

## VII. Prayer for Relief

43. Wherefore, Grant prays that this Court:

    a. declare the conduct engaged in by Defendant to be in violation of his rights;

    b.    enjoin Defendant from engaging in such conduct;

    c.    reinstate him to the position Juvenile Supervision Officer with all pay increases, seniority, and benefits as if he had not been terminated with a reasonable accommodation;

    d.    award him back pay, front pay, and other benefits lost because he was fired from November 2013 to present;

    e.    award him compensatory damages of $300,000.00;

    f.    award him monetary damages that were caused by the termination;

    g.    award prejudgment and post judgment interest;

    h.    award him reasonable costs and attorney's fees; and

    i.    grant such other relief as it may deem just and proper.

## VIII. Demand for jury

44.    Grant demands a jury trial.

Respectfully submitted,
    /s/   *Victoria Plante-Northington*
VICTORIA PLANTE-NORTHINGTON
Texas Bar No. 00798436
Federal Bar No. 21235
PLANTE LAW FIRM, P.C.
5177 Richmond Avenue Suite 1275
Houston, Texas 77056
Telephone: (713) 526-2615
Facsimile: (713) 960-0555
Email: victoria@plantelawfirm.com

ATTORNEY FOR PLAINTIFF
OTIS GRANT

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of November 2017, a true and correct copy of the foregoing instrument was sent via the e-filing electronic system to all counsel of record.

    /s/   *Victoria Plante-Northington*
VICTORIA PLANTE-NORTHINGTON