**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **OTIS GRANT**<br>          *Plaintiff,* | **CIVIL ACTION NO.: 4:16-CV-3529** |
| **V.** | |
| **HARRIS COUNTY,**<br>          *Defendant.* | **JURY TRIAL** |

<u>**DEFENDANT HARRIS COUNTY'S MOTION FOR SUMMARY JUDGMENT**</u>

Respectfully submitted,

OF COUNSEL:
VINCE RYAN
HARRIS COUNTY ATTORNEY

_____
SETH HOPKINS
Assistant County Attorney
Texas Bar No. 24032435
Federal (Southern District) No. 2043155
1019 Congress Plaza, 15th Floor
Houston, Texas  77002
(713) 274-5141 (telephone)
(713) 755-8924 (facsimile)
Seth.Hopkins@cao.hctx.net

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………….. ii

TABLE OF EXHIBITS…………………………………………………………… v

TABLE OF AUTHORITIES……………………………………………………… vii

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT…….……... 1

II.    STANDARD FOR SUMMARY JUDGMENT…..……………………… 1

III.   BACKGROUND AND PROCEDURAL HISTORY.................................... 2

       A. Grant's most important job was to monitor children and maintain an
          Observation Log…………………………..………………………….. 2

       B. Grant had a long history of neglecting vulnerable children in his care. 3

          1. Grant repeatedly took off his shoes at work, slept on duty, missed his
             shifts without providing notice, and neglected children……………….. 3

          2. On October 29, 2012, Grant was suspended for five days for falsifying
             his Observation Log and altering his supervisor's notes to conceal his
             falsification……………………………………………………….…….. 4

          3. On February 19, 2013, Grant was issued a Last Warning Letter……..... 4

          4. On October 29, 2013, Grant once again falsified his Observation Log,
             then altered his supervisor's report to conceal that he falsified his
             Observation Log……………………………..……………………… 5

       C. Grant engaged in similar misconduct at every one of his jobs…..……. 6

IV.    ARGUMENT……………………………………………………………. 7

       A. Grant did not have an impairment that substantially limited a major
          life activity……………………………………………………………….. 7

          1. Grant's ability to walk far surpasses that of the average person……… 7

          2. Grant's foot pain was not a disability under the ADA because it did
             not substantially limit his ability to walk……………………………… 9

3.  Grant's foot pain was not a disability because it was sporadic and temporary……………………………………………………………………   9

**B.  Grant did not need an accommodation……………………………………**   10

**C.  Grant never requested a reasonable accommodation…………………..**   11

1.  Grant had an affirmative duty to explain his disability, clearly identify the accommodation he wanted, and engage in an interactive discussion   11

2.  Grant never requested an accommodation, rejected Harris County's accommodation offers, and refused to engage in an interactive process……………………………………………………………………   11

13

**D.  Though he never asked for an accommodation, Grant was given one...**

**E.  Alternatively, Grant is not "otherwise qualified" as a JSO and would pose an undue staffing hardship and safety risk………………………..**   14

1.  Grant admits he is not qualified to perform the essential physical or administrative functions of a JSO…………………………………...   14

2.  There was no reasonable accommodation available to Grant…………   16

**F.  Grant was not treated differently than similarly situated non-disabled JSOs……………………………………………………………………..**   18

**V.  GRANT DOES NOT STATE A CLAIM FOR HARASSMENT OR RETALIATION…………………………………………………………….**   20

**A.  Grant fails to establish a claim for hostile work environment under the ADA…………………………………………………………………..**   20

**B.  Grant was not a member of a protected group…………………………**   20

**C.  Grant was not subjected to unwelcome harassment……………………**   20

1.  Grant's complaint about his supervisor scrutinizing others is not harassment…………………………………………………………….   20

2.  Asking Grant to follow the rules and stay out of the Control Booth on August 17, 2011 was not harassment…..……………………………   21

3.  Asking Grant to keep accurate Observation Logs is not harassment….   21

iii

4.  Giving Grant 15 minute breaks is not harassment……………….…….. 22

5.  Asking Grant not to walk off the job and abandon children is not       22
    harassment…………………………………………………….………… 23

6.  Giving Grant time off to attend his cousin's wedding is not            23
    harassment…………………………………………………………….. 24

7.  Grant cannot state an ADA claim for an employee's private Facebook
    post…………………………………………………………………….. 24

**D.  The alleged harassment was not based on Grant's alleged disability….  24**

**E.  The alleged harassment was not severe or pervasive and did not affect
    a term, condition, or privilege of employment…………………………..  25**

**F.  Grant fails to establish a claim for retaliation under the ADA………...**

**VI.    CONCLUSION AND PRAYER……………………………………......…  25**

# TABLE OF EXHIBITS

Attachment     Statement of undisputed material fact.

Attachment     Business records affidavit of Dr. Matthew Shelton

Exhibit 1      Affidavit of Melissa Watson.

Exhibit 2      Grant's 2012 and 2013 signed and initialed Observation Checklist Policy Acknowledgment (HC 183 & 610).

Exhibit 3      Excerpts from the October 25, 2017 deposition of Otis Grant.

Exhibit 4      Excerpts from the October 20, 2017 deposition of Anthony Samuel.

Exhibit 5      Grant's 2008 and 2009 evaluations (HC 245 & 251).

Exhibit 6      Exception Report by Supervisor Placido Solis, April 17, 2010 (HC 1048).

Exhibit 7      Grant's March 10, 2012 counseling notice to keep his shoes on and not prop his feet on desks while on duty in a secure facility (HC 1045).

Exhibit 8      Final Warning Letter sent to Grant on February 19, 2013 (HC 200-201).

Exhibit 9      Exception Report by Grant acknowledging he fell behind on his Observation Logs and that Supervisor Anthony Samuel had to complete them for him and counseling notice regarding this incident (HC 1046-47).

Exhibit 10     Letters to Grant regarding his failure to provide reasonable notice before missing work on April 1, 2012 and April 2, 2012 (HC 1050-51).

Exhibit 11     Grant's October 29, 2012 five day suspension for falsifying his Observation Log and altering his supervisor's notes to conceal his falsification (HC 178).

Exhibit 12     Affidavit of Alfred Bryant and Grant's altered Observation Log from the morning of October 29, 2013 (HC 222).

Exhibit 13     Grant's Termination Letter (HC 176-177).

Exhibit 14     Excerpts from October 23, 2017 deposition of Aaron Beasley.

Exhibit 15     Excerpts from October 26, 2017 deposition of Melissa Watson.

Exhibit 16     Affidavit of Dr. Matthew Shelton.

Exhibit 17     Use of Electronic Devices Policy (HC 606).

Exhibit 18     Excerpts from December 14, 2017 deposition of Giselle Jones-Robinson.

Exhibit 19    Grant's October 28, 2013 exception report regarding his "pen malfunction" (HC 156).

Exhibit 20    Grant's October 30, 2017 Responses to Harris County's Requests for Admission.

Exhibit 21    Certified employment records of Otis Grant from Fort Bend Independent School District, which include Grant's most recent resume (HC 4029-31).

Exhibit 22    Certified employment records of Otis Grant from Helfman Dodge (HC 4284-89 & 4319-4322).

Exhibit 23    Certified employment records of Otis Grant from the Center for Success (HC 3547).

Exhibit 24    Certified employment records of Otis Grant from Intracare Hospital (HC 4143-4147).

Exhibit 25    August 28, 2012 physician's statement releasing Grant to work "without restrictions" (HC 1875).

Exhibit 26    Grant's December 20, 2011 and March 6, 2012 "exception reports" (HC 1052-1058 & HC 1027-28).

Exhibit 27    Affidavit and report by Erika Owens (HC 1866-70).

Exhibit 28    Affidavit of Bianca Malveaux.

Exhibit 29    Dr. Matthew Shelton's July 11, 2013 Accommodation Letter to Grant (HC 211).

Exhibit 30    Plaintiff's Answers to Defendant's Interrogatories After Motion to Compel Order.

Exhibit 31    Juvenile Supervision Officer essential job functions.

Exhibit 32    Redacted termination letters of similarly situated Juvenile Supervision Officers.

Exhibit 33    Affidavit of Doris Phillips.

Exhibit 34    Plaintiff's Responses to Harris County's First Set of Interrogatories.

Exhibit 35    Investigation regarding January 5, 2013 incident in which Grant walked off the job for nearly 20 minutes (HC 992-995).

Exhibit 36    Redacted original copy of Grant's falsified October 29, 2013 Observation Log.

Exhibit 37    August 6, 2013 letter from Dr. Matthew Shelton to Otis Grant inviting Grant to contact him.

Exhibit 38    Affidavit of Aaron Beasley.

## **TABLE OF AUTHORITIES**

**Cases**

*Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 709 (D. Md. 2013)…………………….…..9

*Bleiweiss v. Panduit Sales Corp.*, No. CIV.A. H-13-0080, 2015 WL 163819 (S.D. Tex. Jan. 13, 2015)…………………………………………………………….………..7, 11, 16

*Celotex Corp. v Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)…….....2

*Chollett v. Patterson-UTI Drilling Servs., LP, LLLP*, No. CIV.A. V-08-27, 2011 WL 4592378, at *5 (S.D. Tex. Sept. 30, 2011)……………………………………………………….9

*Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017)……………………………..14, 24, 25

*Davis v. Ockomon*, 668 F.3d 473, 478 (7th Cir. 2012)……………………………………..…..3

*Dunlap v. Refuse Dep't Sanitary Dist.*, No. 3:05-CV-214RM, 2006 WL 1707268, at *5 (N.D. Ind. June 19, 2006)……………………………………………………………....19

*E.E.O.C. v. Chevron Phillips Chemical Co., LP,* 570 F.3d 606, 619 (5th Cir.2009)…………….9

*Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 36 (D.D.C. 2011)…………....10

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 236-237 (5th Cir. 2001)……...………24

*Ingles v. Neiman Marcus Grp.*, 974 F. Supp. 996, 1003 (S.D. Tex. 1997)………………...…..9

*Marsh v. Terra Int'l (Oklahoma), Inc.*, 122 F. Supp. 3d (N.D. Okla. 2015)…………..….15, 18

*Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995)………………………………17

*Morris v. Covan World Wide Moving*, 144 F.3d 377, 380 (5th Cir. 1998)………………….…..2

*Neely v. PSEG Texas, Ltd. Partnership,* 735 F.3d 242, 245 (5th Cir.2013)………………………7

*Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437 (5th Cir. 2017)…………………..………...11, 20

*Stafford v. True Temper Sports*, 123 F.3d 291, 294 (5th Cir. 1997)………………………………2

*Stewart v. Mississippi Transp. Comm.,* 586 F.3d 321, 332 (5th Cir. 2009)………………….....25

*Texas Mfr'd Housing Ass'n v. City of Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied*, 521 U.S. 1112 (1997)…………………………….…………………………………2

*Williamson v. Clarke Cty. Dep't of Human Res.*, 834 F. Supp. 2d 1310, 1316
(S.D. Ala. 2011)……………………………………………………..……...…11

**Statutes**

42 U.S.C. § 12102(2)-(4)……………………………………………………………7

42 U.S.C. § 12111(8)………………………………………………...…………….7


**Code of Federal Regulations**

29 C.F.R. § 1630(k) & (l)……………………………………………...……….7

29 C.F.R. § 1630.2……………………………………………………………….17

29 C.F.R. § 1630.2(n)……………………………………………...….17


**Rules**

Federal Rule of Civil Procedure 56……………………………………………1, 2

Southern District of Texas Local Rule 7……………………………...………1

## DEFENDANT HARRIS COUNTY'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7, Defendant Harris County respectfully files this Motion for Summary Judgment, and represents as follows:

## I.
## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Otis Grant was a Juvenile Supervision Officer ("JSO") who was fired from the Harris County Juvenile Probation Department ("Center") for using an unauthorized electronic device in a secure facility, falsifying a government document, and altering his supervisor's report to hide his misconduct. That was the second time in a year Grant was caught altering documents to cover up his dereliction of duty, and his eighth disciplinary infraction in 20 months.

No reasonable employee would expect to keep his job under these circumstances, yet Grant claims he did nothing wrong and that at least 11 co-workers conspired to have him fired because he was allegedly disabled. There is no issue of material fact that Grant—whose current job is to stock lumber and paint at Home Depot—is not disabled, never requested a reasonable accommodation, admitted he did not need an accommodation, and refused to engage in an interactive process with Harris County to discuss his complaints. Grant is unable to meet any of the elements required to state a claim under Title I of the ADA, and Harris County respectfully requests that summary judgment be granted and all claims be dismissed.

## II.
## SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

1

party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). *See,*
*Celotex Corp. v Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment has the initial burden of demonstrating the
absence of a material fact issue with respect to those issues on which the movant bears the
burden at trial.  The nonmovant then has the burden of producing significant probative evidence
that there is an issue of material fact to warrant a trial. *See Texas Mfr'd Housing Ass'n v. City of*
*Nederland*, 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied*, 521 U.S. 1112 (1997).  This issue
of material fact must be "sufficient to support a jury verdict." *See Morris v. Covan World Wide*
*Moving*, 144 F.3d 377, 380 (5th Cir. 1998).  The nonmovant cannot rely on allegations or denials
in his pleadings. Instead, he must present specific facts which show the existence of a genuine
issue concerning every essential component of his case. *See Morris, Id*.  A dispute about a
material fact is genuine only if the evidence is such that a reasonable jury could return a verdict
for the nonmoving party. *See Stafford v. True Temper Sports*, 123 F.3d 291, 294 (5th Cir. 1997).

### III.
### BACKGROUND AND PROCEDURAL HISTORY

**A.  Grant's most important job was to watch children and maintain an Observation Log.**

The Harris County Juvenile Probation Department is responsible for assuring the safety
of 500 children who have been remanded into custody because they pose a threat to themselves
or others. An at-risk child can commit suicide in a matter of minutes, so Texas law strictly
requires the Center to monitor these children at either 10 or 15 minute intervals while they are in
their rooms, and to maintain a detailed Observation Log of their activities by recording: (1) the
<u>exact</u> time (using a designated clock), (2) a code indicating what each child was doing at that
exact time, and (3) the initials of the officer observing the child at that exact time.[1]

---

[1] Exhibit 1, Affidavit of Melissa Watson and Exhibit 38, Affidavit of Aaron Beasley.

The Observation Logs were so important that in 2012 and 2013, every JSO was required to sign an Agreement signifying he would follow these rules.  Grant promised that if he made a mistake on his Log, he would "draw a line through the mistake" and "not write over the area to correct the mistake."  He also promised that if he failed to monitor a child's activity on schedule, he would complete an "exception report" explaining why he failed to follow procedures.  Finally, Grant promised he would never record a time unless he viewed a child "at that actual moment," and if he recorded an incorrect time, he had "falsified that document."[2]

In both 2012 and 2013, Grant initialed in four places to signify: (1) "I have been notified of the attached listed new/revised procedures," (2) "They have been explained and I fully understand the above listed procedures and have been given the opportunity to ask questions," (3) "I have received a copy of the above listed procedures and I understand that violation of these procedures may lead to additional sanctions and/or including termination," and (4) "I will adhere to the above listed procedures."[3]

## B.  Grant had a long history of neglecting vulnerable children in his care.

### 1.  Grant repeatedly took off his shoes at work, slept on duty, missed his shifts without providing notice, and neglected children.

Grant's supervisors ranked him among the Center's worst staff and repeatedly caught him sleeping on the job and falsifying Observation Logs—two activities that placed children at risk.[4] In 2008 and 2009, Grant's performance reviews indicated he needed to "pay more attention to detail when filling out observational checklists" (Exhibit 5). On April 17, 2010, Supervisor

---

[2]  Exhibit 2, Grant's 2012 and 2013 Agreements; Exhibit 38, Affidavit of Aaron Beasley.

[3]  Exhibit 2, Grant's 2012 and 2013 Agreements. Grant initially refused to sign the Agreement and was terminated. However, he changed his mind, signed, and talked his way back into his job. Exhibit 3, Grant deposition at 34:24-36:18. Grant still believes he was not bound by these policies because he signed "under duress." Exhibit 3 at 242:4-243:25. It is well established that an employee can be fired for refusing to agree to follow workplace policies. *See Davis v. Ockomon*, 668 F.3d 473, 478 (7th Cir. 2012). That alone is dispositive of Grant's case.

[4]  Exhibit 4, Samuel deposition at 47:15-19, 57:7-10, 96:13-21, and 221:15-222:7.  Exhibit 33, Phillips Affidavit.

Placido Solis noticed that Grant failed to monitor children in his care for <u>58 minutes</u>. A few hours later, Grant again neglected them for <u>45 minutes</u> (Exhibit 6).

On <u>December 10, 2011</u>, Grant defiantly <u>took off his shoes and propped his bare feet up on a table while on duty</u>. He was not disciplined, but was counseled that he had to keep his shoes on while watching children (Exhibit 7). On <u>February 11, 2012</u>, Grant once again put his bare feet on a table (Exhibit 8). The next day, Grant admits he fell behind on his Observation Logs and that Supervisor Anthony Samuel discovered this and had to complete Grant's logs for him (Exhibit 9). On <u>March 3, 2012</u>, Supervisor Doris Phillips discovered that Grant once again failed to supervise children in his care (Exhibits 8 & 33). On <u>April 1 and 2, 2012</u>, Grant stayed home from work, but failed to give proper notice, thus creating a staffing hardship (Exhibits 1 & 10).

**2. On October 29, 2012, Grant was suspended for five days for falsifying his Observation Log and altering his supervisor's notes to conceal his falsification.**

After returning from an extended absence for an unrelated condition, Grant's misconduct grew more serious. On <u>October 23, 2012</u>, Samuel noticed Grant had not completed his Observation Log. Samuel documented the lapse and marked a code "<u>88/2</u>" (indicating Grant's deficiency). After Samuel left, Grant retrieved the form and <u>wrote in false times to make it appear he had watched the children</u>. Grant did not dispute this fraud and was suspended for five days. He was warned he could be fired for another violation (Exhibit 11).

**3. On February 19, 2013, Grant was issued a Last Warning Letter.**

On <u>January 13, 2013</u>, Grant walked off the job without telling anyone for nearly 20 minutes. Though he could have been fired, he was given a <u>Last Warning Letter</u> on <u>February 19, 2013</u>. This letter summarized Grant's violations and stated in unequivocal terms: "***<u>Mr. Grant, please note that this memorandum is your FINAL WARNING that any further violation of policy will lead to immediate termination</u>***." (Exhibit 8). Grant signed the letter.

4

### 4. On October 29, 2013, Grant once again falsified his Observation Log, then altered his supervisor's report to conceal that he falsified his Observation Log.

Grant finally went too far on <u>October 29, 2013</u>. His only job was to sit in a chair, watch a high-risk child through a window, and record what the child was doing every 10 minutes. Grant admits he never had to stand or walk, and he did not require any type of accommodation.[5] Rather than face the window he was supposed to be watching, Grant pushed his table and chair back in an attempt to evade the camera, then propped his foot on a chair to <u>cover</u> the window:



At <u>1:55 a.m.</u>, Supervisor Alfred Bryant noticed that Grant's Log showed he had checked on the child at <u>1:58 a.m.</u>—which was impossible, since that was *three minutes away*. In keeping with policy, Bryant pointed this out and made a new entry at 1:55, with the code "<u>88/2</u>", which signified an irregularity in Grant's Log. The next day, Bryant noticed the Log had been altered in two ways. First Grant changed "<u>1:58</u>" to "<u>1:55</u>" to conceal his false entry.  Second, Grant changed Bryant's code from "<u>88/2</u>" to "<u>99/2</u>".  A code "99" means there was no error (Exhibit 12). These alterations can be clearly seen below:[6]



---

[5]  Exhibit 3, Grant Deposition at 260:7-23.

[6]  Exhibit 12, Affidavit of Alfred Bryant and Exhibit 36, Grant's falsified Observation Log.

This serious misconduct violated nearly every term of the Agreement Grant signed in 2012 and 2013, and is strikingly similar to the fraud Samuel caught Grant committing one year earlier. Grant could no longer be trusted watching children. Before he was fired, a committee reviewed surveillance footage for any mitigating factors. Instead of exonerating Grant, the footage incriminated him and showed that he also secretly used his cell phone on duty and tried to hide it under a table.[7]  The Center prohibits JSOs from using cell phones on duty.[8]

Grant could provide no reasonable explanation for any of this. He disingenuously claimed that an unspecified "pen malfunction" made him write the incorrect time,[9] admitted to frequently using his cell phone at work,[10] and never gave any excuse for why Bryant's code was changed from "88" to "99." Grant committed insubordination of the highest order, and Harris County had no choice but to terminate him.[11] Not surprisingly, Grant claimed at least **91 times** during his deposition that he could "*not recall*" basic information about these facts, and he admits to withholding or destroying "a lot" of documents related to his claim. (*See* Doc.49).

## C.  Grant engaged in similar misconduct at every one of his jobs.

Harris County was the only employer willing to tolerate Grant's antics for so long. After leaving Harris County, Grant concocted a resume that is a work of extraordinary fiction that he uses to job-hop from one scandal to another. Grant tells prospective employers that while at Harris County, he "Created the 'A-Chart' organizational tool that was used for structuring inmate analysis." No such "tool" exists.[12] In the same resume, he claims he sold cars at Helfman Dodge for seven years, but he actually lasted only six weeks before being fired for being late, not paying

---

[7] Exhibits 1 & 13; Exhibit 14 at 34:1-5; Exhibit 15 at 178:2-179:6; Exhibit 16; and Exhibit 38.

[8] Exhibit 17, Electronic Use Policy; and Exhibit 18 at 23:4-28:6.

[9] Exhibit 19. Despite this "pen malfunction," Grant continued to use the same pen.

[10] Exhibit 20, Grant's Response to Request for Admission No. 5.

[11] Exhibits 1 & 13, Exhibit 14 at 33:17-20, and Exhibits 16 & 38.

[12] Exhibit 21 at HC 4029-31 and Exhibit 16, Affidavit of Dr. Matthew Shelton.

attention, and "sleeping and had his foot on his desk."[13] Grant claims to have worked four years at Intracare Hospital, but that job lasted less than three months before he was fired for failing to show up for work.[14] After leaving Harris County, Grant tried working at the Center for Success but quit while on probation for being late and using a cell phone at work.[15]

## IV.
## ARGUMENT

**A. Grant did not have an impairment that substantially limited a major life activity.**

**1. Grant's ability to walk far surpasses that of the average person.**

To survive summary judgment, Grant must first establish he is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A disability is "(A) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." The ADA Amendments Act broadened the definition of a disability in 2008 by adding 42 U.S.C. § 12102(2)-(4).[16]

Grant's only alleged impairment was that his feet would swell and hurt once or twice per month.[17] Grant never saw a specialist—or even a doctor—about his feet, except to sporadically

---

[13] Exhibit 22 at HC 4319-22. Grant stated he had a medical issue but did not need an accommodation. He promised he "will not sleep and put his feet on his desk" and would not "allow this to happen again."

[14] Exhibit 24, Intracare records at HC 4151 & 4185.

[15] Exhibit 23 at HC 3583-84 & 3599 and Exhibit 3, Grant deposition at 335:20-336:14.

[16] *Neely v. PSEG Texas, Ltd. Partnership,* 735 F.3d 242, 245 (5th Cir.2013); *Bleiweiss v. Panduit Sales Corp.,* No. CIV.A. H-13-0080, 2015 WL 163819, at *7 (S.D. Tex. Jan. 13, 2015). Grant has not—and cannot—assert a "record of an impairment." "To have a record of such an impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." 29 C.F.R. 1630(k) & (l). The only medical records regarding Grant's feet were forms related to occasional FMLA use, which, as discussed *infra*, do not suggest Grant's ability to walk was ***permanently and substantially*** impaired. Grant also does not allege Harris County "regarded him" as being ***permanently and substantially*** impaired in his ability to walk.

[17] Grant was diagnosed with diabetes, but he does not claim he needed accommodations to monitor his blood sugar, use insulin, or treat his condition. The only alleged job-related impairment was that his feet sometimes hurt and he

visit a sports medicine clinic in Katy. He <u>designated no expert, had no surgery, never needed an</u> <u>orthopedic device to walk, never had prescription shoes</u> (he buys his shoes at Nordstrom), and <u>never even wore basic compression socks.</u>[18]  On <u>August 28, 2012</u>, a physician who treated Grant for an unrelated condition released him to work "**without restrictions**" (Exhibit 25 at HC 1875).

Grant's mild foot condition never limited any major life activity. Both during and after his time at Harris County, Grant worked a string of physically demanding jobs. In 2011, Grant worked a second job as a technician at Intracare Hospital, where he acknowledged being able to spend <u>80-90% of the time standing, walking, and kneeling</u>.[19]

After leaving Harris County, Grant took a job removing cable boxes from houses before trying to find work as an offshore **oilfield roustabout**—one of the most strenuous jobs possible. He testified that he understood how demanding a roustabout's work is and that he could do the job because he was in "<u>sound physical condition</u>."[20]

Grant now spends his days on the field coaching football, where he acknowledges being able to stand and walk.[21]  At night, Grant works as a Home Depot freight associate **walking on a** **cement floor and climbing up and down a ladder while lugging heavy paint cans and** **lumber to stock shelves**. Grant walks "**all night**" from 9 p.m. to 5:30 a.m.[22]  That would be hard on anyone's feet, and it establishes that Grant's abilities far surpass that of a typical person.

Though Grant's work at Home Depot is far more strenuous than it was at Harris County, he admits that he never requested—or needed—an ADA accommodation:

---

needed to "sit down for periods of time." *See* Doc. 61, Third Amended Complaint at ¶ 10. At times, everyone has swollen and aching feet. That does not render everyone disabled.

[18] Exhibit 3, Grant deposition at 300:16-303:11.

[19] Exhibit 24 at HC 4147.

[20]  When asked about the inconsistency of claiming to be disabled while seeking such a job, Grant angrily stated, "<u>This has nothing to do with this case or pertaining to this case</u>." Exhibit 3 at 307:12-310:20.

[21] Exhibit 21, Fort Bend Independent School District Records at HC 4014.

[22] Exhibit 3, Grant deposition at 337:21-338:24; 341:21-25; & 342:23-343:21.

Q.   You have never made a formal ADA accommodation request with Home Depot?

A.   **No, I have not**.  But in my signing of this job, it asked: Did you want to talk about anything that was wrong with you? And I checked that I am disabled. And then it asked did I want to talk about it. I checked **I did not want to talk about it**.[23]

### 2.   Grant's foot pain was not a disability under the ADA because it did not substantially limit his ability to walk.

It is well established that occasional foot pain and swelling is not a disability under the ADA. In the *Ingles* case, a Neiman Marcus waiter was diagnosed with diabetes that caused vascular disease, peripheral sensorimotor neuropathy, foot ulcers requiring multiple surgeries, and amputation of a toe and the bone behind it. As a waiter, Ingles' job required that he walk all day. For a while, Neiman Marcus allowed Ingles to work in the carpeted section of the restaurant to ease the pain on his amputation wounds, but it ultimately withdrew that accommodation.

The Southern District of Texas held that Ingles was not disabled under the ADA. "While Ingles's diabetes has adversely affected his feet, it has not substantially limited his ability to walk as required by the ADA." *Ingles v. Neiman Marcus Grp.*, 974 F. Supp. 996, 1003 (S.D. Tex. 1997). The Court was persuaded by the fact that Ingles was able to work other jobs and could walk on hard surfaces, though it caused pain.[24] Grant's condition is similar—but far less serious. Unlike Ingles, Grant can walk "***all night***." Exhibit 3, Grant deposition at 337:21-343:21.

### 3.   Grant's foot pain was not a disability because it was sporadic and temporary.

The Fifth Circuit has repeatedly held that "temporary impairments are not sufficient to constitute 'disabilities' under the ADA." *Chollett v. Patterson-UTI Drilling Servs., LP, LLLP*, No. CIV.A. V-08-27, 2011 WL 4592378, at *5 (S.D. Tex. Sept. 30, 2011). *See also, E.E.O.C. v.*

---

[23]  Exhibit 3, Grant Deposition at 342:1-7. Grant never sought accommodations **at any job**.

[24]  *See also, Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 709 (D. Md. 2013). That case found that a nurse with diabetes, post-traumatic stress disorder, sleep apnea, peripheral neuropathy, and fibromas of the feet was not disabled because these impairments did not substantially limit major life activities. Bennett's affidavit, testimony, and "scant, one-page document stating that Plaintiff has chronic pain in his feet that limits his ability to walk or stand for prolonged periods of time" was insufficient to establish he was disabled, since people commonly experience foot pain and have differing abilities to walk.

*Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 619 (5th Cir.2009). Conditions such as plantar fasciitis (which Grant now claims he was diagnosed with, but never disclosed to Harris County prior to filing suit) are not disabilities under the ADA because of their sporadic nature. *Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 36 (D.D.C. 2011).

Grant's own physician concluded that Grant's foot pain was intermittent and temporary and would possibly occur "***one or two times per month***." During these times, Grant could walk, but should avoid doing so for a "***prolonged***" period.[25] By Grant's own admission, his condition was sporadic, temporary, and did not cause a significant and permanent impairment.

**B.  Grant did not need an accommodation.**

Assuming, *arguendo*, Grant was disabled, he admitted he did not need accommodation.[26] He testified that in 2011, 2012, and 2013, he could "stand/walk throughout the majority of the shift," exert 20 to 50 pounds of force, and engage in "frequent standing, stooping, bending, pulling, and walking."[27]  These are essential functions for a JSO.[28]

Grant was already working the easiest shift at the Center, and employees with disabilities often asked to work nights as an accommodation because it required less physical activity than the day shifts.[29] Grant's shift could be as sedentary as sitting in a chair and as active as walking down a hall once every 15 minutes to check on children. He rarely walked more than a few minutes and took breaks as needed.[30] This is far less strenuous than Grant's work at Home Depot, for which he admits he does not need an accommodation.

---

[25] Exhibit 3, Grant deposition at 105:23-106:3, 102:16-19.

[26] Exhibit 3, Grant deposition at 178:13-17.

[27] Exhibit 3, Grant deposition at 298:4-299:24.

[28] Exhibit 31 at HC 215-218.

[29] Grant acknowledged his shift was easy because the children he supervised were generally asleep, and there was less walking required.  Exhibit 1; Exhibit 3 at 184:1-186:1; and Exhibits 16 & 38.

[30]  Exhibits 1, 16, & 38. Other JSOs were accommodated by being placed on Grant's shift.

**C.  Grant never requested a reasonable accommodation.**

**1.  Grant had an affirmative duty to explain his disability, clearly identify the accommodation he wanted, and engage in an interactive discussion.**

The Fifth Circuit places the burden on <u>Grant</u> to (1) timely contact Harris County, (2) <u>clearly</u> identify his disability, (3) <u>explain</u> his limitations, and (4) suggest a <u>specific</u>, <u>reasonable</u> accommodation. After notifying Harris County of his specific request, Grant was then required to engage in a "<u>flexible, interactive discussion</u>" with Harris County:

> The plaintiff bears the burden of requesting reasonable accommodations. The employee who needs an accommodation because of a disability has the responsibility of informing her employer. Where the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee ... to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations. If the employee does so, the employer and the employee should engage in a flexible, interactive discussion to determine the appropriate accommodation.[31]

**2.  Grant never requested an accommodation, rejected Harris County's accommodation offers, and refused to engage in an interactive process.**

Grant did none of these things. He often filed "exception reports" filled with a rambling litany of complaints and excuses for his misconduct. Twice—on <u>December 20, 2011</u> and <u>March 6, 2012</u>—these reports made vague references to his feet hurting and his inability to do his job.[32]

The Center asked an independent investigator to review Grant's complaints. The investigator found no evidence to support his allegations, but noted that Grant hinted it would be nice if the Center rearranged staff so he could work in the coveted control booth position most of

---

[31] *Bleiweiss v. Panduit Sales Corp.*, No. CIV.A. H-13-0080, 2015 WL 163819, at *9 (S.D. Tex. Jan. 13, 2015)(internal punctuation and citations omitted). *See also, Williamson v. Clarke Cty. Dep't of Human Res.*, 834 F. Supp. 2d 1310, 1316 (S.D. Ala. 2011). (Employee stated he was disabled but was unclear about what accommodation was needed and never submitted a written request). *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 444-445 (5th Cir. 2017) (An employee must clearly link a specific medical disability with a specific request).

[32] The December 20, 2011 exception report is the first written notice Grant provided that he might need an accommodation. In that document, he was gaming for a vacation and stated a "Just and Fair Solution" to his grievance would be to <u>have Friday and Saturday nights off</u>. Exhibit 26 at HC 1052. Harris County responded to this document within days.

the time, even though Grant constantly fell asleep in the control booth.[33] On <u>December 27, 2011</u>, Assistant Deputy Director of Administrative Services Bianca Malveaux took the initiative to meet with Grant in person and by phone to learn about his needs. **<u>Grant admits he told Malveaux he did not want an accommodation</u>**.[34] He further admits he had **<u>no medical documentation indicating why he needed an accommodation</u>**.[35] Grant agreed to call Malveaux back if he changed his mind, but he never did.[36]

A few months later, Grant asked his physician to write a note requesting 15-minute breaks to prop up his feet.[37] Rather than provide that note to Malveaux, he gave it to another employee, who forwarded it to Dr. Matthew Shelton. Grant admits the note was superfluous, since he was <u>always</u> allowed 15-minute breaks.[38] In 2013, Grant's doctor mentioned on an FMLA form that Grant should have 15 minute breaks, so Dr. Shelton again tried to engage in an interactive process with Grant. He sent Grant a follow-up letter on <u>July 11, 2013</u> to confirm that Grant was receiving breaks and to see if Grant had any special requirements for where and when he took his breaks.[39] <u>Grant received the letter, but ignored it</u>.[40]

Dr. Shelton scheduled a subsequent meeting with Grant on <u>August 6, 2013</u> in which he once again attempted to discuss what accommodations Grant needed. Grant secretly recorded the

---

[33] Exhibit 27, Owens Report; Exhibit 33, Phillips Affidavit, & Exhibit 38, Beasley Affidavit.

[34] Exhibit 20, Grant's Response to Request for Admission No. 4, admitting that on December 27, 2011, he told Bianca Malveaux that he "<u>did not want to make an ADA accommodation request</u>." *See also,* Exhibit 28.

[35] Exhibit 20, Grant's Responses to Request for Admission Nos. 81-83.

[36] Exhibit 3 at 89:6-8 and Exhibit 28, Affidavit of Bianca Malveaux.

[37] Exhibit 3, Grant deposition at 212:23-213:4. Grant's physician was apparently under the misimpression that Grant walked continuously through the night. In reality, he sat most of his shift and only occasionally walked down a hallway when on a particular round. *See also* Exhibits 1, 16, & 38.

[38] Exhibit 3, Grant deposition at 122:23-25. In his entire career, Grant complained only once about his breaks—a single incident on January 5, 2013, discussed on page 22, in which he abandoned children and walked off the job without telling anyone. Rather than reprimand Grant, the Center immediately instructed all administrators and supervisors to give Grant priority when he wanted a break. Grant never again complained about the lack of breaks *See also,* Exhibits 1, 16, & 38.

[39] Exhibit 29 at HC-211 and Exhibit 16, Affidavit of Dr. Shelton.

[40] Exhibit 3 at 119:6-8, 123:24-124:5, 111:18-24 & 112:15-18.

meeting, but deleted parts of the tape harmful to his case. In his haste to destroy evidence, Grant forgot to erase a portion of the tape where <u>Dr. Shelton asked about his feet and suggested that they talk about an accommodation</u>.[41] Grant's tape revealed that instead of <u>engaging</u> in an interactive process, Grant <u>avoided</u> it by changing topics to discuss his vacation and friends in the entertainment industry.[42] When Grant learned during his deposition that he inadvertently produced this part of the recording, he incredulously demanded that the clip be replayed three times, then broke down and admitted **he should have—but did not—ask Dr. Shelton for an accommodation**.[43]

On November 3, 2017, the Court compelled Grant to answer Interrogatory 6 and identify "<u>the exact accommodations that you requested</u>" and the dates and people to whom the requests were made (*See,* Doc. 34). Other than mentioning his FMLA (which is not part of this lawsuit) **<u>Grant did not identify a single accommodation request</u>**.[44] Grant resolved any doubt about this topic when he admitted <u>he does not recall ever asking for an accommodation</u>:

> Q.    What accommodation request did you want from Harris County related to your disability?
>
> A.    **<u>I can't recall at this time</u>**.[45]

**D.  Though he never asked for an accommodation, Grant was given one.**

As noted, the closest Grant ever came to a meaningful accommodation request was to ask for 15-minute breaks to prop up his feet. Grant admits he was always provided with this:

> Q.    **<u>But you were getting 15-minute breaks</u>**, weren't you, Mr. Grant, when you needed them?

---

[41]  Exhibit 3, Grant deposition at 135:2-14 and Exhibit 16.

[42]  Exhibit 3, Grant deposition at 145:22-147:1 and Exhibit 16.

[43]  Exhibit 3, Grant deposition at 140:3-12, 342:13-15 and Exhibit 16.

[44]  Exhibit 30, "Plaintiff's Answers to Defendant's Interrogatories After Motion to Compel Order" at No. 6.

[45]  Exhibit 3, Grant deposition at 89:6-8. *See also,* Exhibit 18, 129:5-7.

A.    **Yes**.[46]

Grant's own doctor did not advocate any additional accommodation, and certainly did not advocate reassigning him to the control booth or any other more sedentary position. In fact, Grant's physician criticized him for not walking enough and recommended that he walk more.[47] Grant admits his doctor had a sound medical reason for this decision and "...doesn't want to lose his license, so he's the one who knows if this was needed for me or not."[48]

**E. Alternatively, Grant is not "otherwise qualified" as a JSO and would pose an undue staffing hardship and safety risk.**

**1. Grant admits he is not qualified to perform the essential physical or administrative functions of a JSO.**

Grant has the burden to prove he is "otherwise qualified" to perform the essential functions of his job. *Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017). Assuming, *arguendo*, Grant was disabled and requested an accommodation, he could not fulfill the essential functions of a JSO and posed an undue hardship and safety risk to the institution.

The Fifth Circuit holds that a court can _only_ consider an "employer's judgment" of what constitutes an essential job function, and that a job description "shall be considered evidence of the essential functions of the job." An employee's assessment of his own job functions are given little to no weight. *Credeur*, 860 F.3d at 792-793.

In 2012, the Center uniformly implemented job descriptions for all JSOs based on model descriptions promulgated by the U.S. Department of Labor.[49] A JSO is an "Essential Employee" who must ***frequently stand, stoop, bend, pull, and walk*** and must specifically be able to

---

[46] Exhibit 3, Grant deposition at 122:23-25 & 221:21-23. Grant was also allowed to wear tennis shoes instead of standard uniform shoes as an additional accommodation. *Id.,* Grant deposition at 327:11-14.

[47] Exhibit 20, Grant's Response to Request for Admission No. 44. Exhibit 3, Grant deposition at 104:5-7.

[48] Exhibit 3, Grant deposition at 216:2-218:6.

[49] Exhibits 1, 16, & 38.

"***stand/walk throughout the majority of the shift***" and exert 20 to 50 pounds of force occasionally and 10 to 25 pounds of force frequently.[50]

These standards are logical. A JSO must respond to emergencies, help fellow officers, and safeguard troubled children in his care. He is the first line of protection, and if he cannot walk, break up fights, take others' shifts, and restrain violent residents, he cannot do his job and jeopardizes the safety of the institution.[51] Grant repeatedly claimed he could not safely work as a JSO.[52] By his own admission, he was not qualified for the job.[53]

Grant was also not qualified to complete the job's most basic administrative requirements. As noted, Grant was asked to sign and initial his understanding of the procedures for completing Observation Logs. Grant was the only employee who initially refused to sign,[54] and he still claims he signed under "*duress*" and never agreed to follow the Center's procedures.[55] Grant knew his Observation Logs were vital government records that were synced to a designated clock on each floor, but no matter how many times this was explained to Grant, he could not grasp why he could not use his cell phone or other clocks in the facility. He argued ferociously to his supervisors that everyone should sync *their* logs with *his* cell phone.[56] Grant was either deliberately obstinate or genuinely unable to understand this essential job function. Either way, he was not qualified to work as a JSO for this reason as well.

---

[50]  Exhibit 31 Juvenile Supervision Officer essential job functions at HC-215-218.

[51]  Exhibits 1, 16, & 38.

[52]  Grant wrote on his job description that he was incapable of meeting the essential functions of his job and needed "light duty." Exhibit 31. Grant also admitted on his exception reports that he was slower than his peers and posed a safety threat to the children. Exhibit 26.

[53] *See Marsh v. Terra Int'l (Oklahoma), Inc.*, 122 F. Supp. 3d 1267, 1275 (N.D. Okla. 2015), holding that an employer may fire an employee who expresses concern that his disability makes it unsafe for him to perform the essential functions of his job.

[54]  Exhibit 18, Robinson deposition at 130:7-131:13 & Exhibit 38, Beasley Affidavit.

[55]  Exhibit 3, Grant deposition at 242:4-246:5; Exhibit 20, Grant's Response to Request for Admission No. 19.

[56] Exhibit 38, Beasley Affidavit.

### 2.  There is no reasonable accommodation to JSOs unable to walk their shifts.

Grant has no idea what accommodation he wanted—and even less of an idea of whether his desired accommodation was reasonable or available. This District holds:

> While the employee has a right to a reasonable accommodation, the right is not to his preferred accommodation. The employee bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform. A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously.[57]

JSOs rotate between: (1) walking the floor about two minutes of every 15 minutes, (2) working the central control booth, and (3) sitting down and watching a particular child on a rotation known as Constant Watch. There are few control booth positions on Grant's shift, and Constant Watch is only available when a child is suicidal or in need of particular care.[58]

Unlike most businesses, the Center is mandated by law to maintain minimal staffing levels. Staff frequently get sick, have emergencies, go on vacation, and quit. When that happens, the Center scrambles to find enough personnel to fill each position. This requires that staff work as long as 16 hours per day and cover for each other when they take breaks. Because of the fluid nature of staffing, each officer must be available to fill emergent staffing needs.[59]  This district explains that the ADA does not require the Center to change this arrangement for Grant:

> The ADA does not require an employer to reassign the employee to an occupied job, create a new job, eliminate essential functions of a job, or assign existing employees or hire new employees to perform the functions of the employee's job that the employee could not perform.

*Bleiweiss v. Panduit Sales Corp.*, No. CIV.A. H-13-0080, 2015 WL 163819, at *8 (S.D. Tex. Jan. 13, 2015). When a JSO has a short-term impairment, such as recovering from surgery, the Center attempts to place him on Constant Watch or in the control booth. However, these

---

[57]  *Bleiweiss v. Panduit Sales Corp.*, No. CIV.A. H-13-0080, 2015 WL 163819, at *9 (S.D. Tex. Jan. 13, 2015).
[58] Exhibits 1, 16, & 38.
[59] Exhibits 1, 16, & 38.

positions are in short supply, and there was no permanent sedentary job available for Grant in 2011-2013.[60] To place Grant in the control booth position would have affected the rotation of all JSOs, imposed higher workloads on other employees, eliminated the essential functions of a JSO's job, and made temporary accommodations unavailable to JSOs who actually had impairments. That would have been particularly inappropriate, since Grant had no medical evidence of a need to work in the control booth and refused to engage in an interactive process.

Harris County was also not required to jeopardize the safety of its residents or staff by lowering its standards because of Grant's alleged disability:

> An accommodation that would result in other employees having to work harder or longer hours is not required. Slowing the production schedule or assigning plaintiffs lighter loads would fundamentally alter the nature of defendant's warehouse operation, a change not demanded by the law.[61]

Grant admits he is slower than other employees. As noted, he also falsifies documents, ignores rules, and sleeps at work. Grant seemingly wanted exactly what the ADA prohibits—to do less work and require the Center to accept lower standards of safety.

To the extent Grant claims he was accommodated prior to 2012, and that this establishes he could be accommodated, that argument fails as well. First, Grant's evaluations prior to 2012 establish that he has always rotated like other JSOs and "worked in various capacities (supervising youth, laundry room, inventory, and central control)."[62] Second, as noted, the

---

[60]  Exhibits 1, 16, & 38. *See also,* Exhibit 18, Deposition of Giselle Robinson at 128:2-5. ("**No, there's no JSO position that doesn't require walking**.")

[61]  *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995). The interpretive guidance to 29 C.F.R. § 1630.2 explains that courts may not "second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor require employers to lower such standards." Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n). The guidance illustrates that if a hotel requires its employees to clean 16 rooms per day, the ADA does not require it to retain workers who are not as thorough, or who cannot clean as many rooms.

[62]  Exhibit 5 at HC-245. *See also,* Exhibits 33 & 38.

17

Center refined its job descriptions in 2012 to assist with staffing shortages, require minimum physical standards, and to more carefully enforce regulations across-the-board to all JSOs.[63]

The ADA allows an employer to increase an employee's responsibilities to meet business needs. In the *Marsh* case, a shipping technician with knee and back injuries worked for 15 months operating a pump to load rail cars. He had excellent evaluations, but the facility doubled his work load and required him to operate two pumps instead of one. Marsh immediately informed his supervisor he could only operate one pump due to a disability. Marsh, like Grant, testified he could not move as fast as his coworkers and this posed a safety concern. *Marsh v. Terra Int'l (Oklahoma), Inc.*, 122 F. Supp. 3d 1267, 1272, 1275 (N.D. Okla. 2015). As a result of this disclosure, Marsh was fired. The employer's decision to increase Marsh's responsibilities was not discrimination, because the new standards did not single him out. *Marsh v. Terra Int'l (Oklahoma), Inc.*, 122 F. Supp. 3d 1267, 1285–86 (N.D. Okla. 2015). Similarly, Harris County's stricter enforcement of policy was directed at all officers and did not single out Grant.

## F.  Grant was not treated differently than similarly situated non-disabled officers.

Even if Grant could prove a *prima facie* case of discrimination, he cannot survive summary judgment unless he proves the actions taken against him were the result of his disability. To do that, he must show that his termination was a pretext:

> Pretext is more than a mistake on the part of the employer; it is a phony excuse. Where a defendant has proffered more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons. A court, however, doesn't "sit as a super-personnel department that reexamines an entity's business decisions." It determines "whether the employer gave an honest explanation of its behavior."

---

[63] Exhibits 16 & 38. Around 2011, supervisors began more closely monitoring the accuracy of Observation Logs and more frequently documenting policy violations that endangered children. Exhibit 18 at 127:14-20. Rather than pay closer attention to his work, Grant became more defiant in his violation of the rules.

*Dunlap v. Refuse Dep't Sanitary Dist.*, No. 3:05-CV-214RM, 2006 WL 1707268, at *5 (N.D. Ind. June 19, 2006)(internal citations omitted). Grant must show <u>clear</u>, <u>objective</u> evidence that a JSO without a disability would not have been fired for the same conduct. *Id.*

Grant was fired because he: (1) falsified his Observation Logs, (2) falsified his supervisor's records regarding the falsification of the Observation Logs, (3) used an unauthorized electronic device at work, and (4) had a long record of insubordination and disciplinary infractions, which included being late, failing to notify anyone about his absences, trying to work in areas to which he was not assigned, propping his bare feet on tables, and leaving his post (Exhibits 8 & 13). Grant must not only disprove <u>each</u> of these reasons, but he must also prove the Center knew <u>all</u> of these reasons were false.

Since 2011, more than <u>300</u> employees were fired from the Center—the vast majority for conduct much less serious than Grant's. JSOs have been fired for: (1) sleeping and falsifying an Observation Log (Exhibit 32 at HC-3650-51), (2) falling asleep twice (HC-3644-45), (3) tardiness (HC-3664), (4) a single incident of leaving children unsupervised (HC-3665), (5) a single incident of refusing to work in an assigned location (HC-3673), (6) failing to report to an assigned location (HC-3635-36), (7) failing to report an altercation (HC-3634), (8) leaving a post for 21 minutes and attempting to work in an area to which he was not assigned (HC-3659-60), (9) using a cell phone at work (HC-3628-29), and (10) using a cell phone at work (HC-3669).

As discussed, *infra*, Grant's own supervisor was fired after being accused of taking a <u>single</u> picture of a co-worker. This stands in contrast to Grant's taking of at least 60 unauthorized photos, videos, and audio recordings of coworkers over the course of several years. None of these employees had a known disability, and they were fired for reasons far less serious than Grant's misconduct (Exhibits 1, 16, & 38. *See also,* Exhibit 18 at 131:14-132:9).

**V.**

**GRANT DOES NOT STATE A CLAIM FOR HARASSMENT OR RETALIATION**

**A.  Grant fails to establish a claim for hostile work environment under the ADA.**

Grant vaguely asserts he was harassed based on his disability.[64] To establish a hostile work environment claim under the ADA, the Fifth Circuit requires him to show: (1) he belongs to a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment complained of was based on his disability, (4) the harassment complained of affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment and failed to take prompt, remedial action.[65]

**B.  Grant was not a member of a protected group.**

As noted, while Grant may have complained about an occasional foot impairment, it did not substantially limit his ability to walk and was not a disability under the ADA. Grant cannot satisfy the first element of an ADA hostile work environment claim.

**C.  Grant was not subjected to unwelcome harassment.**

Grant was not subjected to unwelcome harassment, and he does not even suggest how the alleged harassment was based on his claimed disability, or how it affected a term, condition, or privilege of his employment. On November 3, 2017, the Court compelled Grant to answer Interrogatory 7, which required him to "identify ___every___ instance" in which he was retaliated against by Harris County. (Doc. 34). Grant listed seven incidents, which are addressed below.[66]

**1.  Grant's complaint about his supervisor scrutinizing others is not harassment.**

Grant's "Event #1" is that his African American supervisor scrutinized ___other___ employees more than he scrutinized Grant, based on their national origin. Grant makes no claim that ___he___ was

---

[64]  *See,* Doc. 61, Plaintiff's Third Amended Complaint, at ¶ 41.

[65]  *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 445 (5th Cir. 2017).

[66]  Exhibit 34, Grant's Answers and Objections to Defendant's First Set of Interrogatories, at No. 7.

harassed, and suggests he was treated <u>better</u> than his coworkers. Grant does not even identify the employees he claims were scrutinized more, and they certainly did not join Grant's grievance.

**2. Asking Grant to follow the rules and stay out of the Control Booth on August 17, 2011 was not harassment.**

On August 17, 2011, Grant attempted to force his way into a control booth where he had no right to be. Grant admitted the Center depended on him to work where he was assigned. He further admitted he was not assigned to work in the control booth that night, had no right to be in the control booth, and was "supposed to be watching the kids on the floor."[67] Instead of remaining at his post, he bothered the female staff member assigned to the booth that night. Samuel, aware of Grant's propensity to force his way into the booth, instructed her that Grant was to remain at his duty station. It is not harassment to ask Grant to work where he is assigned and stay out of places he is forbidden.

**3. Asking Grant to keep accurate Observation Logs is not harassment.**

Grant's "Event #3" is that he was "written up" in February, 2012 because he falsified his Observation Logs. Grant admits his Logs were inaccurate, but claims he has the right to falsify logs by a "few minutes."[68] Grant has no evidence to support this wild claim and admits <u>he does not even believe the write-up had anything to do with his disability</u>. Instead, he claims (without any basis) that it was motivated by his filing an EEOC grievance against his African American supervisor for allegedly mistreating other employees from African countries.  Grant never filed a national origin suit, has no standing to sue on behalf of these unnamed men, and allowed the

---

[67] Exhibit 3, Grant deposition at 163:18-167:22.  *See also,* Exhibits 1, 33, & 38.

[68] Exhibit 34, Grant's Interrogatory Response No. 7, Event #3 ("they were off only by a few minutes"). While Grant blames a burned bulb on a clock for his inaccurate time, no other JSO had difficulty maintaining Observation Logs during the brief time this clock had a burned bulb.  *See also,* Exhibit 38.

statute of limitations to expire on this claim. Finally, though Grant could have been fired for this falsification, he wasn't. There was absolutely no adverse employment action taken against him.[69]

**4.  Giving Grant 15-minute breaks is not harassment.**

Grant's "Event #4" is that in March, 2012, he requested FMLA time and provided a doctor's note asking for 15-minute breaks. This is not harassment or retaliation. As discussed, Bianca Malveaux attempted to engage in an interactive process with Grant three months earlier, and Grant admits (both through deposition and requests for admission) that he told Malveaux he did not want an accommodation.[70] Grant also admits he refused to engage in an interactive process with Dr. Shelton regarding his request for 15-minute breaks.[71] With respect to his FMLA claim, Grant never filed an FMLA claim with the EEOC or this Court and produced no evidence that he was denied FMLA time (*See also*, Exhibit 18, Robinson deposition at 133:18-134:3).

**5.  Asking Grant not to walk off the job and abandon children is not harassment.**

Grant's "Event #5" is that he was written up for taking a break on January 5, 2013. Grant admits he had a duty to inform his coworkers before taking a break and that it was "reasonable" and "logical" for him to let someone know before leaving children unattended.[72] During Grant's "Event #5", a supervisor walked onto a floor of sleeping children and found Grant speaking loudly to a coworker and discovered that Grant left his post for 19 minutes without telling anyone, then returned and blamed three of his coworkers for not working his shift. All three coworkers signed statements explaining that Grant never told them he was taking a break.[73] The Center did not take any adverse employment action against Grant for this incident. It simply

---

[69] Exhibit 16, Affidavit of Dr. Shelton.

[70] Exhibit 20, Grant's Response to Request for Admission No. 4 and Exhibit 28.

[71] Exhibit 3, Grant deposition at 119:6-8; Exhibit 16; & Exhibit 29 at HC-211.

[72] Exhibit 3, Grant deposition at 221:3-17.

[73] Exhibit 35, Investigation of January 5, 2013 incident where Grant walked off the job, HC 992-995.

asked him to request backup before taking his breaks.[74] Grant admits this was the only time he

ever had difficulty taking a break.[75] That is not harassment or retaliation.

### 6.   Giving Grant time off to attend his cousin's wedding is not harassment.

Grant's "Event #6" alleges he was somehow harmed because he took time from work for

his cousin's wedding. Grant suffered no adverse employment action for attending his cousin's

wedding. He requested three vacation days off, but was only eligible to take two days. He was

allowed his vacation, despite not being eligible for it.[76] That is not harassment or retaliation.

### 7.   Grant cannot state an ADA claim for an employee's private Facebook post.

Grant's "Event #7" is that he was terminated for falsifying his Observation Logs on

October 29, 2013. That event was discussed in detail on pages 5-6 of this Motion.

Though Grant does not include it in his interrogatory response, he also accused Samuel of

briefly posting (then deleting) a picture of an unidentified person (whose face cannot be seen)

with his feet propped up in a position suggesting he is asleep at work. This was an unaltered

image that only Samuel's personal friends could see on his private Facebook account.[77]

Grant—who often spent nights struggling to stay awake with his feet propped up[78]—

assumed he was the person in the image and filed a grievance against Samuel. Though Samuel

denied posting the picture, the Center immediately fired Samuel for suspicion of taking an

unauthorized photo of another employee.[79]  Grant sees no irony in the fact that he engaged in far

more egregious conduct by making dozens of secret video and audio files of coworkers without

---

[74] Exhibits 1, 16, & 38.

[75] Exhibit 3, Grant deposition at 122:23-25 & 221:21-23.

[76] Exhibit 33, Affidavit of Doris Phillips.

[77] Exhibit 16, Affidavit of Dr. Shelton.

[78] As noted, Samuel, Phillips, and Beasley repeatedly caught Grant sleeping at work, but Grant was never disciplined for this misconduct, though others were fired.

[79] Exhibits 1 & 16.

their knowledge or permission, and then selectively editing them to present his coworkers in a negative light.[80] It was Grant—not Harris County—who engaged in harassment and retaliation.

**D.  The alleged harassment was not based on Grant's alleged disability.**

There is no evidence that Grant's alleged incidents of harassment relate to a disability. Each incident relates to Grant being asked to follow standard rules, such as completing accurate Observation Logs, staying out of unauthorized parts of the facility, and getting permission before going on vacation. None of that related to his alleged foot pain.

**E.  The alleged harassment was not severe or pervasive and did not affect a term, condition, or privilege of employment.**

There is no evidence any of the alleged incidents were severe enough to "alter the conditions" of Grant's employment and create an abusive working environment. To establish this, the Fifth Circuit looks to factors such as (1) frequency of the discriminatory conduct, (2) its severity, (3) whether it was physically threatening, or merely offensive, and (4) whether it unreasonably interferes with the employee's performance. *Credeur*, 860 F.3d at 795-96.

The type of conduct deemed harassing includes an employer who intercepted an employee's phone calls and subjected her to frequent humiliating, offensive, and vulgar sexual comments and *ad hominem* attacks based on her HIV status. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 236-237 (5th Cir. 2001). The Fifth Circuit conversely holds it is <u>not</u> harassment to order an employee to attend meetings, require an employee to sign job descriptions or agreements, criticize an employee's performance, provide an employee with a "Last Chance" letter, or threaten to terminate an employee. *Credeur*, 860 F.3d at 796. Grant cannot show that any of the alleged incidents created an abusive work environment.

---

[80] As discussed, Grant deleted portions of his conversation with Dr. Shelton to make it appear as though Dr. Shelton would not offer him accommodations. Grant adamantly defended taking unauthorized video and audio recordings of co-workers within a secure facility by claiming he had the right to do so because Texas is a "one-party state . . . and I can do that." Exhibit 3, Grant deposition at 128:3-17.

**F.  Grant fails to establish a claim for retaliation under the ADA.**

Grant fails to state a claim for retaliation for the same reasons he fails to state a claim for harassment. To show retaliation, Grant must prove (1) he engaged in activity protected by the ADA, (2) an adverse employment action occurred, and (3) a causal connection exists between the protected act and the adverse action. *Credeur*, 860 F.3d at 797. As noted, Grant was not disabled and never requested an accommodation, so he could not have engaged in activity protected by the ADA. His only adverse employment action was being terminated for the reasons provided on pages 1, 5, and 6 of this brief. There is no causal connection between his termination and any protected act.

The Fifth Circuit holds that criticizing an employee's work and threatening to terminate the employee for failing to follow the rules is not retaliation. Further, "petty slights, minor annoyances, and simple lack of good manners" are not actionable. *Id.*, quoting *Stewart v. Mississippi Transp. Comm.,* 586 F.3d 321, 332 (5th Cir. 2009). Grant's allegations do not even rise to the level of a petty slight.

## VI.
## CONCLUSION AND PRAYER

Otis Grant was among the Juvenile Probation Department's worst employees. He slept through his shift, played on his cell phone while on duty, abandoned children in his care, and ultimately resorted to fraud to cover up his dereliction of duty. Harris County provided him every chance to become an honest, productive JSO, and was far more forgiving than his other employers. However, Grant squandered the opportunity and was fired because of his misconduct—not his alleged disability. His case should be dismissed.

WHEREFORE, Defendant Harris County respectfully requests that summary judgment be GRANTED, and Plaintiff's case be dismissed with prejudice, with all costs taxed to Plaintiff.

Respectfully submitted,

OF COUNSEL:
VINCE RYAN
HARRIS COUNTY ATTORNEY

_____
SETH HOPKINS
Assistant County Attorney
Texas Bar No. 24032435
Federal (Southern District) No. 2043155
1019 Congress Plaza, 15th Floor
Houston, Texas  77002
(713) 274-5141 (telephone)
(713) 755-8924 (facsimile)
Seth.Hopkins@cao.hctx.net

## CERTIFICATE OF SERVICE

I certify that on the 29th day of January, 2018, a true and correct copy of the foregoing document was delivered to all counsel of record via the CM/ECF system and served by electronic notice to all parties of record:

**Attorney for Plaintiff**
Victoria Plante-Northington
Plante Law Firm, P.C.
5177 Richmond Avenue, Ste. 1140
Houston, Texas  77056
Fax: (713) 513-5176
Email: Victoria@plantelawfirm.com

_____
Seth Hopkins

26