<u>**EXHIBIT A**</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **OTIS GRANT,** | § | **CIVIL ACTION NO. 4:16-CV-03529** |
| | § | |
| **PLAINTIFF** | § | |
| | § | |
| **V.** | § | **JUDGE KENNETH HOYT** |
| | § | |
| **HARRIS COUNTY,** | § | |
| | § | |
| **DEFENDANT.** | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff, Otis Grant, files this Response to Defendant's Motion for Summary Judgment.

Based on the law, facts, and argument provided in this Response, Defendant's motion should be

denied and the Court' Order withdrawing the original Order Denying Summary Judgment should

be reinstated.

Respectfully submitted,

<u>    /s/    *Victoria Plante-Northington*            </u>
VICTORIA PLANTE-NORTHINGTON
Texas Bar No. 00798436
Southern District No. 21235
PLANTE LAW FIRM, P.C.
5177 Richmond Avenue Suite 1140
Houston, Texas 77056
Telephone: 713.526.2615
Facsimile: 713.516.5175
Email: victoria@plantelawfirm.com

ATTORNEY-IN- CHARGE FOR PLAINTIFF

-1-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of April 2018, a true and correct copy of the foregoing instrument was sent via the e-filing electronic system to all counsel of record.

_/s/   Victoria Plante-Northington_
VICTORIA PLANTE-NORTHINGTON

## **TABLE OF CONTENTS**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Exhibit List.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Law & Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conclusion & Prayer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chiari v. City of League City*, 920 F.2d 311 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Edwards v. Your Credit, Inc.*, 148 F.3d 427 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606 (5th Cir. 2009*)*. . . . . . . . . . . . . . 20

*EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014*)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Felton v. Polles*, 315 F.3d 470 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229 (5th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . 28

*Lujan v. National Wildlife Federation*, 497 U.S. 871(1990). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Lytle v. Household Mfg., Inc.*, 494 U.S. 545 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986).. . . . . . . . . . . . . . . . . . . . . 18

*McGinnis v. Alamo Community College Dist.*, 207 F.3d 276 (5th Cir. 2000). . . . . . . . . . . . . . . 23

*Miles- Hickman v. David Powers Home, Inc.*, 589 F.3d 849 (S.D. Tex. 2008).. . . . . . . . . . . . . 30

*Reeves v. Sanderson Plumbing Prod., Inc.*, 120 S.Ct. 2097 (2000).. . . . . . . . . . . . . . . . . . . . . 19

*Tabatchnik v. Cont'l Airlines,* 262 F. App'x 674,(5th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . 31

*Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155 (5th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . 20

*Thornborough v. Columbus & G. R. Co.,* 760 F.2d 633 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . 19

*Tremont LLC v. Halliburton Energy Servs.,* 694 F. Supp. 741 (S.D. Tex. 2010). . . . . . . . . . . . 18

*Valle-Arce v. P.R. Ports Auth.*, 651 F.3d 190 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Weed v. Sidewinder Drilling, Inc.*, 245 F. Supp.3d 826 (S.D. Tex. 2017).. . . . . . . . . . . . . . 21,28

*Zenor v. El Paso Healthcare Sys,* 176 F.3d 847(5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . 27

**Statutes**

42 U.S.C. § 12102 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

42 U.S.C. § 12112 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,25

**Code of Federal Regulations**

29 C.F.R. § 1630. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Rules**

Federal Rule of Civil Procedure 56 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## <u>EXHIBIT LIST</u>

Exhibit 1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Aaron Beasley

Exhibit 2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Anthony Samuel

Exhibit 3.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Erica Owens

Exhibit 4.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Bianca Malveaux

Exhibit 5.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Matthew Shelton

Exhibit 6.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Thomas Brooks

Exhibit 7.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Melissa Watson

Exhibit 8.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Deposition of Giselle Robinson-Jones

Exhibit 9.. . . . . . . . . . . . . . . . . . . . . . .  FMLA Documents and Various Medical Communications

Exhibit 10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . First and Second EEOC Position Statement

Exhibit 11. . . . . . . . . . . . . . . . . . . . . . . . . . . 2/11/12 Exception Report & Observation Checklist

Exhibit 12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Various Harris County ADA/ADAAA Policies

Exhibit 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Grant's Termination Letter 11/23/13

Exhibit 14. . . . . . . . . . . . . . . . . . . . . . . . . 8/4/11 Exception Report From Grant About Samuel

Exhibit 15. . . . . . . . . . . . . . . . . . . . . . . . . . 12/20/11 Exception Report to HR About Samuel

Exhibit 16. . . . . . . . . . . . . . . . . . 3/6/12 Exception Report from Grant about Accommodations

Exhibit 17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Grant's Eligibility for Rehire Form

Exhibit 18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . July 2013 Facebook Post by Samuel

Exhibit 19. . . . . . . . . . . . . . . . . . Grievance from Grant Re: Continual Retaliation & Harassment

Exhibit 20. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Grant's Declaration

Exhibit 21. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Deposition of Otis Grant

Exhibit 22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Photos of Grant's Foot April 2018 and 2012

Exhibit 23. . . . . . . . . . . . . . DOJ Notice of Right to Sue Letter for Title VII (3/1/18 and 4/11/18)

Exhibit 24. . . . . . . . DOJ Notice of Right to Sue Letter for ADA/ADAAA (12/16/13 and 2/17/16)

Exhibit 25. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Blatant/Intentional Misrepresentations of Facts By
Defense Counsel Seth Hopkins in Defendant's Motion for Summary Judgment

Exhibit 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Malveaux Letter to Grant 12/28/11

Exhibit 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . February 2013 Warning Letter from Jones

Exhibit 28. . . . . . Email Re: Missing Performance Appraisals for Grant and Appraisals Produced

Exhibit 29. . . . . . . . . . . . . . . . . . . . . . . Grant's 2012 and 2014 EEOC Charges of Discrimination

Exhibit 30. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Worker's Compensation Report July 2013

Exhibit 31. . . . . . . . . . . . . . . . . . . . . Defendant's Policy on Reprimands and Disciplinary Action

Exhibit 32.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Supervision of Youth Policy

Exhibit 33.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4/18/10 Exception Report

Exhibit 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2013 Performance Evaluation

Exhibit 35.. . . . . . . . . . . . Multiple Exception Reports Confirming Some of Grant's Declaration

Exhibit 36.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Photos of Clock Malfunction/Deficiencies

Exhibit 37.. . . . . . . . . . . . . . . . . . . . . . . . Tikidra Batiste Statement Re: Samuel's Instructions

Exhibit 38.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Verbal Counseling Email from Jones

Exhibit 39.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Letter from Erika Owens February 2013

Exhibit 40.. . . . . . . . . . . . . . . . . . . . . . . . . . . Job Description Signed Under Duress 03/24/12

**STATEMENT OF FACTS**

Grant was employed by Defendant in August 2005 as a Juvenile Supervision Officer (JSO). [Ex. 17 (Grant Decl. ¶1)].  JSO performed diverse responsibilities to keep the juvenile facility operating.  This could range from being assigned to the floor for supervision of youth (mostly non-sedentary position) to manning central control, the control booth, inventory, intake, and single resident constant watch (sedentary positions).  There was great flexibility to accommodate those who had disabilities or injuries. [Id.].

For approximately six (6) years, Grant received no reprimands.  Defendant included an April 2010 incident on a warning letter give to Grant months before his termination.  The April 2010 was not a reprimand should not have been used an incident that occurred almost two years before the February 2013 warning letter. [Ex. 27 & 42 ].[1]

_____

[1]Defendant write-ups or reprimands were required to state, "this is a letter of reprimand to provide employees with notice." [Ex. 31]. Counseling notices, write-ups, verbal counseling, or emails that did not include this phrase were not counted as reprimands for the purposes of discipline.  The write up that Defendant references in April 2010 on Exhibit 31 was an exception report; a report commonly used by a JSO or supervisors to note an error, problem, or irregularity in anything related to the job, residents, or coworkers. According to Defendant's written policy, documents designated as "reprimands" were required to be forwarded to a Deputy Director and to be documented by HR and placed in the employees personnel file for six (6) months. [Id.]. Exhibit 31 gave supervisors and managers strict instructions on the difference between how exception reports, memos, and letters, like the ones that Grant received should have been designated and used. They were not to be used as a "reprimand" unless it was titled "reprimand."  More importantly, exception reports were only to be used in the annual evaluations process of the employee rather than documents to terminate an employee. [Id.]  It is undisputed that none of Grant's letters, exception reports, memos, or any other documents include the phrase or word "this is a reprimand" or "reprimand in the actual alleged violation."  The February 2013 letter of warning has the word "reprimand" on it, but there should have been a separate document for the alleged violations that included "reprimand."  Specifically, the April 1, 2012 and April 2, 2012, (FMLA call-in policy violation) were verbal and were not consistent with the policy that reprimands be in writing. [See Ex. 27 & 31].  Even so, intermittent leave under FMLA for both days (April 1-2) was granted. [Id.].  FMLA leave that could not be counted against Grant for disciplinary purposes. Grant properly notified Defendant that he could not make it to work within the time required and within a practical or reasonable time. [Ex. 20 (Grant Decl. ¶9h)]. Per the policy, after the expiration of six months (May 2013 in this case), Grant would no longer be monitored for this type of conduct.  That is October 2012 to May 2013, Grant had no additional reprimands or write-ups of any kind in his file.  It is not coincidental that the warning letter to Grant in February 2013 threatening termination was written by Defendant within three months of Defendant receiving the EEOC's notice of Grant's first charge in or about November 2012. Although he received no additional write-ups from October 2012 to November 2013, Defendant still used incidents more than almost a year old to fire Grant.

His performance evaluations prior to 2011 were good.  Defendant commented on Grant's attention to detail, yet Grant was never reprimanded for an alleged failure to supervise youth. [See footnote 1].  Specifically in his performance evaluations, Defendant made the following observations about Grant's performance:

> "Mr. Grant is thorough in the completion of his daily work responsibilities and completes all tasks with attention to detail in a timely manner.
> ****
> Mr. Grant demonstrates the ability to complete tasks assigned with minimal or no mistakes.
> ****
> Mr. Grant completes all assignments in a timely manner as well as assuming extra tasks when requested by supervisors.
> ****
> Mr. Grant is an excellent employee who has become a key team member on the 11-7 shift and is truly a delightful person to work with.
> ****
> Mr. Grant has a very positive attitude and certainly could some day achieve his goal of becoming a supervisor of this department."

[Ex. 28 (Bates HC-0241-275)].[2]

In addition to good performance evaluations,  prior and current supervisors (including Samuel and Doris Phillips) assigned Grant to JSO duties that required minimal to no standing or walking because they were fully aware that Grant's legs, ankles, and feet would frequently swell after standing and walking for periods of time due to his diabetes.  [Ex. 20 (Grant Decl. ¶5); Ex. 1

---

[2]To Grant's knowledge, Defendant did not produce Grant's performance evaluation for 2010-12, although it was required to provide them.  Grant requested the documents months ago, but Defendant stated it produced all performance appraisals in its possession. Grant relies on some of the many positive comments about his performance in his 2009 evaluation (before he engaged in protected activity in August 2011).  His last evaluation dated August 13, 2013, was produced by Defendant. [Ex. 28 ]. The August 2013 evaluation was given to Grant about three (3) months before Defendant terminated him for the multiple alleged violations in 2012 and 2013. [Ex. 13].  Although Defendant rated Grant as "meet standards" in each category of the August 2013 evaluation, this evaluation directly contradicted the memo dated February 19, 2013, to Grant entitled "Last Warning Letter." [Ex. 27].

(Beasley Depo. 71:6-9); Ex. 15]. Defendant knew that Grant suffered from complications associated with Type 2 Diabetes.[3] [Id.]. Grant told multiple employees and supervisors from time to time when he had flare-ups from 2007 to 2013. [Id.] Additionally HR and upper level management knew about his diagnosis based on Grant's doctor, Dr. David Braunreiter, providing the medical information necessary for him to be excused from work and to receive leave under FMLA. [Ex. 9]

Not only did Defendant know about Grant's disability, Defendant regarded him as disabled. [Ex. 20 (Grant Decl. ¶5); Ex. 5 (Shelton Depo. 153:16-18) ]. Many supervisors including his prior supervisors, Phillips and Samuel saw his swollen calves, ankles, and feet. [Id.]. Some time in 2008 or 2009, after observing Defendant struggle with performing primarily non-sedentary duties (i.e. working the floors), Grant's supervisors told him that he would work in a JSO position that did not require a lot of standing or walking. [Id.]. Because of the foot problems were caused by diabetes, Defendant accommodated Grant without a request to do so and assigned him to inventory, intake, central control, the control booth, and primarily on the CW.[4] Things were fine for Grant until August 2011.

Samuel and Phillips became Grant's primary supervisor some time in 2010. Samuel had been Grant's supervisor in 2007 at times when Samuel worked the overnight shift. [See Ex. 28]. Initially, Grant had a good working relationship with them and the accommodation continued. Additionally, they were cooperating with the FMLA leave requests. Grant reported his supervisor

---

[3]Grant has suffered from Type 2 Diabetes since 2007 to based on his recollection. He had been approved by Defendant for FMLA for a serious health care condition as early as 2007 or 2008. [Ex. 9]. The duration of his disability is a lifetime. There is no cure for diabetes but it can be managed to a certain degree. [Id.].

[4]Constant watch is where a JSO is assigned to one resident to watch constantly while sitting down and recording the activities of the resident in ten minute intervals. Constant watch is usually reserved for residents who are on suicide watch.

Samuel for discrimination against other African employees to Samuel's supervisor and Building Superintendent, Aaron Beasley, in August 2011. [Ex. 1 (Grant Decl. ¶3); Ex. 15]. He also provided facts to support this harassment and discrimination in an exception report on August 4, 2011. [Ex. 14]. In Exhibit 15 submitted in December 2011, Granted painted a detailed narrative of the facts and law (including Defendant's policy) on retaliation, discrimination, harassment, and ADA accommodations. Almost immediately after Grant made the August 4, 2011 report, he followed-up with Beasley about the discrimination that he observed. [Ex. 1 (Beasley 68:21-69:1)]. Beasley assured Grant he would speak to Samuel about the complaint. [Ex. 15 (P. 2)]. There were multiple meetings with Samuel and Beasley about his treatment of employees after the Grant reported Samuel for discrimination. According to Beasley, he spoke with Samuel on at lease five (5) occasions. [Ex. 1 (Beasley (68:21-69:1)]. Samuel claimed he could not recall any meetings with Beasley regarding Grant's complaint. Beasley described Samuel as "abrasive" which to him meant also "hostile" and "harsh." [Ex. 1 (Beasley 48:7-9)]. Even when answering questions during the deposition, Samuel appeared very hostile. [Ex. 2 (Samuel 39:8-21); Ex. 20 (Grant Decl. ¶9t)].[5]  When he was told the court (judge) may intervene in the deposition if he could not be more responsive to the questions, he said he did not care that the court may need to intervene and that Judge Hoyt could not make him answer questions that he claimed he could not remember. [Id. (36:18-37:6)].[6]

As punishment for reporting discrimination, Grant's accommodations of sedentary

_____

[5]Defense counsel objected at times, but he did not refute or dispute the fact that Samuel was hostile during his deposition.

[6]Samuel testified that he did not know, recall, or could not remember in some form about **650** times on material facts in his deposition. Counsel for Grant, Plante-Northington, called the court to intervene but the court clerk returned the call and stated the issue would need to be addressed in a motion.  Beasley testified that he did not know, recall, or could not remember in some form about **300** times on material facts in his deposition.

assignments were revoked and he was assigned by Samuel and later Phillips to Unit 4A. [Ex. 20 [Grant Decl ¶5 & 9c)].   Unlike other male units, 4A was in the female section of the facility completely isolated from the male section. [Id.].   Additionally, the juvenile residents in 4A were males with behavior problems that required closer attention. [Id.]. Grant was the only JSO assigned to 4A. [Id.]. Consequently, when he needed to be relieved or needed help with residents, he was required to call for male JSO's to relieve him. [Id.]. Often it would take at least several minutes for a male JSO to relieve him. After being assigned to 4A, he complained to HR that he believed due to his disability that it posed a safety concern for the children. [Ex. 15 (P.2)].   Specifically, Grant alerted management and HR and wrote:

> "Due to my health condition, I feel that my response time would be slower than others because of my physical problem. I'm not saying I cannot do my job.  I am saying I don't move as fast as other fellow employees.  So for me to be isolated to the 4th floor (Unit A) as the only male, it's risky for a J.D.C. resident.  There are fellow employee similar to me but placed together on a different floors or parts of the building (like the basement intake) and had never been isolated to work the 4th floor."

[Id.].

        This assignment to 4A would go on for months and would prove detrimental to Grant's health. His feet became worse.  Overtime his doctor had to intervene and provided medical documentation on August 16, 2011 and March 21, 2012, alerting Defendant that Grant could not perform newly assigned floor duties like prolonged standing or walking due to diabetic neuropathy of his feet that limits his ability the stand and walk when symptomatic. [Ex. 9].  In March, Grant's diabetes had worsened due to the floor duties and was now diagnosed by his doctor with  "chronic diabetes." [Ex. 9].  Due to this condition, he suffered from neuropathy and swelling/edema of the feet. Dr. Braunreiter informed Defendant that "prolonged standing and frequent walking worsened"

his chronic condition.  He also requested that Grant be allowed to take "15-minute breaks as needed to prop his feet up to help with reducing swelling during his shift." [Ex. 9 (HC-0505, 0214-Grant)]. Defendant completely ignored the requests by Grant and his orthopaedic physician.  Grant could only stand constantly one hour before his feet and legs started hurting. [Id].  The longer he stood or walked, the more it hurt and the more he slowed down.  He often limped and needed to leave work early due to illness.  When he attempted to leave early from a FMLA qualified sickness, Defendant refused to sign the documents necessary for early departure to be approved.  [Ex. 20 [Grant Decl. ¶9r)]. Grant believed if he left without approval he would be fired. [Id.].

When another employee agreed to swap with him or when he requested to go home due to swelling and foot pain, Phillips denied his request.  [Ex. 20 [Grant Decl ¶9a & ); Ex. 35]. After requests for reinstatement to his old assignments were denied, Grant made a verbal request for accommodations under the FMLA to Samuel and Beasley. [Ex. 1 (Beasley 73:5-11; 80:5-81:7)]. Beasley did not forward Grant's request to HR and did not attempt to engage in discussion regarding the accommodation that Grant required. [Id.].  Superintendent Beasley told Grant that it was not his responsibility to handle ADA requests. [Id. (Beasley 76:1-5)].  Defendant knew it had an obligation to discuss an accommodation when Grant requested it, but it did refused, another form of retaliation and harassment.

Grant's report of harassment and retaliation in December 2011 fell on deaf years.  Defendant allegedly investigated a retaliation and harassment complaint by Grant in February 2012, but Grant provided additional complaints of retaliation, harassment, and the failure to accommodate many times after the February 2012 investigation was complete.  Not one of his complaints was investigated after February 2012. [See Ex. 35].  Even in the February 2012 alleged investigation,

-13-

there is a material factual dispute about whether Defendant conducted a complete or thorough investigation. [See DE 67, 71& 100]. Although Erika Owens, Employee Relations Manager, allegedly conducted the investigation in or about February 2012, the documents that allegedly existed in February 2012, were not produced until December 2017. [Ex. 3 (Owens 11:14-25)]. Grant believes these documents were drafted to bolster the claim that Defendant investigated Grant's claim. During her deposition, her letter regarding her findings during the retaliation and harassment investigation, had information that was not stated by any employee. Specifically, Owens insulted Grant and lied about him when she called him "lazy" in her report.  When in fact, nowhere in the notes that she reviewed was there any person calling Grant "lazy."  Thus the retaliatory, harassing, and discriminatory treatment was not just with Samuel, Phillips, and others who directly managed Grant, it was also with others in HR. [Ex. 3 (Owens 140:1-25]. Notes from independent witnesses like Tikidra Batiste supported Grant's claim about being singled out and harassed. [Ex. 37].

The discrimination, retaliation, and harassment started some time after August 2011 and did not end until Grant was terminated in November 2013.  From 2011 to 2013, Grant recorded, took pictures, and got statements from employees willing to help him show and eliminate the retaliation and harassment. [See Ex. 34 & 35; See also Ex. 1 (Grant Decl. ¶ 9 (a)-(u)].  He recounts about 22 incidents of harassment in his testimony.  The following is an abbreviated summary of the incidents:

1. Refusing to permit Grant to swap on a CW so he could rest his feet and the other employee could stay awake while working the floor; (July 2013)
2. Intentionally losing his paperwork for requested days off to set Grant up for a no-call, no show, and discipline including termination; (July 2013)
3. Isolating Grant to 4A in the female unit where he was responsible for children with behavior problems and was required to wait on a male JSO on the other side of the building to relieve him when he had to use the

restroom.  A few times he came close to urinating or
defecating on himself due to his diabetes medication;

4.   Making him work the floors until his legs and feet
were so swollen that he would limp in severe pain.
On a few occasions, the swelling spread to his
genitalia;

5.   Placing a picture on Facebook with his leg propped up
as his doctor suggested to relieve severe swelling and
pain and posting a comment that made the people
think he was a lazy employee;

6.   Making it seem like he was the only person who
makes alleged errors in completing observation
checklists.  This was a common occurrence that
happened frequently.  While deficiencies in this area
were supposed be noted on performance evaluations,
Defendant used it as a tool to suspend and terminate
Grant;

7.   Accusing him of leaving a constant watch without
letting anyone know that they needed to take over
while he was on a restroom break.  Samuel had
informed Grant that he was watching him on video
which as intended for use to watch the resident so
Grant would not and did not leave without providing
notice to employees to take over his assignment until
he returned.

8.   Using his FMLA absences as a reprimands to support
his termination which was a clear violation of FMLA.

9.   Excluding only Grant from entering the control booth
near the North Booth but permitting all others access;

10.  Ordering Grant to sign a supervision of youth policy.
When stated he did not want to sign because
Defendant had clock deficiencies and inaccuracies
that would be a trap to terminate him on being off on
time. When he didn't readily sign, Defendant told him
he would be fired and had termination documents
ready. He was not terminated because he agreed to
sign to keep his job (under duress); [Ex. 40].

11.  Suspending Grant for five (5) days when policy stated
he was only supposed to be suspended for (3) days.
Grant disputed the facts supporting the suspension.

12.  Asking Samuel if he could switch to another unit
because his feet were swelling and he was in pain
when walking.  Samuel said he would check into it
and never got back to Grant with the answer.

13. Providing a doctor's notes about the seriousness of his illness and physical restrictions, but the notes were ignored.

14. Moving his table to place him in the video intended to watch children so they could watch every move Grant made. No other employee was scrutinized like this.

15. Sending Grant to an assignment to watch residents. When he arrived, no residents were there. Grant believed this was done solely for him to be behind on signing up children on his designated floor.

16. Returning from a worker's comp injury in 2012 and ordered to sign a job description that included standing and walking requirement. This was done to support an argument that Grant could not fulfill the essential functions of his position. He was placed on light duty after his return from an injury on the job but Defendant denied light duty assignment.

17. Falsely accusing Grant of using personal pillow in the unit to place in the hard chairs while at work. When Grant met with Beasley, Samuel entered the room and threatened him by saying "I'm going to put paperwork in your life," clearly indicating Grant would receive write-ups and he did through 2012 and some of 2013.

18. Placing negative comments on his performance appraisal in essence saying since Grant had complained of discrimination, harassment, the failure to accommodate that he was not a team player and needed to get along with others better. Shelton laughed in Grant's face after he objected to Phillips doing his appraisal since she was a person Grant had accused of illegal misconduct.

19. Expressing their dislike of Grant through facial expression and not engaging cordially with Grant on any level from 2011 to 2013. Grant was deemed the enemy;

20. Giving Grant unwarranted write-ups to build a file without proper documentation and making Grant jump hurdles to try to negate the allegations were not true. The write-ups were other incidents of harassment; and

21. Accusing Grant of much faking and exaggerating his illness in the summary judgment motion when Defendant's HR Director, Matthew Shelton, admitted Grant was disabled under the ADA. The whole

> thought that Grant would fake an illness and bring medical documents to support it is offensive and insulting to Grant, Plante-Northington, and his medical doctor who certified Grant's diagnosis and complications associated with it.

(Ex. 20 (Grant Decl. 9a-u)].

It was obvious by looking at the timing of the write-ups, the exception reports, the complaints, and the EEOC charges, that Defendant was building a file to terminate him. No other employee whose file was produced in this case contained a warning letter vaguely similar to Exhibit 27 in his or her file before termination. This warning letter (that included no new alleged violation, misconduct, or performance issues) was created about three (3) months after Grant filed his First Charge of Discrimination and eight (8) months before his termination. [Ex. 10, 27].[7] Defendant was true to the common code in employment that supervisors and management stick together as long as possible. Even when Grant provided direct evidence that supported his claim of harassment and retaliation, management refused to look at other decisions Samuel had made to see if Grant's claims could be substantiated.

If the physical pain of working the floor and constant write-ups in 2012 were not enough to cause him great distress and show the hostile environment in which he worked, 22 or so incidents of harassment and retaliation clearly pushed the level from a hostile environment to a toxic one.

## I.     LAW & ARGUMENT

### A.     SUMMARY JUDGMENT STANDARDS

---

[7]As stated in footnote 1, Defendant's reliance on the write-ups are problematic because many were not "reprimands" and Defendant did not follow its policy to count only documents titled "reprimands" to support termination and to remove them as reason for disciplinary action after six months per policy. Exhibit 27 shows that Defendant arbitrarily went back three years to include an incident on a 2010 exception report incident that never became a reprimand of any kind. The entire expedited process showed overkill on Defendant's part that no jury will believe is coincidental.

Summary judgment under Fed. R. Civ. P. 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A dispute of material fact is genuine if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the nonmovant bears the burden of proof at trial, the movant must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the nonmovant's claim; the movant may, but does not have to, negate the elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

The moving party bears the initial burden of production and persuasion in demonstrating a lack of any genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). The moving party cannot simply ignore material evidence in the record that is not favorable to the motion being granted. It must show there is an absence of evidence to support the nonmoving party's case. *Tremont LLC v. Halliburton Energy Servs.*, 694 F. Supp. 741, 750 (S.D. Tex. 2010). After the movant meets its burden, the nonmovant must designate specific facts showing there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.*, 494 U.S.

545, 554-55 (1990).  Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.  *Anderson v. Lobby*

*Liberty, Inc.*, 744 U.S. 242, 255 (1986); *Deville v. Marcantel*, 567 F.3d156, 164 (5th Cir. 2009).

Thus, although the court should review the record as a whole, it **must disregard evidence favorable**

**to the moving party** that the jury is not required to believe.  *Reeves v. Sanderson Plumbing Prod.,*

*Inc.*, 120 S.Ct. 2097, 2110 (2000).

Because employment discrimination claims generally involve "nebulous questions of

motivations and intent," summary judgment is an inappropriate tool for resolving claims of

employment discrimination.  *Thornborough v. Columbus & G. R. Co.,* 760 F.2d 633, 640-41 (5th Cir.

1985).   Often, motivation and intent can only be proved through circumstantial evidence;

determinations regarding motivation and intent depend on complicated inferences from the evidence

and are therefore peculiarly within the province of the fact-finder.  *Id.*

At the summary judgment level, Grant is not required to prove by the preponderance of the

evidence that Defendant discriminated, retaliated and/or harassed him on the basis of disability or

engaging in a protected activity.  He is only required to point to facts in the record that *could* support

a finding of discrimination, retaliation and/or harassment against Defendant at trial.

Most, if not all, of the information Defendant claims supports granting its motion is not

information this court is required to believe.[8] The majority of Defendant's motion focuses on the

credibility of Grant and irrelevant fictional account of many of the facts.  Because Defendant bears

the burden proving the lack of material fact to support discrimination, harassment and retaliation,

---

[8]Grant uses the word "information" because many of the alleged facts are not supported by Defendant's
references to the exhibit.  As it has throughout this case, Defendant engages in dramatic fictional writing, hyperboles,
out of context statements, and blatant lies that are not supported when the record is read.  See Plaintiff's Section of
Misstatements in the Record by Defendant previously addressed in this Response.

it cannot satisfy this burden by simply ignoring, downplaying, excusing away or even lying about

facts to dismiss this case.   Because it has repeatedly done so, Defendant's motion must be denied.

## B.   GRANT HAS PRODUCED OVERWHELMING EVIDENCE THAT DEFENDANT VIOLATED THE ADA/ADAAA AND TITLE VII ANTI-RETALIATION PROVISION.

### 1.   ADA/ADAAA

Title I of the ADA, 42 U.S.C. § 12112(a), prohibits discrimination against an employee on

the basis of physical or mental disability and requires an employer to make reasonable

accommodations necessary to allow an employee with a disability to perform the essential functions

of his job unless the accommodation would impose an undue hardship on the employer.   When an

employee's disability, limitations, and required reasonable accommodations are not open, obvious,

and apparent to the employer, the initial burden rests primarily upon the employee to specifically

identify the disability and resulting limitations, and to suggest the reasonable accommodations.

*E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009).   When a qualified

individual with a disability requests a reasonable accommodation, the employer and employee should

engage in flexible, interactive discussions to determine the appropriate accommodation. *E.E.O.C.*

*v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009) (citing 29 C.F.R. § 1630.9). If the employee

fails to request an accommodation, the employer cannot be held liable for failing to provide one.

*Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996).

#### a.   Grant, who suffers from Type 2 Diabetes, has an impairment that substantially affects walking, standing, and working under the ADA/ADAAA.

Defendant claims Grant does not have an impairment that substantially limits a major life

activity. [Doc. 69 (file-marked P.15)].   It spends about four pages arguing an issue of law that has

-20-

already been decided. Defendant's argument is without merit because diabetes is an impairment per se. Disabilities under the ADAAA now include epilepsy, hypertension, asthma, **diabetes**, major depression, bipolar disorder, schizophrenia, and cancer. 29 C.F.R. § 1630.2(j)(5); See also *Weed v. Sidewinder Drilling, Inc.*, 245 F. Supp.3d 826, 834 (S.D. Tex. 2017). Though Defendant only references Grant's diagnosis of diabetes in footnote 7 of its motion, it is undisputed that Grant has Type 2 Diabetes. It is also undisputed that Defendant believed Grant had a disability under the ADA. [Ex. 5 (Shelton Depo. 153:16-18). Shelton, Deputy Director of Administrative Services and HR Director, admitted Grant was disabled under the ADA. [Id. (See also 13:18-14:22]. (Emphasis added). Additionally, it is undisputed that Grant has been approved for leave based on a serious health condition under the FMLA since 2007. [Ex. 9].

Defendant next argues in this case that complications associated with diabetes does not substantially limit a major life activity. The ADAAA directs that "substantially limits" should not be as strictly construed as some courts have required in the past and should not require "extensive analysis." ADA Amendments Act of 2008. The ADAAA maintains that "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). In this case, Grant suffers from edema, neuropathy, swelling, and severe pain in the leg when standing and walking for long periods of time. These are direct complications of Type 2 Diabetes.

The following facts support that Grant is substantially limited from standing, walking, and working. First, Grant's physician diagnosed him with chronic neuropathy with swelling of the feet from diabetes that will require 15 minute breaks as needed to prop his feet up to reduce swelling.

[Ex. 9 (HC-0406 Grant). Moreover, his physician stated Grant would be absent from work during flare-ups because Grant cannot tolerate weight bearing and needs complete rest until resolved. His doctor also said that he could not perform basic sign-up floor duties of a JSO without accommodations. [Id]. Grant could perform other assignments as a JSO like being assigned to central control, the control booth, inventory, intake, and CW duty. Second, Grant testified that he cannot stand or walk consistently for more than one hour before his feet are swelling and he is in pain. For each minute he walks or stands thereafter, the pain will increase, and he will start limping and may not be able to stand or walk without severe pain. [Ex. 20 (Grant Decl. ¶9d)]. His doctor confirmed the same by stating he required complete rest during flare-ups of this nature. [Ex. 9]. Third, Grant's diagnosis of diabetes is a lifetime condition per his physician. [Ex. 9]. Fourth, Grant's condition has gotten progressively worse. [See Ex. 9 and 22]. Fifth, Grant required FMLA leave because his condition impairs his ability to work consistently due to unpredictable episodes. [Ex. 9]. He must stop standing or walking and prop his feet up as needed. Due to the unpredictable nature of the impairment, it will make it impossible for Grant to work a job that required prolonged standing or walking. Grant is on a leave of absence from Home Depot from his last flare-up which required hospitalization. [See Ex. 22]. Sixth, the only type of work that Grant could perform without making the swelling and edema worse was JSO assigned to sedentary positions as he had performed from 2009 to 2011. He must maintain sedentary position that permits him to sit down during most of the working day. [Ex. 20 (Grant Decl. ¶8-9,11-12)]. Grant is 6'6" and trained in basketball and football but will not be able to perform any types of jobs related to these sports that require standing or walking for prolonged or constant periods of time. [Id]. Grant has provided sufficient evidence that his diabetes substantially affects standing, walking and working (as it relates to the types of jobs that

he can perform).

### b.      Defendant regarded Grant as disabled.

Grant believes he is disabled, because his impairment substantially limits a major life activity. Moreover, he believes Defendant regarded him as disabled under the ADAAA. The admission by HR Director Shelton that Defendant believed Grant to be disabled under the ADA should be sufficient to establish this point. [Ex. 5 (Shelton 153:16-18)].  Nevertheless, an individual may be "regarded as disabled" if he has a physical or mental impairment that does not substantially limit major life activities but nonetheless is treated by a covered entity as constituting such a limitation. *McGinnis v. Alamo Community College Dist.*, 207 F.3d 276, 280 (5ᵗʰ Cir. 2000).  In order to be "regarded as" disabled a plaintiff must: (1) have a physical or mental impairment that does not substantially limit major life activities, but be treated as such by an employer; (2) have a physical or mental impairment that substantially limits one or more major life activities, but only because of the attitudes of others toward the impairment; or (3) have no actual impairment at all, but be treated by an employer as having a substantially limiting impairment. *Id.* at 281.

Since diabetes is an impairment under the ADAAA, Grant need only prove that he was regarded as disabled even if the diabetes does not substantially limit a major life activity. It is undisputed that for years, Grant was treated by Defendant (2009 to 2011) as an employee with diabetic flare-ups that caused him to be assigned to limited JSO duties .  Because Grant told his prior supervisors about his condition and they observed his feet swelling and his difficulty with walking and standing for long periods of time, they voluntarily reassigned him to almost all sedentary work. This reassignment is evidence that Grant's supervisors regarded him as disabled. [Ex. 20 (Grant Decl. ¶5)].  He kept these duties for years.  But for him engaging in the protected activity of reporting

-23-

Samuel for national origin discrimination, he would likely still have the same job assignments.

> **c.** **Defendant makes material misrepresentations of fact throughout its motion. As such, any reliance on these fact by the court without confirming them in the record will cause a misguided and unsupported memorandum or order.**

Defendant blatantly lies to the court about facts that are not in the record. At times, counsel for Defendant, Seth Hopkins, completely makes-up facts, intentionally takes statements out of context, and embellishes or exaggerates statements to be something the record does not support. [See Ex. 25]. If Exhibit 25 is not Rule 11 Sanction-worthy, it is very close to it. Many of the facts relied on in its motion are not supported by the record. By blatantly lying or embellishing statements or evidence, Defendant/Hopkins wants to distract the court from the truth. Hopkins makes numerous assumptions that are not true. Many of the statements are not even relevant. Most, if not the entire motion, focuses on the credibility of Grant. Based on this fact alone, summary judgment must be denied as the court cannot make credibility determinations. Grant will not waste time trying to negate every fiction Hopkins alleges but incorporates Exhibit 25 into this section of his Response as fully set forth herein. If the court did not closely review the record, it has likely been misled by Defendant/Hopkins about the facts of this case.

> **d.** **Grant was given a reasonable accommodation for his diabetic flare-ups when he was permitted to take intermittent FMLA leave and perform his JSO duties primarily by working in intake, central control, the control booth, inventory, and periodically sitting on CW. Defendant violated Grant's ADA rights as well as Title VII rights when it revoked his accommodations and refused to reinstate them.**

Although Grant requested a reasonable accommodation after his standing accommodation was revoked in or about August 2011, Defendant took no action to accommodate him. Discriminating against a qualified individual on the basis of disability includes "not making

-24-

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). An unreasonable delay in providing accommodations may also qualify as discriminating against a qualified individual on the basis of disability. *Valle-Arce v. P.R. Ports Auth.*, 651 F.3d 190, 200 (1st Cir. 2011). "To make out a reasonable accommodation claim, [a plaintiff] must show (1) that [he or] she suffers from a disability, as defined by the ADA, (2) that [he or] she is an otherwise qualified individual, meaning that he or she is 'nevertheless able to perform the essential functions of [his or her] job, either with or without reasonable accommodation,' and (3) that the [employer] knew of [his or] her disability and did not reasonably accommodate it." *Id*. at 198.

Grant satisfies all requirements. Grant incorporates as fully set forth herein the law and facts under sections (1)(a) and (b) of this motion to show he has a disability as defined under the ADAAA. It is undisputed that he was qualified for the JSO position. He continued employment for approximately eight (8) years and was never rendered unqualified by Defendant. He received satisfactory performance evaluations and was viewed as a good employee, until he reported Samuel for discrimination in August 2011. There is overwhelming evidence that Defendant knew about his diagnosis of diabetes. His employment records include several FMLA certifications from his doctor with a diagnosis of diabetes from 2007 to 2013. [Ex. 9]. He was approved for FMLA. He was given an accommodation without requesting one in 2009 until it was revoked in August 2011. Thereafter, he requested reinstatement and even submitted additional documentation of his physician requesting Grant be accommodated for chronic diabetes in March 2012 . [Ex. 9 (HC-0214-Grant)]. His

sedentary accommodation had been revoked since August 2011 and his diabetes had worsened as evidenced in his medical records. [Ex. 9 (HC 0214 & HC-505-Grant]. The neuropathy and swelling were not issues until his accommodations were revoked. [Id.]. The removal of the accommodation and failure to accommodate Grant upon numerous requests beginning in August 2011, caused his diabetic symptoms to worsen. [Id.]. Defendant's ignored his request for almost two years. It was not until Grant filed the EEOC Charge for failure to accommodate and an investigation was underway when Defendant took a small step in discussing an accommodation. He was never reinstated to his original accommodation. However some time in 2013, Defendant permitted Grant to elevate his feet periodically. The delay and removal of the accommodations are sufficient to warrant a trial on this issue. A fact question exists on whether Defendant violated the ADA/ADAAA by removing and delaying his accommodation. Considering to the physical pain Defendant caused in its unnecessary and unreasonable delay in granting or reinstating the accommodation, this should be a relatively easy for a jury to decide in Grant's favor.

Grant could perform the essential functions of his position with accommodations. This fact is confirmed by his performance at a satisfactory level from 2009 to 2011 when he worked in sedentary areas. Any dispute regarding his performance is tainted by the retaliation he experienced after reporting Samuel for discrimination in August 2011. A jury could easily and reasonably conclude that Grant could perform his job duties as JSO with accommodation as he had for years. Unlike most cases, there must be some degree of speculation on whether an employee can perform the essential function of the position with an accommodation that has not been tested. Here, the accommodation was tested and worked well for Grant and Defendant. Grant has provided overwhelming evidence to permit his case to be heard by a jury.

-26-

> ### e.    Grant's disability was a motivating factor when Defendant made the decision to terminate his employment in November 2013.[9]

In sum, the prima facie case approved by the panel for a disability-discrimination-in termination claim under the ADA arises from the *Zenor* line of cases, which requires a plaintiff to allege and show (1) he has a disability; (2) he was qualified for the job; and (3) that he was subject to an adverse employment on account of his disability. *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014). *See Zenor v. El Paso Healthcare Sys,* 176 F.3d 847, 853 (5th Cir. 1999). Thus, there is no necessity for comparators under this test.[10]

Under the Americans with Disabilities Act, discrimination need not be the sole reason for the adverse employment decision so long as it actually plays a role in the employer's decision making process and has a determinative influence on the outcome. For this reason, an employee who fails to demonstrate pretext can still survive summary judgment by showing that an employment decision was based on a mixture of legitimate and illegitimate motives and that the illegitimate motive was a motivating factor in the decision.

For the reason previously address under subsections (1)(a), (b), and (d), Grant has satisfied the first and second elements. Defendant does not dispute that the termination was an adverse action

---

[9]While the suspension claim is untimely under the ADA for this suit, untimely claims can be used to support timely claims. Therefore, Grant believes the 2012 write-ups and suspension were all a part of a larger scheme to terminate Grant.

[10]Defendant cites a fourth element not found in other cases. In *EEOC v. LHC Group, Inc.*, 773 F.3d 688 (5th Cir. 2014), the Fifth Circuit refused to add the comparator element because in assessing case precedent, the panel found that *Zenor v. El Paso Healthcare Sys,* 176 F.3d 847, 853 (5th Cir. 1999) was the first *prima facie* formulation in the disability-discrimination context which cited *Chiari v. City of League City*, 920 F.2d 311, 315 (5th Cir. 1991). Another disability discrimination subsequently decided added the comparator element. *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394 (5th Cir. 1995)   Because one panel cannot overturn another panel's decision absent an intervening change in law, such as a statutory amendment, or the Supreme Court, or Fifth *en banc* court, the first panel governs. As such, the *prima facie* case in *EEOC v. LHC* that followed *Zenor* is the correct statement of law on an employee's *prima facie* case in a disability discrimination termination case.

but disputes the fourth element. It claims that Grant cannot establish that the employee who replaced him terminated was not disabled.  As discussed in footnote 8, the comparator element is not necessary at this stage. *See Weed*, 245 F. Supp at 837.  Therefore, Grant has met his *prima facie* showing.

Grant believes Defendant's own motion proves its discriminatory animus against Grant and any employee who has diabetes with chronic neuropathy, edema, and swelling that causes the employee to only be able to perform the sedentary assignments of a JSO.  Since Defendant claims that a person with Grant's disability would not be qualified for the position and that Grant is not qualified for the position, Defendant clearly fired Grant in part because it believed he was not qualified due to his disability and it could not accommodate any person with his disability due to undue hardship and safety risk.  [See DE 69 (filemark Pp. 22-23)]. Based on this admission by Defendant, a jury could reasonably conclude that Grant was terminated in part because of his disability.

> f.    **While all of Grant's claims are strong, one of his stronger claims is for ADA harassment.**

In 2001, the Fifth Circuit recognized a cause of action for disability-based workplace harassment under the ADA, modeling it after a similar claim under Title VII.  *Flowers v. S. Reg'l Physician Servs*., 247 F.3d 229, 235-36 (5th Cir. 2001). To succeed on this claim, a plaintiff must demonstrate 1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *Id*.

-28-

Defendant spends about five pages on this claim.  Most of the argument includes merely conclusory statements with very few facts that negate the presence of a material fact.  Grant incorporates as fully set forth herein subsections (1)(a), (b), and (d) to establish the first element. It is undisputed that Granted reported disability harassment in December 2011.  An alleged investigation was conducted but nothing was done to correct the problem.  Out of the hundreds of investigations Owens has conducted, she has found only <u>two</u> complaints to have merit – one is a sexual harassment case and the other is substantiating an employee who made a false complaint. [Ex. 3 (Owens Depo. 88:18-90:1)]. Owen conducted the investigation but admitted that she destroyed all handwritten notes related to the investigation. She drafted a report where she concluded that no retaliation or harassment has been found. [Ex. 39].  The report had statements in it that did not come from any of the alleged witnesses.  For instance, Grant was characterized in the letter as "lazy," but Owens could not explain who made this derogatory statement. [Ex. 3 (Owens Depo. 139:6-141:1)]. In reading Exhibit 39, it has part of it show give credence to harassment or retaliation.  For instance, Samuel ordered Batiste, a JSO, to deny Grant access to the control booth. [Ex. 37].   All employees were permitted to go through North door into the control booth but Grant. The tone of the letter is not objective but has an intended conclusion and get facts to support the conclusion.

This was the only internal complaint by Grant that was allegedly investigated.[11]  Grant lodged

---

[11]The harassing complaint by Grant against Samuel for placing a photo of him on Facebook showing his feet elevated on a desk (approved conduct) with derogatory comments about Grant's work ethic was so blatant, no investigation needed to be done.  The post directly related to Grant's disability and the limited accommodation that he was given after almost two years.  Samuel denied that he placed the post on Facebook in his deposition, insinuating someone took his cell phone and placed the image on Facebook without his knowledge. [Ex. 2 (Samuel Depo. 61:12-62:20)].  Evidence this blatant showed a retaliatory and discriminatory animus that Grant's other complaint should have been taken more seriously and revisited.  They were not and a few months after the Facebook post in July 2013, Grant was fired.  Samuel was permitted to resign. [Ex. 5 (Shelton Depo. 134:14-19)].  Grant was not permitted to resign.  Based on these facts alone, a jury could reasonably conclude that Defendant permitted harassment that affected the term and conditions of Grant's employment.

several complaints via Exception Reports. [Ex. 35].  He also lodged a complaint of retaliation and

harassment as late as July 2013.  But nothing was done.

To show harassment that is severe and pervasive, Grant incorporates as fully set forth herein

the testimony provided in his declaration in paragraph 9, subsections a-u to support his hostile work

environment claim based on retaliation and ADA discrimination.   He also notes this case is

especially egregious because the retaliation and harassment caused Grant severe physical pain and

suffering.  There was not absolutely no justifiable reason for making Grant work 4A with his feet

constantly in swollen and in severe pain. Exhibit 22 speaks volume to the malice and hatred

supervisors including management and HR had for Grant.  A jury could reasonably conclude that

in revoking his accommodation and restricting him as they did that Defendant is liable for

harassment.  There are so many facts Defendant must negate for this court to grant summary

judgment. As the court stated in initially denying Defendant's Motion for Summary Judgment, there

are too many factual disputed for this court to dismiss this case, even without a Response from

Grant.  Now that it has a Response from Grant, the facts in this motion an in the record should

confirm that the court first decision was correct.

> **g.      Based on the facts provided in the record, there is sufficient
> evidence for a jury to reasonably conclude that but for Grant
> requesting accommodations and his rights under the ADA, he
> would not have been terminated.**

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she

engaged in an activity protected by the ADA; (2) she was subjected to an adverse employment

action; and (3) a causal connection exists between the protected activity and the adverse employment

action.  *Miles- Hickman v. David Powers Home, Inc.*, 589 F.3d 849, 868 (S.D. Tex. 2008).

Importantly, in order to prosecute an ADA retaliation claim, [the] plaintiff need not show that she

suffers from an actual disability. Instead, a reasonable, good faith belief [by the plaintiff] that the statute has been violated suffices." *Tabatchnik v. Cont'l Airlines,* 262 F. App'x 674, 676 & n. 1 (5th Cir. 2008). If a defendant articulates a legitimate nondiscriminatory reason for the adverse action, the plaintiff must next demonstrate that a material issue of fact exists about whether DPH's explanation is pretextual. To meet this burden the plaintiff must demonstrate that she would have been retained "but for" engaging in the protected activity.

Grant has provided sufficient evidence to make a *prima facie* showing of retaliation. He filed his this EEOC charge in October 2012 soon after his suspension by Defendant. Approximately three months after lodging the complaint, Grant received another supervision of youth policy violation in January 2013, just three months later. One month after (unlike other employees), Grant received a "final warning letter." [Ex. 27]. Yet, a few months after the final warning, Grant received a satisfactory performance evaluation that rated Grant as "meets expectations" in all areas of job. [Ex. 34]. This type of conflict of evidence can lead to pretext, especially when it was Defendant's policy for terminations that stated it would not count a violation against an employee six (6) months from the violation date. [Ex. 31]. If January 2013 was his last write-up for a violation of supervision of youth, by August 2013 this violation (though the validity of it is highly disputed) should not have been used in the termination decision. Defendant admitted it went back as far as almost three years to support a termination. In doing so, it violated its own policy. Mangement testified that Defendant has no formal progressive discipline policy. As such, managers, supervisors and HR are acting arbitrarily and creating the rules that make it impossible or difficult to establish pretext. This is not unintentional. It is intentional. Defendants, like Harris County, will continue to get a get out of jail free if courts do not hold it to policies and procedures consistent with an employer the size of Harris

County.  Causal connection in time is established.  Facts to support pretext are present.  Therefore, the jury should be permitted to decide this issue of retaliatory discharge.

## Conclusion and Prayer

For the reasons set forth in this Response to Defendant's Motion for Summary Judgment with accompanying exhibits and with the facts and circumstances set out in Plaintiff's Motion to Amend Final Judgment and Memorandum and Order Granting Summary Judgment, Grant requests that this court permit this case to go before a jury.  He has provided sufficient facts and law for this court to grant this motion.  As such, he asks that it be granted and that he be granted any additional relief to which he may be entitled.