# Plaintiff's Exhibit #5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


OTIS GRANT,                    ) CIVIL ACTION NO. 4:16-CV-03529

          Plaintiff,          )

VS.                            ) JUDGE KENNETH HOYT

HARRIS COUNTY,                 )

          Defendant.           ) JURY TRIAL DEMANDED

*****************************************************************

ORAL DEPOSITION OF

MATTHEW SHELTON, Ph.D.


OCTOBER 19, 2017

*****************************************************************

ORAL DEPOSITION OF MATTHEW SHELTON, Ph.D., produced as

a witness at the instance of the Plaintiff, and duly sworn,

was taken in the above-styled and numbered cause on

October 19, 2017, from 9:34 a.m. to 1:49 p.m., before

Robin Potts, CSR in and for the State of Texas, reported by

machine shorthand, at the Harris County Attorney's Office,

1019 Congress, 15th Floor, Houston, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
    Ms. Victoria Plante-Northington
    Plante Law Firm, P.C.
    5177 Richmond Avenue, Suite 1140
    Houston, TX  77056

FOR THE DEFENDANT:
    Mr. Seth Hopkins
    Harris County Attorney's Office
    1019 Congress, 15th Floor
    Houston, TX  77002

ALSO PRESENT:
    Otis Grant

---

Page 4

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Report dated 2/17/12 from Erika Owens, Investigation of Harassment and Retaliation Complaint filed by Otis Grant against Juvenile Probation, Bates marked HC-1868-Grant through HC-1870-Grant | 34 |
| 2 | Report dated 2/23/12 to Tom Brooks from Erika Owens, Re: Complaint of Retaliation and Harassment Filed by Otis Grant, Bates marked HC-1867-Grant | 34 |
| 3 | Memorandum dated 2/19/13 to Otis Grant from Giselle Jones, Re: Last Warning Letter, Bates marked HC-0069-Grant and HC-0070-Grant | 61 |
| 4 | E-mail chain dated 1/17/14, Subject: Determination Letter of Otis J. Grant, with attachments, Bates marked HC-1321-Grant through HC-1323-Grant | 62 |
| 5 | E-mail chain dated 2/18/13, Subject: TerminationWarningLtr OGrant2013.docx, Bates marked HC-1179-Grant | 62 |
| 6 | Letter dated 3/21/12 from David Braunreiter, M.D., Methodist Orthopaedic Specialists of Texas, Bates marked HC-0103-Grant | 65 |
| 7 | Letter dated 8/6/13 to Otis Grant from Matt Shelton, Re: Grievance Response, Bates marked HC-1346-Grant | 131 |
| 8 | Letter dated 2/7/14 to Marilyn Blackshear from Lina Peng Garcia, Re: Charge No. 460-2014-00955, Bates marked HC-0138-Grant through HC-0140-Grant | 138 |

---

Page 3

INDEX

Appearances ........................................... 2
Stipulations ........................................ 5
MATTHEW SHELTON, Ph.D.
    Examination by Ms. Plante-Northington ......... 5
Signature and Changes ............................... 156
Reporter's Certificate .............................. 158

---

Page 5

        THE REPORTER:  Any stipulations?

        MS. PLANTE-NORTHINGTON:  Just according to
the Rules.

        Do you want to read and sign your deposition?

        MR. HOPKINS:  Yes.

        MS. PLANTE-NORTHINGTON:  Okay.

                **********

        MATTHEW SHELTON, Ph.D.,

having been first duly sworn, testified as follows:

                EXAMINATION

BY MS. PLANTE-NORTHINGTON:

    Q.  Please state your name.

    A.  Matt Shelton.

    Q.  Mr. Shelton, my name is Victoria
Plante-Northington; and I represent Otis Grant in a lawsuit
against Harris County.  Do you understand that?

    A.  Yes.

    Q.  Have you ever given a deposition before?

    A.  Two times before.

    Q.  And when was that?

    A.  Probably -- this is going to be approximately.
Probably about four or five years ago and then again about
two or three years ago.

    Q.  And were those employment law cases?

    A.  Yes, they were.

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 6

1  Q.  What type case was it?  Was it a labor case, a
2  discrimination?
3  A.  The first one was an age discrimination, wrongful
4  termination case.  And the second one was a disability case
5  in that we didn't -- we hadn't hired somebody.
6  Q.  You didn't hire somebody?
7  A.  We did not hire them --
8  Q.  Okay.
9  A.  -- through the process.
10 Q.  Failure to hire.  Okay.
11 A.  Yeah.
12 Q.  And do you remember the name of the age
13 discrimination employee?
14 A.  Let me think about that for a second.  I can see
15 her face.
16     I'm sorry.  I don't remember that one.
17 Q.  You don't know her name?  How old was she?
18 A.  She was in her early 70s.
19 Q.  And do you remember whether that was a state or
20 federal case?
21 A.  I do not.  I'm sorry.
22 Q.  What was the outcome of the case?
23 A.  We went to mediation and we settled in mediation,
24 but neither one of the attorneys notified the Court.  So, we
25 got summary judgment after that.  But since we had already

Page 7

1  entered into a settlement, we settled the case.
2  Q.  Oh, okay.
3  A.  It was crazy.
4  Q.  Too bad for you, huh?
5  A.  Yes.
6  Q.  What about the disability case?  Do you remember
7  the name of the person?
8  A.  Her name was Natasha Colbert.  That was the more
9  recent one.
10 Q.  That was two to three years ago?
11 A.  Yeah.
12 Q.  Okay.  And what was the outcome of that case?
13 A.  We went to mediation and settled that case also.
14 Q.  Okay.  Was that the case that Mr. -- you may not
15 know.  Do you remember the attorney in that case, DaSean?
16 A.  Yes, DaSean.
17     What is odd, Mr. Grant was named as one of the
18 witnesses in that case.
19 Q.  Yes.  I didn't know if you had reviewed the
20 documents to know that.
21     Okay.  Any other depositions you've given that you
22 can recall?
23 A.  No.  Not only that I can't recall, I'm sure that
24 those are my only two.
25     MS. PLANTE-NORTHINGTON:  I'll turn off my

Page 8

1  cell phone.
2  Q.  (BY MS. PLANTE-NORTHINGTON)  You know the rules and
3  regulations of depositions since this is not your first time,
4  but let me go over them just for the record.  Do you
5  understand you're under oath?
6  A.  I do.
7  Q.  And do you understand that you are testifying today
8  as though you would be testifying before a judge or jury?
9  A.  I do.
10 Q.  Do you understand that you are to give truthful
11 testimony?
12 A.  I do.
13 Q.  Do you understand that if you do not give truthful
14 testimony, you risk the penalty of perjury?
15 A.  I do.
16 Q.  Is there any reason why you cannot tell the truth
17 today?
18 A.  No, there is not.
19 Q.  No medications impairing you?
20 A.  No.
21 Q.  Did you get a good night's sleep?
22 A.  Pretty good.
23 Q.  Good.  I didn't.
24     Can we agree that if I ask a question that when you
25 answer, you understand it?

Page 9

1  A.  Yes.  If not, I will ask for clarification.
2  Q.  That's what my next question would be.  Just ask
3  for clarification.  I'll be more than happy to rephrase the
4  question or try to break it down.  Okay?
5  A.  Okay.
6  Q.  The court reporter can take only a question or a
7  response at a time.  So, I ask that you permit me to finish
8  my question before you begin to answer.  Okay?
9  A.  Okay.
10 Q.  And I will try to do likewise.  But sometimes it
11 will get messy, and she will come in and referee us.  Okay?
12 A.  Okay.
13 Q.  All right.
14     If you need a break at any time, just let me know.
15 I'm more than happy to give you a break.  But I would ask
16 that you allow me to finish a topic of discussion before we
17 take a break.  Okay?
18 A.  Okay.
19 Q.  What's your home address and telephone number?
20     MR. HOPKINS:  We're going to object to that.
21 If you need the witness, we can provide the witness.
22     MS. PLANTE-NORTHINGTON:  You may.  Well, I've
23 had issues where they were terminated for some reason and we
24 didn't have their last known address and I couldn't subpoena
25 them for trial.  So, I'm going to have to ask his home

Page 10

```
1    address. I'll redact it.
2            MR. HOPKINS:  You'll redact it?
3            MS. PLANTE-NORTHINGTON:  Yes.
4            MR. HOPKINS:  Then I'm going to leave it up
5    to you whether or not you want to provide that or not.  It's
6    up to you.
7        A.
8            MS. PLANTE-NORTHINGTON:  And can you put a
9    note in there that I am to redact?  Because I will forget.
10       Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  And your
11   telephone number?
12       A.   Do you want the city and ZIP Code?
13       Q.   Oh, yes, I do.  I'm sorry.
14       A.   Pearland, Texas 77584.
15       Q.   Your telephone number?
16       A.
17       Q.   Your date of birth?
18       A.   11/19/1971.
19       Q.   Your place of birth?
20       A.   Kansas City, Missouri.
21       Q.   Are you married?
22       A.   Yes.
23       Q.   Do you have children?
24       A.   Yes.
25       Q.   Ever been divorced?
```

Page 11

```
1        A.   No.
2        Q.   What's your highest level of education?
3        A.   Ph.D., doctoral degree.
4        Q.   In what area of concentration?
5        A.   Psychology.
6        Q.   Have you ever been a psychologist?
7        A.   It's not a yes or no question.
8        Q.   Okay.
9        A.   I've never been a licensed psychologist.  I did my
10   predoctoral residency at the VA Hospital here.  Then I did a
11   postdoctoral fellowship in forensic psychology with MHMRA
12   here.  Then I transitioned into an administrative role.  And
13   my emphasis in my doctoral degree was in industrial
14   organizational psychology.  So, I'm not practicing as a
15   psychologist; but I do have that background.
16       Q.   Okay.
17       A.   Sorry for such a long answer.
18       Q.   Other than the Ph.D. and the other degrees prior to
19   that, do you have any other certifications?
20       A.   No.
21       Q.   Okay.
22       A.   I'm sorry.  I am a certified juvenile probation
23   officer.
24       Q.   Have you ever been sued?
25       A.   I have not.
```

Page 12

```
1        Q.   Have you ever been named in a lawsuit even though
2    you were not technically on the caption of the case?
3        A.   I have not been.  And you're asking me personally
4    versus Harris County Juvenile Probation?
5        Q.   Harris County as well.
6        A.   My name has not been on there, but I've -- Harris
7    County Juvenile Probation has been named.
8        Q.   Okay.  And in those lawsuits has anyone ever
9    accused you of discriminating --
10       A.   No.
11       Q.   -- as a person --
12       A.   No.
13       Q.   -- in the capacity?
14       A.   No.
15       Q.   Okay.  What about a retaliation case?
16       A.   No.
17       Q.   What about a harassment case?
18       A.   No.
19       Q.   Hostile work environment case?
20       A.   No.
21       Q.   I talked about lawsuits.  Have you had any informal
22   complaints to Harris County about you discriminating,
23   harassing someone, or retaliating against someone?
24       A.   No.
25       Q.   Have you ever felt retaliated against?
```

Page 13

```
1        A.   No, I have not.
2        Q.   Have you ever testified at trial?
3        A.   Not in a personnel capacity.  When I was --
4    actually in a couple of cases from the forensic assessments I
5    did.  I testified in maybe just two or three juvenile cases.
6    And probably three years ago I was called to a death row case
7    that -- it was a kid that I had assessed seven or eight years
8    before that had matriculated into the adult system, and they
9    called me to testify in that case.
10       Q.   Were you testifying for the State or the defense?
11       A.   The State.
12       Q.   And you were designated as an expert?
13       A.   Yes.
14       Q.   Have you done any work -- or have you testified for
15   the defendant in any cause of action as -- in a criminal
16   proceeding as a forensic expert?
17       A.   No, I have not.
18       Q.   What is your current position with Harris County?
19       A.   I am the Deputy Director of Administrative Services
20   for the Harris County Juvenile Probation.
21       Q.   How long have you been in that position?
22       A.   Approximately six years.
23       Q.   So, from --
24       A.   2011.
25       Q.   Okay.  Do my math.
```

Page 14

```
1    A.  I was doing it backwards.
2    Q.  What's your annual salary?
3    A.  It is --
4         MR. HOPKINS:  Is that a public record?
5         THE WITNESS:  Yes, it is public record.
6         MR. HOPKINS:  Okay.
7    A.  It's approximately $130,000.
8    Q.  (BY MS. PLANTE-NORTHINGTON)  What are your job
9    duties as Deputy Director of Administrative Services?
10   A.  I am over several different functions in the
11   department.  One is human resources.  One is IT and all the
12   research endeavors that the department engages in.
13   Q.  That's it?
14   A.  Yeah.
15   Q.  So, you answered my next question.  You do serve in
16   an HR function?
17   A.  I do.
18   Q.  In the hierarchy or the organizational chart, would
19   the HR director fall under you or how would it occur?
20   A.  I am probably -- I am considered the HR director.
21   Q.  Oh, you are the HR director?
22   A.  Yes.
23   Q.  You're wearing many hats here.
24   A.  I have a few on.
25   Q.  And you're IT over the --
```

Page 15

```
1    A.  Yeah.
2    Q.  -- information technology?
3    A.  All of our information systems and then all of our
4    research.
5    Q.  Okay.  Great.
6         Before assuming the role of Deputy Director of
7    Administrative Services, what other positions did you hold
8    with Harris County, if any?
9    A.  I was briefly for about nine months the Assistant
10   Deputy Director of Administrative Services.
11   Q.  Was it an acting role or were you actually in that
12   role?
13   A.  I was in that role.
14   Q.  Okay.  And what happened?  You were promoted?
15   A.  I was promoted.
16   Q.  Okay.
17   A.  It will probably make sense with the next step.
18   Q.  Okay.
19   A.  Prior to that, I was the Assistant Deputy Director
20   of Health Services.  So, as I transitioned into the HR role,
21   I came in under the previous director briefly and then moved
22   into that role.
23   Q.  As the Assistant Deputy Director of Administrative
24   Services, was your function to oversee HR as well?
25   A.  Yes.  While I was Assistant Deputy Director, there
```

Page 16

```
1    are two Assistant Deputy Directors of Administrative
2    Services.  One is on the HR side.  That was the role that I
3    played.  The other one is over the IT and research side.
4    Q.  Okay.  And those are all the positions that you've
5    held within Harris County's Probation Department?
6    A.  The division titles have changed kind of over the
7    years.  When I first started, it was called the Psychological
8    Services Division.
9    Q.  Okay.
10   A.  And, so, that was my first job there.
11   Q.  Okay.
12   A.  The director then took over all the medical aspects
13   in addition to the psychological aspects.  So, it went from
14   Psychological to Health Services.  So, the title changed,
15   but --
16   Q.  The job functions?
17   A.  Yeah.  I was doing basically the exact same thing.
18   Q.  Okay.
19   A.  Prior -- I'm sorry.
20   Q.  Go ahead.
21   A.  Prior to that, I was with MHMRA, now The Harris
22   Center, for four years; and it was kind of a cooperative
23   position.  So, I was supervised by a psychologist with the
24   Juvenile Probation Department; but I got my paycheck from
25   MHMRA and I was housed with the Juvenile Probation
```

Page 17

```
1    Department.  So, that probably goes back to 2001.  It goes
2    back to 2001, and that's kind of when I became involved with
3    the department.
4    Q.  So, 2001 would have been your first position with
5    the Harris County probation office?
6    A.  No.  That was with MHMRA.  And then in 2006 would
7    have been when I was officially hired by the Harris County
8    Juvenile Probation Department.  My office didn't change.  It
9    was just organizations changed.
10   Q.  Your check?
11   A.  Yes.
12   Q.  Okay.  At MHMRA did you serve any HR role?
13   A.  I did not.
14   Q.  Okay.  Did you do any kind of psychological
15   evaluations or anything?
16   A.  Yes.  That was my full-time job.  That's all I did.
17   Q.  Prior to -- I am not going to go too far back.  But
18   prior to MHMRA, where did you work?
19   A.  I did a one-year predoctoral residency at the
20   Houston VA Hospital.
21   Q.  And I assume before that, you were just in school?
22   A.  For a very long time.
23   Q.  I understand.
24        Have you ever been terminated from a job?
25   A.  Yes, I have.
```

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 18

```
1        Q.   What employer?
2        A.   It was my first job out of college in 1994. I held
3   the job for about two months. It was something Collateral
4   Insurance Agency. It was calling people and trying to
5   repossess their phone -- their cars over the phone. It was
6   the insurance company that banks have for car loans. If they
7   write off a car loan, the insurance company gets it. This
8   was, like, one step further down the road. They then sell
9   those to another company that can call and try to repossess
10  those cars. So, you call people and try to talk them into
11  giving their cars back after they hadn't paid on them for
12  usually two years by that point. And I wasn't very
13  successful at that job.
14       Q.   Okay. So, were you terminated for performance or
15  misconduct?
16       A.   It was performance. It was almost mutual. I got
17  paid straight commission, and I wasn't making any money.
18       Q.   I understand.
19            Were you ever disciplined at a job?
20            MR. HOPKINS: I'm going to object. He is not
21  a party to the case. He's just a fact witness. That's why
22  you've called him. And we're going far afield.
23            MS. PLANTE-NORTHINGTON: I mean, you can make
24  your objection.
25            MR. HOPKINS: Yeah.
```

Page 19

```
1             MS. PLANTE-NORTHINGTON: Your objection is
2   noted.
3             THE WITNESS: I don't mind answering that
4   question.
5             MR. HOPKINS: Okay.
6        A.   No.
7        Q.   (BY MS. PLANTE-NORTHINGTON) Okay. So, you've
8   never been warned, suspended, counseled, or anything?
9             MR. HOPKINS: Objection.
10       A.   Not in the last 20 years.
11       Q.   (BY MS. PLANTE-NORTHINGTON) As it relates to your
12  job now, do you know what Exception Reports are?
13       A.   I do.
14       Q.   What are they and what is the -- well, what are
15  they?
16       A.   Exception Reports, as the term is used within our
17  department, is kind of the working reports that are used
18  typically at the line level within the different facilities.
19  And they use that term extremely broadly. If you come in
20  late, they may have you do an Exception Report explaining why
21  you're late. If there is an incident that happens on the
22  floor, they may have you fill out an Exception Report. They
23  are used for a broad base.
24       Q.   Okay. So, it could be employee to employee? It
25  could be juvenile to the employee? It could be --
```

Page 20

```
1        A.   No. It is usually employee to first-level
2   supervising staff.
3        Q.   Okay.
4        A.   Probably 95-plus percent are at that level.
5   Sometimes it will be from a -- like, a building supervisor,
6   which is two levels up, will ask an employee during the
7   course of an investigation to fill out Exception Reports.
8   It's just a report.
9        Q.   Okay. So, if an incident occurred with the
10  juvenile, it would not -- with the juvenile and the actual
11  employee, it would not be included in an Exception Report?
12       A.   The Exception Reports would probably be filled out
13  by the investigators that are looking into what the
14  accusations were. The juvenile, if they wanted to make a
15  written complaint against anybody there -- and it could be a
16  teacher, an employee, anybody -- could fill out a grievance.
17  And it's a juvenile grievance, which is different from an
18  employee grievance. It's a different process.
19       Q.   So, they would not fill out an Exception Report?
20       A.   No.
21       Q.   Okay.
22       A.   The juvenile would never fill out an Exception
23  Report.
24       Q.   What is the purpose of the Exception Report?
25       A.   It depends on who is asking. They use them for a
```

Page 21

```
1   wide variety of things. It's basically just to document
2   events that have occurred within that facility.
3        Q.   Would a person fill out an Exception Report if they
4   feel they have been treated discriminatorily or unfairly?
5        A.   They could.
6        Q.   Is there another form -- in your HR function, is
7   there another form that they have to complete in order to
8   lodge a -- I'm not saying that a written report is necessary.
9   But if there is a form that exists in HR, is there a form?
10       A.   There is a form at the county level in the ADA
11  policies that basically if you feel that -- for ADA purposes
12  that if you feel your ADA needs aren't being met, you can
13  fill that form out. But we take those complaints --
14  sometimes we get e-mails. Sometimes we get telephone calls.
15  But if it was done on an Exception Report and handed to HR,
16  it would be treated as a report.
17       Q.   Okay. So, you can take complaints of
18  discrimination, harassment verbally or by document?
19       A.   That is correct.
20       Q.   Do you know what this lawsuit is about?
21       A.   Generally, yes.
22       Q.   Okay. What is it --
23       A.   I think I do.
24       Q.   Okay. What do you think it is about?
25       A.   It's an ADA lawsuit about whether the department
```

Page 22

```
1    was responsive enough for meeting Mr. Grant's needs.
2       Q.   Would you say that's a reasonable accommodation
3    type of request?
4       A.   Yes, I would.
5       Q.   Okay.  And were you aware there's a retaliation
6    component to the lawsuit?
7       A.   Yes.
8       Q.   What about a harassment portion to the lawsuit?
9       A.   Yes.
10      Q.   Let's talk about you and Mr. Grant's relationship.
11   During his employment, did you interact with him directly?
12      A.   Yes, I did.
13      Q.   On how many occasions?
14      A.   I was thinking about this last night.  Maybe five
15   or six.
16      Q.   Over -- I think he worked there maybe eight years?
17      A.   It would have been the tail end of that.  I might
18   have run into him when I was doing psychological assessments
19   and going in and out of the detention center that way.  I
20   don't recall having any conversations with him particularly.
21   It was probably -- it was after I moved in.  So, probably
22   late 2011 was the first time I think I learned Mr. Grant's
23   name.
24      Q.   Okay.  Was that related -- and when I say that,
25   "related," was the interaction and your learning of his name
```

Page 23

```
1    related to him lodging any type of complaint?
2       A.   Yes, it was.
3       Q.   What type of complaint did you understand him to
4    lodge?
5       A.   The first complaint I remember him lodging was a
6    complaint about nation of origin.  And let me kind of explain
7    a little bit further.
8       Q.   Uh-huh.
9       A.   Our paths crossed in two different lines.  I sat in
10   on at least two interviews that Mr. Grant did for positions,
11   and I don't know the timeline of that.  That could have been
12   slightly before or slightly after.  I don't know where that
13   timeline was.  But I do remember Mr. Grant from interacting
14   with him in interviews also.
15            But from the complaint side of things, it was late
16   2011 when that --
17      Q.   Okay.  These interviews, were they for promotion
18   positions or lateral positions?
19      A.   One of them I believe was in intake in court.  That
20   would have been a promotion.  I do not recall what the -- I
21   can remember the rooms we met in, but I can't recall exactly
22   those positions he was interviewing for.
23      Q.   Okay.  And the other one you can't remember?
24      A.   No, I can't.
25      Q.   Okay.  I assume he did not receive the promotion?
```

Page 24

```
1       A.   He did not.
2       Q.   Okay.  Who did you select?
3       A.   I don't know off the top of my head.
4       Q.   Were they a person with a disability?  Do you know?
5       A.   Honestly, I don't know.  I don't remember who got
6    either one of those positions or exactly what those positions
7    were.
8            MR. HOPKINS:  Just for the record, to the
9    extent that we're talking about something before the statute
10   of limitations, 2011, we're just going to lodge the objection
11   for the record; but you can certainly ask.
12            MS. PLANTE-NORTHINGTON:  Okay.
13      Q.   (BY MS. PLANTE-NORTHINGTON)  And, so -- I lost my
14   point here.  Just one moment.
15            When you interviewed him, was it a panel or did you
16   individually interview him?
17      A.   It was a panel.
18      Q.   Who was included in the panel?
19      A.   I do not know off the top of my head.
20      Q.   I mean --
21      A.   The way the panels work is there's an HR
22   representative, which I would have been serving that role.
23   And then there's usually two people from the division that's
24   interviewing.  We do probably five or six of these a week.
25      Q.   Okay.
```

Page 25

```
1       A.   I'm sorry.  I remember meeting Otis there and I
2    remember looking at his resume for the first time and kind of
3    learning a little bit about him, but I really don't remember
4    exactly what those positions were other than he did not
5    receive those positions.
6       Q.   How did he come across in the interview?
7       A.   Otis has a great smile.  I mean, he presents well.
8    He's a nice, competent man.
9       Q.   I'm sure he would appreciate that.
10            Do you know anything about him personally?
11      A.   From those interviews, a little bit, what he's
12   chosen to share.
13      Q.   Okay.  What did you gather?
14      A.   Being a sports fan, I remember looking at his
15   resume the first time; and he's a two-athlete star from U
16   believe U of H.  Nobody does that.  That's awesome.  I
17   believe he played in the NFL, maybe NFL Europe.  But I kind
18   of got a wow factor.  It sticks in your mind when you look at
19   a resume.
20      Q.   That is true.
21      A.   I'm pretty sure he graduated from U of H.
22      Q.   Okay.  And do you know anything about his personal
23   life?  Is he married?
24      A.   I know a little bit about his personal life now
25   because I have listened to kind of the tapes and the audio
```

Page 26

1   that he submitted.
2       Q.   Okay.
3       A.   I'm not sure if I knew that at the time.  We might
4   have chitchatted a little bit before the interview, and he
5   might have -- I don't know for sure.
6       Q.   Okay.  You have never gone to any functions outside
7   of the Harris County functions with him?
8       A.   No.
9       Q.   Did you know he was having problems with his leg as
10  it relates to diabetes, his foot and his leg?
11      A.   That came up with that initial complaint back in
12  2011.  I think it -- I don't remember exactly when I got
13  involved, but I think it ended up in the EEOC complaint.  I
14  think there was several other things kind of mentioned in
15  there, and I think that was when I became aware.
16      Q.   Okay.  Speaking of EEOC charges, are you
17  responsible for overseeing the investigation of those
18  charges?
19      A.   In some cases.
20      Q.   Were you in charge for Mr. Grant at any time?
21      A.   We take kind of a team approach when we do that.
22  I believe Bianca Malveaux, my assistant deputy, was the lead
23  on kind of gathering the information and putting that
24  together.
25      Q.   And what's her job title?

Page 27

1       A.   She is the Assistant Deputy Director of
2   Administrative Services on the HR side.
3       Q.   So, you believe in both charges she oversaw that
4   investigation?
5       A.   I believe so.  I was involved in it, but I think
6   she was primary on those.
7       Q.   When you say you were involved, what do you mean?
8       A.   We talked about it.  We met with the other
9   deputies.  Or in this case I believe Dr. Quintana was kind of
10  involved in the beginning.  And then she was later replaced
11  with Melissa Watson.
12      Q.   When you met with her, what did you discuss with
13  her specifically about Mr. Grant's investigation of his
14  charges?
15      A.   I don't recall.  It was a long time ago.
16      Q.   Did you meet with her formally or just informally?
17      A.   Informally.
18      Q.   Did you make notes?
19      A.   No.
20      Q.   Is it common for you not to make notes as the HR
21  director of an investigation of an EEOC charge?
22      A.   If I was interviewing somebody, I would definitely
23  take notes.  If I'm kind of coordinating what's going on,
24  then I don't always take notes.
25      Q.   When you say you're coordinating what's going on,

Page 28

1   are you actually approving that the investigation was done
2   properly or are you just allowing Miss Malveaux to do her
3   thing?
4       A.   I'm her supervisor.  She's my direct report.  So,
5   she's running ideas by me.  I'm making sure that we're
6   talking to everybody and requesting that she talks to
7   additional people or looking at the information that she
8   gathers.
9       Q.   So, you would be a person that would receive, after
10  they completed an investigation, a final report?
11      A.   Yeah.  She gathers the information.  There's
12  usually a County Attorney that's involved in putting together
13  and writing the report.  So, that report will come back to
14  me.  I'll look over that report.  I will get back with
15  anybody I had involved to make sure that everything was
16  accurate in what it reflected.  I do not write the report.
17      Q.   Have you ever seen things in a report that you
18  stated, "You need to look at this.  You need to ask this.
19  You need to go back and find out this"?
20      A.   Yes.
21      Q.   In Mr. Grant's case, were you able to do that?
22      A.   Yes.
23      Q.   Have you ever done an investigation yourself?
24      A.   Yes.
25      Q.   How long ago?

Page 29

1       A.   It has been a couple of years.
2       Q.   Okay.  What was your process when you did an
3   investigation?
4       A.   Initially I talk to the complainant, gather a
5   statement.  Then I usually go talk to the director of the
6   division that I'm about to start questioning their
7   employees and let them know that I'm going to be conducting
8   an investigation.  Reach out to witnesses and people that
9   have been identified as having knowledge, call them in, take
10  statements, compile the report, and then typically get back
11  with the complainant kind of at the end of the process.
12      Q.   When you're taking statements from witnesses, are
13  you writing something down?
14      A.   Typically, yes.
15      Q.   When you question employees, does that mean
16  management employees or that is the person involved in the
17  complaint?
18      A.   It's really dependent on the complaint.
19      Q.   Okay.
20      A.   If it's a sexual harassment case against a
21  co-worker, I mean, you would obviously talk to co-workers and
22  try to get witnesses and that.  So, the complaint itself
23  really drives what direction the questioning goes.
24      Q.   Okay.  What type questions would you have asked in
25  that particular scenario two years ago?

Page 30

1    A.  What type of questions?
2    Q.  Yeah, to the witnesses.
3    A.  Just accounts of what happened.
4    Q.  And do they typically give statements or you just
5  include -- or in that particular situation -- let's keep it
6  with that situation -- did they give written statements or
7  did you just write down what they said?
8    A.  We usually talk to them and then ask them to make a
9  written statement kind of upon leaving the office.
10   Q.  You said you compile a report.  So, do you give
11  just a narrative of what the evidence shows or the facts
12  show?
13   A.  In some cases we do, not in all cases.  In some
14  cases we just take action or meet with them.  It's really
15  case dependent.
16   Q.  Okay.  In that particular situation two years ago
17  where you were directly involved in investigating, who was
18  the person?
19       THE WITNESS:  Is it okay if I share?
20       MR. HOPKINS:  You can, yeah.
21       THE WITNESS:  Okay.
22   A.  The investigation I'm thinking of is with Timothy
23  Brown.
24   Q.  (BY MS. PLANTE-NORTHINGTON)  Timothy Brown.  What's
25  his job title?

Page 31

1    A.  He was a supervisor, I believe.
2        And now that I think about it, it may have been
3  closer to, like, four years ago.
4    Q.  That's okay.  I'm not going to hold you to it.  I
5  understand it all gets gray at a certain point.
6        So, he was a supervisor, JPO or JPD?  I don't know.
7    A.  Juvenile Probation Officer, yes.
8    Q.  Okay.
9    A.  He was over one of the field units.
10   Q.  He had been accused of something?
11   A.  Yes.
12   Q.  What had he been accused of?
13   A.  Sexually harassing one of his employees.
14   Q.  Did you find sexual harassment?
15   A.  We did.
16   Q.  Was he terminated?
17   A.  He was.
18   Q.  What is his race?
19   A.  African-American.
20   Q.  Who was he found to have sexually harassed?
21   A.  A subordinate.
22   Q.  Name?
23   A.  Danielle Ford.
24   Q.  Is she still employed with you?
25   A.  I don't believe so.  I think she left subsequently.

Page 32

1    Q.  Did she file a lawsuit?
2    A.  She did not.
3        MR. HOPKINS:  For the record, I'm going to
4  object.  This is a disability case.  We are getting a little
5  bit far afield.  That's just for the record, a continuing
6  objection.  You're certainly welcome to ask.
7        MS. PLANTE-NORTHINGTON:  I'm laying the
8  foundation for something else you don't know about.
9    Q.  (BY MS. PLANTE-NORTHINGTON)  So, Miss Ford, what's
10  her race?
11   A.  Caucasian.
12   Q.  How many witnesses verified what she said?
13   A.  The incident happened away from the office in a
14  hotel room.
15   Q.  The office hotel room?
16   A.  No, away from the office in a hotel room.
17   Q.  Oh, away from the office.  So, there were no
18  witnesses but her and Mr. Brown?
19   A.  There was another complainant that came forward
20  that had a similar situation.
21   Q.  But to that incident involving Miss Ford's
22  allegation against Mr. Brown, were there any other witnesses
23  in that scenario?
24   A.  We talked to basically everybody in the office, but
25  the incident itself --

Page 33

1    Q.  The incident that she claimed.
2    A.  No.
3    Q.  No other witnesses.
4    A.  She claimed some grooming behavior that happened
5  prior to that that we kind of talked with other people about
6  to verify that piece.
7    Q.  Okay.  So, in essence, you believed Miss Ford over
8  Mr. Brown?
9    A.  When the second complainant came forward, it seemed
10  very plausible, yes.
11   Q.  So, would you say that if somebody validates a
12  person's complaint -- when I say "validates," comes in and
13  gives a "me too" type of factual pattern -- would you say
14  that that adds credence to the complaint?
15   A.  I would.  It does kind of depend on the situation
16  and there's a lot of factors that go into that, but it
17  definitely can.
18   Q.  And this particular person that was involved in
19  another, I guess, incident with Mr. Brown, this woman that
20  was involved, did she come in and say, "I was harassed too"?
21   A.  When we asked the other employees that were
22  currently in that office, one of them confided that this
23  employee who was no longer in the office had complained to
24  them in the past about Mr. Brown.  So, we reached out, talked
25  to this other employee who had a similar story.

9  (Pages 30 to 33)

Page 34

1    Q.  Did Mr. Brown, to your knowledge, before
2  termination have any other disciplinary action in his file?
3    A.  I do not recall.
4    Q.  Did Mr. Brown file suit?
5    A.  He did not.
6    Q.  As it relates to Mr. --
7        MR. HOPKINS:  Just for the record, I want to
8  make very clear that we have a continuing objection to all of
9  this stuff.
10       MS. PLANTE-NORTHINGTON:  I understand.
11       MR. HOPKINS:  Okay.
12       MS. PLANTE-NORTHINGTON:  I'm laying the
13  foundation for something, but you can object.
14       Can you mark this as 1?  Oh, I can mark it, help
15  you out here.
16       (Exhibit No. 1 was marked)
17    Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  I'm placing
18  before you what's been marked as Shelton Exhibit 1.  I have
19  another copy, I believe.  Can you tell me -- while I find the
20  copy, can you tell me, have you seen that report before?
21    A.  Yes, I have.
22    Q.  And let me go ahead and mark this as Shelton
23  Exhibit 2.
24       (Exhibit No. 2 was marked)
25    Q.  Have you seen that document before, Exhibit 2?

Page 35

1        MR. HOPKINS:  Can I have a copy?
2        MS. PLANTE-NORTHINGTON:  Yeah.  I'm just
3  trying to figure out where my other copy is.  Here's this.
4        MR. HOPKINS:  Thank you.
5        MS. PLANTE-NORTHINGTON:  And hold on just one
6  minute.  Let me see if I have that other one.
7    Q.  (BY MS. PLANTE-NORTHINGTON)  Did you say "yes"?
8    A.  I remember seeing the initial document.  I am cc'd
9  on the second document.  I can't recall that I've seen it,
10  but it was --
11    Q.  Okay.
12    A.  -- five years ago.
13    Q.  Okay.
14       MS. PLANTE-NORTHINGTON:  One minute.  Let me
15  make sure I mark my own exhibits so I can reference them.
16       MR. HOPKINS:  Once again, to the extent that
17  this references something before the statute of limitations,
18  just for the record, I'll object.
19       MS. PLANTE-NORTHINGTON:  We're not trying to
20  say -- okay.  Objection noted.
21    Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  Can you tell me
22  why -- what is -- just for the record, what is Exhibit 1?
23    A.  It is a report that was generated by Human
24  Resources & Risk Management, the county-governing HR
25  department.

Page 36

1    Q.  Do you have oversight of them?
2    A.  No.
3    Q.  So, this is an investigation you had no oversight
4  over?
5    A.  Absolutely not.
6    Q.  Why?
7    A.  Because it was an allegation of harassment and
8  retaliation, we contacted HRRM, which does investigations at
9  a county level, and asked them to conduct an investigation.
10    Q.  So, this HR department is --
11    A.  Supersedes.
12    Q.  -- different from Harris County Probation
13  Department?
14    A.  Yes.
15    Q.  Does that happen frequently?
16    A.  I believe every county department would have that
17  arrangement.
18    Q.  Why was the sexual harassment claim handled by you
19  if it could have been handled by another department?
20    A.  We notify HRRM when we get those complaints.
21  Sometimes they review and say that they will take on the
22  investigation.  Other times they ask us to take on the
23  investigation.
24    Q.  How many investigations do you recall in the last
25  five years you've taken on where you had oversight?

Page 37

1    A.  I don't know an exact number.  Several.
2    Q.  Has it been ten in the last five years?
3    A.  Probably less than ten.
4    Q.  More than five?
5    A.  Fiveish maybe.
6    Q.  Okay.  I'm not going to hold you to it.  Just an
7  approximate.  Less than ten is good.
8        And were those allegations of sexual harassment?
9  What made it a point of interest for you to oversee?
10    A.  We would have staffed any harassment or
11  discrimination with HRRM and let them know that we got this
12  complaint.  Specifically those that involve managers, usually
13  they take -- they'll take those on.  I don't know what
14  exactly their criteria is of telling us to run with it versus
15  them.
16    Q.  Did you manage the investigation of Anthony Samuel?
17    A.  No.  The HRRM conducted that one also.
18    Q.  So, the same one that -- when you say "HRRM," are
19  you talking about Human Resources & Risk Management?
20    A.  Yes.  I'm sorry.
21    Q.  Okay.  I just want to get it for the record.  A lot
22  of acronyms here that I'm not familiar with.
23    A.  I apologize.
24    Q.  That's okay.
25        And Exhibit 2 you're copied on; correct?

Page 38

1   A.   Yes.
2   Q.   And that is what, a memo from whom?
3   A.   Erika Owens.
4   Q.   And is she the same person that authored Exhibit 1?
5   A.   It appears so.
6   Q.   Okay.  And do you know why her signature does not
7   appear on Exhibit 2?
8   A.   I do not.
9   Q.   Is that abnormal?
10  A.   I really haven't re -- yes, I think it would be
11  fairly -- I haven't received a lot of reports formatted like
12  this.
13  Q.   Okay.  Do you know Miss Owens?
14  A.   I know who she is, yes.
15  Q.   Does she still work for Harris County?
16  A.   She does.
17  Q.   Did you read the report that is Exhibit 1?
18  A.   Yes, I would have read that report.
19  Q.   You would have read the report?
20  A.   Yes.
21  Q.   And did you believe she had done pretty much an
22  investigation, so to speak, by the book?
23  A.   There was nothing for me to question her
24  investigation.
25  Q.   Okay.  When you read it, did you have any questions

Page 39

1   to her about it?
2   A.   It would be typical that I would talk to her on the
3   phone after an investigation.  I don't remember what that
4   conversation would have entailed.
5   Q.   Did you ask her -- okay.  Do you recall asking her
6   to change anything about the report?
7   A.   I do not.
8   Q.   Okay.
9   A.   That would be unusual.
10  Q.   It would be unusual?
11  A.   Yes.  I think I would have remembered that.
12  Q.   Would you ask her any questions regarding things
13  that you saw that were -- just something that, when you read
14  it, didn't strike you as right?
15  A.   I may have.
16  Q.   Okay.  You don't know about in this particular --
17  A.   I don't know.
18  Q.   -- report in Exhibit 1?
19       Would Mr. Grant have been provided a copy of
20  Exhibit 1?
21  A.   I do not know that.
22  Q.   Okay.
23       MR. HOPKINS:  That would be an Erika Owens
24  question.
25       (Sotto voce discussion between Mr. Grant

Page 40

1        and Ms. Plante-Northington)
2   Q.   (BY MS. PLANTE-NORTHINGTON)  You said something to
3   your attorney while -- or your attorney said something to you
4   while I was talking to my client.  Did he tell you something?
5   A.   He said something along the lines of this happened
6   a long time ago.
7        MS. PLANTE-NORTHINGTON:  I'm going to ask you
8   not to coach.
9        MR. HOPKINS:  I'll tell you exactly what I
10  said.  This was authored by Erika Owens.  That might be a
11  question you want to direct to her.  It's not something that
12  Dr. Shelton would know.
13       MS. PLANTE-NORTHINGTON:  No, no, no, no, no.
14  He oversaw it.  Well, he said he actually read it and talked
15  to her about it.
16       MR. HOPKINS:  Okay.
17       MS. PLANTE-NORTHINGTON:  So, I'm asking him
18  questions.
19       MR. HOPKINS:  I'm just telling you what I
20  told him.
21       MS. PLANTE-NORTHINGTON:  Okay.  Well, I would
22  ask that you not coach the witness.
23  Q.   (BY MS. PLANTE-NORTHINGTON)  I'm going to give you
24  a few minutes to read the report to refresh your
25  recollection, and I'm going to ask you some questions about

Page 41

1   it.
2   A.   Okay.
3        (Reading)
4   Q.   When you read it, if you want to take a break, you
5   can.
6   A.   Okay.
7        (Reading)
8        MS. PLANTE-NORTHINGTON:  Are you going to
9   allow me to -- I'm not questioning the witness.  But to
10  Mr. Hopkins, are you going to allow me to depose Miss Owens?
11       MR. HOPKINS:  If we have time.
12       MS. PLANTE-NORTHINGTON:  Okay.  Let Miss
13  Owens know I would like to talk to her.
14  A.   (Reading)
15  Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  Do you want to
16  take a break?
17  A.   Can we take a quick break?
18  Q.   Yeah.
19       MR. HOPKINS:  No problem.
20       (Recess taken)
21  Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  We are back on
22  the record.  You've had an opportunity to read Exhibit 1?
23  A.   I have.
24  Q.   Okay.  And did it refresh your recollection as to
25  what you read maybe a few years ago?  I mean, it's been a

Page 42

1    while. Or does it just seem all new to you?
2       A.  I remember them doing the investigation.  I
3    don't -- it doesn't really refresh my recollection of this
4    particular document very much.
5       Q.  Okay.  Do you remember getting a document that
6    detailed the investigation that was done?
7       A.  I assume I received a document.  I do not remember
8    opening my e-mail and seeing this document.  I recall that
9    that investigation was completed.
10      Q.  Okay.  Since you don't recall opening your e-mail
11   and seeing this document, you are responsible for HR for the
12   Harris County Probation Department; correct?
13      A.  Yes.
14      Q.  And Mr. Grant fell under your area; correct?
15      A.  Yes.  And I'm not saying I did not receive this
16   document.  I just -- I don't recall seeing this document.
17      Q.  Does it look totally new to you?
18      A.  No.  I mean, the information in it is vaguely
19   familiar.  So, I don't think it -- it's not totally new, but
20   I don't recall receiving this e-mail -- or this document,
21   rather.
22      Q.  In reading the document and understanding how you
23   conduct an investigation, write a report, is it consistent
24   with the way you would have written the report?
25      A.  I was not privy to the information that she

Page 43

1    received.  So, it's hard to answer that question.
2       Q.  Do you believe based upon Exhibit 1, which is her
3    report, she did a thorough and complete investigation?
4       A.  Yes.
5       Q.  Okay.  Why do you say that?
6       A.  She reached out to witnesses.  She talked to
7    Mr. Grant.  I know her professionally.  She's very thorough.
8    This seems to have the elements of a successful
9    investigation.
10      Q.  Okay.  Let's go over some things.
11      A.  Okay.
12      Q.  She says she talked to Mr. Grant and seven
13   witnesses.  Do you see that?  The first paragraph -- I mean
14   second paragraph -- first sentence of the second paragraph.
15      A.  Yeah, I see that.
16      Q.  Would it be normal for an investigator to name
17   those witnesses she talked to?
18      A.  I typically would have.  I don't know from her
19   perspective if that was normal on her reports or not.
20      Q.  And based upon this report, did she name the
21   witnesses -- the seven witnesses she talked to -- she met
22   with, rather?
23          MR. HOPKINS:  Objection.  The document speaks
24   for itself.
25      Q.  (BY MS. PLANTE-NORTHINGTON)  I mean, based upon

Page 44

1    your reading of it, do you -- does it appear apparent to you
2    who she actually met with?
3       A.  She mentions multiple names in the text of the
4    report, but I don't know where she -- I do not know how she
5    compiled that information.
6       Q.  When you read the report, if you read it,
7    initially, did you find that to be different than what -- as
8    you described it, you would have had the names in there.  Did
9    you say, "Who are these witnesses?"
10      A.  No, I did not.
11      Q.  She talks about Miss Malveaux in Paragraph 3 going
12   near the end where she says "Mr. Grant stated he did not
13   want to make any rash decision regarding a reasonable
14   accommodation and to date, Mr. Grant has not contacted
15   Mr." -- I'm sorry -- "Miss Malveaux or Dr. Shelton to discuss
16   an accommodation."  Do you see that sentence?
17      A.  I do see that sentence.
18      Q.  Would you agree that if she put that statement in
19   there, then she likely confirmed that with Miss Malveaux and
20   Dr. Shelton?
21      A.  Yes.
22      Q.  Did you ask her had she?
23      A.  I did not.  I am Dr. Shelton.  So, I probably would
24   have known whether she reached out to me at that point.
25      Q.  Oh, that's right.  I forget.  I forget you're

Page 45

1    Dr. Shelton.
2          Okay.  Did she tell you -- did she come to you and
3    ask you that?
4       A.  I don't recall during the course of that
5    investigation.
6       Q.  Miss Malveaux would be your direct report?
7       A.  Yes.
8       Q.  Did Miss Malveaux ever tell you that she came --
9    Miss Owens came to her and asked her about the discussion
10   they had about a reasonable accommodation?
11      A.  I don't recall whether she told me that or not.
12      Q.  Now, she also mentioned in the next sentence that
13   staff members have disabilities.  "Mr. Grant states there are
14   staff members that have disabilities."  Would a thorough
15   investigator get those staff members, actually the names of
16   them?
17      A.  I can't comment on somebody else's investigation.
18   I don't know.
19      Q.  Well, I mean, just what you would do.
20      A.  If someone claimed that other people had
21   disabilities, I would probably -- there's several ways you
22   could approach that.  You could go to the shift supervisors
23   or supervisors and ask, "Are people being assigned based on
24   disabilities?"  It's hard for me to respond what her thought
25   process was.

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 46

```
 1      Q.  Okay.  I understand.
 2          MR. HOPKINS:  Also, I'm going to object.
 3   Dr. Shelton isn't an expert.  He's just a fact witness.
 4          MS. PLANTE-NORTHINGTON:  I understand.  But
 5   he does have some knowledge of being an HR person that
 6   investigates HR claims.  So, I'm just asking him based on his
 7   knowledge.
 8          MR. HOPKINS:  I understand your question.
 9   Just for the record, I'm objecting.  He's not an expert.  He
10   can only testify as to what he knows.
11          MS. PLANTE-NORTHINGTON:  But he has a Ph.D.
12   in industrial organization, and he has been over HR for a
13   substantial period of time.
14      Q.  (BY MS. PLANTE-NORTHINGTON)  Miss Owens, do you
15   know her level of education?
16      A.  I do not.
17      Q.  Do you remember her job title?
18      A.  I'm not 100 percent sure.  I think she's the
19   Assistant Director of Human Resources over there.  I think
20   she reports directly to Joyce Cambric, who is the Director of
21   Human Resources in that department.
22      Q.  Cambric, C-a-m --
23      A.  -- b-r-i-c.
24      Q.  Okay.
25      A.  I believe that's her current title.  I'm not real
```

Page 47

```
 1   sure what it was back then.
 2      Q.  Okay.  That's fine.  But she's -- Miss Cambric is
 3   over HR.  And to your understanding, Miss Owens falls under
 4   her direction?
 5      A.  I'm positive she is a direct report.
 6      Q.  Okay.  Were you aware that Mr. Samuel [sic] had
 7   complained that he had been taken off of certain assignments,
 8   like, the control desk and -- I think it's basement duty.
 9   I'm not sure.  I'm forgetting the actual terminology.
10      A.  You think you made a mistake.  Are you asking if I
11   was aware that Mr. Samuel was removed?
12      Q.  No.  Mr. Grant.
13      A.  Okay.
14      Q.  I'm sorry.  I will make that mistake frequently
15   because I'm dealing with a lot of names.  But thank you for
16   clarifying because I would have gotten the transcript and
17   said, "Oh, I asked him the wrong question."
18          Were you aware that Mr. Grant had stated that after
19   he made his report against Mr. Samuel for retaliation and
20   harassment that he noticed his assignments changing from more
21   of a sedentary position in the control center to Floor 4A
22   where he would walk more?
23          MR. HOPKINS:  Objection.  I'm not sure
24   that's -- I don't know where you got the sedentary position
25   part.
```

Page 48

```
 1      Q.  (BY MS. PLANTE-NORTHINGTON)  Well, would you agree
 2   that a control center is more sedentary?  Have you been over
 3   there?
 4      A.  For background, I've never worked in the facility.
 5   But, yes, you're sitting at a computer working control
 6   booths, opening doors, that type of a thing versus being on
 7   the floor where you are sedentary for a while but
 8   intermittently have to get up and walk around and check
 9   doors.
10      Q.  Okay.
11          MR. HOPKINS:  And, again, objection for the
12   record.  I'll read word for word exactly what this report
13   says.  He noticed a change in his rotation schedule.  Before
14   August 4th, he didn't usually work at 4A.  He rarely worked
15   in that unit.  It doesn't say anything about before, him
16   being in a control booth or more sedentary.
17      Q.  (BY MS. PLANTE-NORTHINGTON)  Were you aware he was
18   in a control booth before?
19      A.  No, I was not.
20      Q.  Well, if you look at her analysis, if you assume it
21   to be true, on Page -- I think it's next to the last
22   paragraph.
23      A.  Second page?
24      Q.  Third page, next to the last paragraph, "After
25   reviewing the shift logs."  Can you read the first two
```

Page 49

```
 1   sentences, I guess?
 2      A.  "After reviewing the shift logs, I concluded that
 3   before the complaint Mr. Samuel did not schedule Mr. Grant
 4   to work in Unit 4A.  However, for the time period of August
 5   through January, Mr. Samuel scheduled Mr. Grant to work in
 6   Unit 4A a total of 7 times."
 7      Q.  Okay.  So, that's what I'm talking about when I say
 8   he was moved from another location.  Whatever that is, we
 9   don't have.  For the record, I don't know if she puts
10   "control" in here.  I would have to pull out some documents.
11   Maybe I will do that.  Just one minute.
12          I'm going to give you what's been -- I'm not going
13   to mark it as an exhibit; but it is Bates stamped, produced
14   by Harris County, HC-1828-Grant through HC-1864-Grant.  Can
15   you review those and tell me what you believe they are?
16      A.  You're not asking me to count up things, are you?
17      Q.  No, no, no, no, no.
18      A.  I actually do remember the time frame where we were
19   gathering this information.
20      Q.  Okay.
21      A.  And this is where we were looking at what locations
22   Mr. Grant had been scheduled.
23      Q.  Okay.  And do you recall anything about the change
24   of him working in one area and then now working in another
25   more mobile area?
```

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 50

1    A.   I don't recall that as being what was primarily
2  discussed.  It was whether he was -- Mr. Grant had a specific
3  complaint about I believe it was 4A and that he didn't like
4  to be assigned to that unit.  I don't recall the argument of
5  why he preferred other floors.  As a matter of fact, I don't
6  think that was ever clarified to us on what floor he was
7  assigned to.  I don't remember him specifically asking for
8  control booth.
9    Q.   Okay.  Were you aware that Mr. Grant had
10  traditionally -- you know, with exception, but traditionally
11  received the control booth under the supervision of -- one
12  moment --
13       (Sotto voce discussion between Mr. Grant
14       and Ms. Plante-Northington)
15    Q.   -- Mr. Cobb and Mr. Stokes?
16    A.   The answer is "no."
17    Q.   Okay.
18    A.   I believe that probably occurred before my tenure
19  in HR.
20    Q.   Okay.
21    A.   So, personally I was not aware of that.
22    Q.   You came on in 2011 you said?
23    A.   Yes.
24    Q.   Okay.  So, do you know who was the supervisor at
25  that time of Mr. Grant?

Page 51

1    A.   I do not.
2    Q.   Okay.  At some point you believe Mr. Samuel was
3  Mr. Grant's supervisor?
4    A.   Yes, I definitely believe that.
5    Q.   Okay.
6    A.   I don't even recognize the two names that you
7  just -- Cobb and Stokes.
8    Q.   Okay.  So, you would --
9    A.   I don't know those individuals.
10    Q.   Okay.  Were you aware that Mr. Grant had stated he
11  had been traditionally, regularly, with exceptions, given the
12  control booth and allowed to work in the basement area?
13    A.   My hesitation is due to from reading all of this,
14  I know that that assertation is being made.  I'm not sure I
15  knew that at the time.
16    Q.   Okay.
17    A.   And I hate to say that.
18    Q.   No, no, no.
19    A.   I've read so much stuff over the last month or two.
20       MR. HOPKINS:  If you don't know, a good
21  answer is just "I don't know."
22    Q.   (BY MS. PLANTE-NORTHINGTON)  If you don't know,
23  just say you don't know.
24    A.   I don't know.
25    Q.   Okay.  It's okay not to know.  I mean, sometimes.

Page 52

1    A.   Well, there's just been so much re-exposure to
2  reading all of the Exception Reports and stuff that have been
3  collected from everybody involved that it gets muddled at
4  this point.
5    Q.   Well, I want you to review those Bates stamped
6  documents.
7    A.   Okay.
8    Q.   And just on Mr. Grant, I think there are certain
9  denotations that represent "Not On Schedule."  Do you
10  understand those abbreviations?  I think "NOS" will appear on
11  there.  It's "Not On Schedule."
12    A.   "Not On Schedule"?  I assume I know what that
13  means.  I'm not --
14    Q.   You don't have to tell me you know what that means.
15    A.   Okay.  I don't --
16    Q.   Okay.  Don't tell me you know something if you
17  don't.  That's okay.
18    A.   It's not an acronym I'm familiar with.
19    Q.   Okay.  Do you see "Complainant" up there?
20    A.   I do.
21    Q.   "Complainant" at the top?
22    A.   I do.
23    Q.   And it shows when he works.  And do you see
24  "Control Booth" on there?
25    A.   Yes, I do.

Page 53

1    Q.   And that was as of September -- was that 2010?
2    A.   2010.
3    Q.   Okay.  Did you request these documents be pulled or
4  do you think Miss Owens just pulled them on her own?
5    A.   Miss Owens reached out to us.
6    Q.   Okay.
7    A.   And I don't know why I remember this.  Aaron
8  Beasley pulled these together.
9    Q.   Okay.
10    A.   Because I remember him -- I just remember him doing
11  that.
12    Q.   Okay.
13    A.   So, this was done as a request from HRRM as part of
14  their investigation.
15    Q.   Okay.
16    A.   That piece is crystal clear.
17    Q.   Now, you were one of the people who decided to
18  terminate Mr. Grant; correct?
19    A.   I was involved in the process.
20    Q.   When you say "involved in the process," what do you
21  mean?
22    A.   The deputy director of that division, Melissa
23  Watson, is the one that determines whether she wants to
24  request that an individual is terminated.  She then typically
25  talks to me and kind of presents her case a little bit to see

Page 54

1    kind of from an HR perspective whether they have enough
2    evidence to kind of move forward.  After that meeting, she
3    goes to the executive director.  And the final decision is
4    made at the executive director level.
5           I kind of get brought back in at the following
6    stage because Miss Watson would have written a letter.  She
7    would have e-mailed the letter to me to basically just
8    proofread it, make sure it's a good HR letter from that
9    perspective.  So, I didn't initiate the termination; but I
10   was involved in the process as it went through.
11      Q.  Did you recommend termination?
12      A.  I told Miss Watson that I believed she had enough
13   evidence to terminate.
14      Q.  When you say "evidence," give me specifically what
15   you mean.
16      A.  We went into her office.  She pulled up video from
17   the video server and showed me the final incident and
18   explained what had happened.  She had the previous write-ups
19   printed out and basically showed me those.  The two primary
20   ones that we looked at was the falsification from -- it was
21   almost a year, close to the date, before this incident.  And
22   that's what the decision was based on or the primary driver.
23      Q.  What do you mean, "primary driver"?
24      A.  There was also a cell phone or electronic device
25   that he had at that point in time too.  But from the HR

Page 55

1    perspective, that's what I was weighing my evidence on that
2    you have enough evidence to proceed.
3       Q.  So, would the phone usage or usage of an electronic
4    device make you change your decision if that was removed from
5    it, if that had not been an allegation?
6       A.  It would not have.
7       Q.  Okay.  It was not a determining factor at all?
8       A.  No.  Well, it was included on the letter.  They
9    kind of wrote up what they had found.  But I'm looking at it
10   from -- I don't want to sound too legal -- an evidentiary
11   point of view.  The things that I was primarily focused on
12   was the previous write-up that happened about a year before
13   and that one.
14      Q.  Okay.
15      A.  I would have made that decision without the cell
16   phone, electronic device involved.
17      Q.  Okay.  And when you say "evidence," you're saying
18   the -- you're assuming that the write-ups are credible?
19      A.  Yes.
20      Q.  Will you agree that all write-ups are not credible?
21          MR. HOPKINS:  Are you asking specifically
22   with Mr. Grant or just in general?
23          MS. PLANTE-NORTHINGTON:  Well, in general.
24      A.  I suppose that that could happen in general.
25      Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  You're assuming

Page 56

1    that the write-ups are credible is what you're saying?
2           MR. HOPKINS:  With respect to Mr. Grant?  Is
3    that what you're asking?
4           MS. PLANTE-NORTHINGTON:  No.
5       Q.  (BY MS. PLANTE-NORTHINGTON)  With respect to anyone
6    that you may receive.
7       A.  The evidence that I was looking at at the time, a
8    lot of it was the video in front of me.  So, if you're asking
9    the write-up a year before, I didn't go back to look at the
10   validity of that write-up at that time I was making the
11   decision.
12      Q.  What did you see in the video that made you
13   believe -- and let me -- before I go into that, let me ask
14   you, was the video what you needed to see in order to make
15   the decision or to recommend she had enough to terminate?
16      A.  It collaborated -- corroborated the --
17      Q.  Is that "yes" or "no"?
18      A.  Yes.  I'm sorry.
19      Q.  Okay.  And then --
20          MR. HOPKINS:  Wait.  Let him finish his
21   answer.
22          MS. PLANTE-NORTHINGTON:  He said it
23   corroborated.
24          MR. HOPKINS:  What did it corroborate?
25          THE WITNESS:  It corroborated basically the

Page 57

1    narrative of what they said happened.
2       Q.  (BY MS. PLANTE-NORTHINGTON)  And what is the
3    narrative of what they said happened?
4       A.  That a shift supervisor -- and I believe the name
5    of that shift supervisor was Alfred Bryant -- came by, did a
6    supervisor review of the form that Mr. Grant had in front of
7    him.  There was a code on there.  And please don't ask me for
8    the codes because I'm not familiar with the sheet.  There was
9    a code on there that the supervisor marked that indicated
10   that Mr. Grant was off on his time.  And the supervisor
11   walked away, and Mr. Grant changed that code.  The supervisor
12   was alleging that.
13      Q.  Okay.  Who was the supervisor?
14      A.  Alfred Bryant, I believe.
15      Q.  Okay.  Did you obtain a statement from Mr. Bryant?
16      A.  That investigation was done by the division.  So,
17   Miss Watson would probably be the person to -- I didn't
18   personally obtain a statement from Mr. Bryant.
19      Q.  Okay.  If I tell you there's no statement in our
20   documentation from Mr. Watson [sic], would that sound odd to
21   you?
22      A.  No.
23      Q.  Why wouldn't it sound odd to you if he's the one
24   that --
25      A.  Because you just asked me about Mr. Watson, and I



Page 58

```
 1   have no idea who Mr. Watson is.
 2      Q.  Okay.  Well, let me put it in a generic term.  If
 3   someone is saying that someone has violated a policy that
 4   ultimately caused the termination of the employee, would you
 5   believe obtaining that employee's statement who actually
 6   reported it is important?
 7      A.  I was talking directly to a deputy director that --
 8      Q.  Is that "yes" or "no"?
 9         MR. HOPKINS:  Well, I think he's allowed to
10   explain his answer.
11         MS. PLANTE-NORTHINGTON:  Well, I mean, he can
12   say he can't answer "yes" or "no," but --
13      Q.  (BY MS. PLANTE-NORTHINGTON)  Is it "yes" or "no"?
14      A.  I can't answer "yes" or "no."
15      Q.  Okay.  Why can't you answer "yes" or "no"?
16      A.  Can you please repeat the question?
17      Q.  Okay.
18         MS. PLANTE-NORTHINGTON:  You are going to
19   have to read it back, please.  I'm sorry.
20         (The following question was read:
21         "Okay.  Well, let me put it in a generic
22         term.  If someone is saying that someone has
23         violated a policy that ultimately caused the
24         termination of the employee, would you
25         believe obtaining that employee's statement
```

Page 59

```
 1         who actually reported it is important?")
 2      A.  In some cases, yes, I would.  In this case I was
 3   talking to the deputy director that had completed an
 4   investigation and was summarizing that investigation for me.
 5      Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.
 6      A.  And I took her conclusions.
 7      Q.  Okay.  You said "evidence," though.  So, when you
 8   say "evidence," you're talking about the video.  I know you
 9   said that you reviewed the video.
10      A.  I did.
11      Q.  And you're talking about a statement or something
12   that Mr. Alfred Watson [sic] observed.
13      A.  Bryant.
14      Q.  Where did I get Watson?  Okay.  That
15   Alfred Bryant observed.
16         And you're saying you did not ask Miss Watson --
17   that's where I get the Watson --
18      A.  Okay.
19      Q.  -- whether she obtained a statement from
20   Mr. Bryant?
21      A.  I don't recall exactly that conversation, but I do
22   not recall seeing a statement from --
23      Q.  Okay.
24      A.  -- Mr. Bryant.
25      Q.  Getting back to the evidence, there is, to your
```

Page 60

```
 1   knowledge, based on what you recall, no statement from
 2   Mr. Bryant regarding this incident?
 3         MR. HOPKINS:  You mean in writing?
 4         MS. PLANTE-NORTHINGTON:  In writing.
 5      A.  I do not know.
 6      Q.  (BY MS. PLANTE-NORTHINGTON)  You do not know.
 7   Would that have been something you would have asked her to
 8   see as an HR, in essence, director or overseeing HR?
 9      A.  She was providing me with a verbal summary of what
10   she had found.
11      Q.  Okay.  Did she look on notes when she was talking
12   to you about this?
13      A.  I do not recall.
14      Q.  Okay.  I'm trying to understand some level of
15   checks and balances.  You're saying that you cannot recall
16   when Miss Watson was talking to you about this evidence she
17   had to support the termination.  And I assume Miss Watson
18   wanted to recommend termination?
19      A.  That is what she was recommending.
20      Q.  Okay.  And you were trying to go through the
21   information she provided or the evidence you say she provided
22   in order to see whether she had all the evidence to
23   terminate, as you said?
24      A.  Yes.
25      Q.  Okay.  So, when we get to Mr. Bryant's statement,
```

Page 61

```
 1   you state she gave you that information verbally?
 2      A.  I don't recall how she gave me that information.
 3   My recollection of that meeting is she had former write-ups
 4   printed out and some paperwork on her desk, and I was
 5   standing beside her at her computer monitor viewing the
 6   incident.
 7      Q.  Okay.  And I'm going to let you view the incident
 8   on my computer later on --
 9      A.  Okay.
10      Q.  -- so you can tell me what you observed and how you
11   processed it.
12         Okay.  I'm going to go on and mark this as
13   Exhibit 3.
14         (Exhibit No. 3 was marked)
15      Q.  Okay.  I'm placing before you what's been marked as
16   Shelton Exhibit 3.  Have you seen this document before?
17      A.  Yes, I have.
18      Q.  Did you receive it prior to her giving it to -- or
19   someone giving it to Mr. Grant?
20      A.  I discussed it.  I am not sure if I saw a hard copy
21   of this.  Our internal practice is that all suspensions and
22   terminations come through me.
23      Q.  No.  This is a letter of warning.
24      A.  I know.  And that's what -- this is a letter of
25   warning.  So, I remember discussing this.  I'm not sure if
```

Page 62

1  she formally e-mailed this to me to get my okay --
2      Q.   Okay.
3      A.   -- before she sent it out because she's not
4  required to do that, but I discussed this with her before she
5  sent this out.
6      Q.   Okay.
7      A.   I hope that is clear.
8      Q.   Yeah.  It makes perfect sense.
9           (Exhibit No. 4 was marked)
10     Q.   I'm placing before you what's been marked as
11  Shelton Exhibit 4.  Do you recall getting that e-mail from --
12  I'm sorry.  I'm going to have to talk about that later
13  because that's a different exhibit.
14     A.   Set it aside?
15     Q.   Yes.
16     A.   You did not mark this.  Do you want this back?
17     Q.   Yes.  Thank you.  We'll come back to that maybe
18  later if we have time.  I think the document will speak for
19  itself.
20          (Exhibit No. 5 was marked)
21     Q.   I'm placing before you what's been marked as
22  Shelton Exhibit 5.  This is what I meant to let you see
23  before I gave you the wrong document.  This looks like it is
24  to you and is a warning letter attachment doc from -- it
25  looks like maybe a Word document was attached.

Page 63

1      A.   Okay.
2      Q.   So, do you know that this is maybe what you
3  received before receiving Exhibit -- I think it's 3?
4      A.   Yes, I would have received that --
5      Q.   Okay.
6      A.   -- correct.
7      Q.   Let me look at Exhibit 3 real quick.
8           And you said that it was standard for you to get,
9  based on what you told me in the record, terminations and
10  suspensions; correct?
11     A.   Correct.
12     Q.   This was a termination warning.  It was not the
13  termination.  So, why would she send that to you?
14     A.   They initially wanted to terminate on this
15  incident, the incident that precipitated this.
16     Q.   Which incident, if you can refer to 3?
17     A.   This was an additional incident that we did not
18  take action on.  And let me --
19          MR. HOPKINS:  Yeah, please.
20     A.   -- give the background to make some sense.
21     Q.   (BY MS. PLANTE-NORTHINGTON)  Yeah.
22     A.   There was an incident that occurred on the unit
23  where Mr. Grant was on the unit for an extended period of
24  time.  He needed to use the restroom.  He had gotten up, went
25  into the booth, said something to the staff.  We don't have

Page 64

1  any audio on the video.  Walked into the control booth and
2  then went to use the facilities in the building.
3           He then returned to the floor, and he was late --
4  I don't remember, like, 20 minutes late or 15 minutes late --
5  from his last entry into that.  Mr. Grant --
6           MR. HOPKINS:  Wait.  Do you mean on the
7  observation check?
8           THE WITNESS:  On the observation checklist.
9           MR. HOPKINS:  Okay.
10     A.   Mr. Grant reported that he had gone into the
11  control booth and told them that he was going to -- he needed
12  to go use the restroom and asked them to cover for him.  The
13  two people in the booth denied that he had asked that when he
14  walked into the booth.  And it was kind of a he said, she
15  said incident.
16     Q.   (BY MS. PLANTE-NORTHINGTON)  They didn't cover, I
17  assume?
18     A.   No.  Nobody covered.
19     Q.   Of course.
20     A.   So, they wanted -- at that point they staffed this
21  for me for termination, and I said, "No.  You can't terminate
22  over that."
23          We had a conversation sometime around that time
24  where Mr. Grant said that due to his medical condition that
25  was documented on his FMLA that he needed to take breaks.

Page 65

1  And at that point in time moving forward, we allowed him to
2  take breaks.  So, we implemented breaks.  We didn't do any
3  formal disciplinary action or anything around that, and they
4  generated this letter subsequent to that sequence of events.
5      Q.   Okay.  So, that would have been between, I assume,
6  January 5th and February 19th?
7      A.   Yes, it would have.
8      Q.   Now, you had received information that Mr. Grant's
9  doctor had requested that he take 15 -- be permitted to take
10  15-minute breaks?
11     A.   I believe the FMLA forms from when I got there to
12  that point had given him time off to do doctor's appointments
13  and to miss work.  The one in July of 2013, which was brought
14  to my attention, I generated a letter that that had -- that
15  that was now on your FMLA form.  We had a subsequent
16  conversation to that in which he told me that he was being
17  allowed to take breaks at that point and things were going
18  better.
19          (Exhibit No. 6 was marked)
20     Q.   I'm placing before you what's been marked as
21  Shelton Exhibit 6.  Have you seen that document before?
22     A.   I do not recall whether I've seen it.
23     Q.   It looks like it was stamped.  Does this look like
24  a stamp that says on this document, Exhibit 6, March 23rd,
25  2012 at 3:57?  Is that a stamp that looks familiar to a

Page 66

1    Harris County stamp?
2        A.   It looks like one of the time clock documenting
3    stamps.   Q.   Okay.  Now, you just stated that you were not aware
4        Q.   Okay.  Now, you just stated that you were not aware
5    that he needed to take 15-minute breaks until this incident
6    that occurred between January 5th and February 19th, 2013;
7    correct?
8        A.   I don't recall being aware of it during that time,
9    no.
10       Q.   Okay.
11       A.   Correct.
12       Q.   Okay.  So, would you like to change your statement
13   or --
14       A.   I do not recall being aware during that period of
15   time.
16       Q.   Okay.  So, as of March or April 2012, you had no
17   knowledge that Mr. Grant had requested that he be permitted
18   to take 15-minute interval breaks per his doctor's
19   instructions?
20       A.   I remember the discussion about propping his feet
21   up, but I don't remember the discussion about the 15-minute
22   breaks.
23       Q.   It says "Please allow him opportunity" -- and this
24   is Exhibit 6 -- "for 15-minute breaks as needed to prop his
25   feet up to help with reducing swelling during his shifts."

Page 67

1        A.   And the reason we probably focused on the propping
2    the feet up is all staff should get breaks when they call on
3    their radio to be relieved.  That should be part of every
4    JSO's -- if you need to go to the restroom, if you need to
5    leave the unit for a period of time, you call the -- I
6    believe it's the shift supervisor that's usually on the other
7    end of the radio to make that happen.
8        Q.   Okay.  So, I'm trying to understand your testimony.
9    Based on your knowledge -- I think it's best to ask an
10   open-ended question.  Based on your knowledge and memory,
11   when do you first remember Mr. Grant request for 15-minute
12   breaks?
13       A.   The first time that -- and, again, it happened a
14   long time ago.  The first time I remember intervening is
15   around February 2013 when he clearly was not getting the
16   breaks he was calling for on the radio.  I do recall having
17   lots of conversations about the propping the feet and the
18   taking the shoes and socks off on the unit and dealing with
19   that before that.
20       But the 15-minute breaks, my first recollection is
21   when I found out he wasn't getting those and his -- he had a
22   clear need to take those.  And that's when I kind of
23   intervened.  And I believe it was Miss Jones reached out to
24   all of her shift supervisors and said it's absolutely
25   mandatory that he gets those breaks.

Page 68

1        Q.   Who was depriving him of those breaks?  Do you
2    know?
3        A.   On that particular incident, he had been calling;
4    and there were multiple people on the other end of the radio
5    all dealing with legitimate crisis, but in restraint or
6    dealing with something in the building, all assuming somebody
7    else was going to take care of Mr. Grant.  So, it was hard to
8    figure out who was at fault at that point.  But he was
9    calling, and clearly nobody came up to relieve him.
10       Q.   Who would he have called?  Would it have been
11   Miss Phillips, Mr. Samuel?  Who would it have been?
12       A.   Again, I don't work in the facility.  But my
13   understanding of the radio is you just -- you say who you
14   are, what floor you are on, and you ask for backup.  You ask
15   for someone to come up and relieve you.
16       Q.   Okay.
17       A.   So, it could have been a variety of people on the
18   other end of the radio.
19       Q.   Okay.  Do you understand -- do you know anybody
20   with diabetes?
21       A.   We have several employees that, through getting our
22   FMLA paperwork, I know have diabetes.
23       Q.   Do you know one of the symptoms being swelling of
24   the ankles, the feet, edema, and neuropathy?
25       A.   I probably have learned that through Mr. Grant, but

Page 69

1    I know that -- I'm not a medical doctor.
2        Q.   Have you done just a Google research on it?
3        A.   I don't think I've ever Google researched diabetes.
4        Q.   Did you ever believe the statement the doctor was
5    making or that he was making about his condition was
6    exaggerated?
7        A.   I did not.
8        Q.   So, you believe that he was telling the
9    truth about what he was feeling and his condition?
10       A.   Having feet issues and diabetes, yes.
11       Q.   Did you ever look at his feet?
12       A.   I did not personally look at his feet.  My
13   assistant deputy looked at his feet.
14       Q.   What did your assistant deputy say?
15       A.   "Oh, my God.  Otis came in and took his shoes off
16   in my office."  She didn't make comments about his feet.
17       Q.   Okay.  Did she say they looked swollen?
18       A.   I think she was so -- I don't remember her
19   describing the feet at all.  She was shocked about the
20   incident.
21       Q.   Because I was shocked about his feet.
22       A.   She was shocked as well.
23       Q.   They swell considerably.  So, I just --
24       MR. HOPKINS:  Just to be clear, she was
25   shocked that he took his shoes off, not she didn't describe

Page 70

1  his feet?
2         THE WITNESS:  She did not describe his feet.
3     Q.  (BY MS. PLANTE-NORTHINGTON)  She didn't say
4  anything about his feet -- swollen, looked abnormal?
5     A.  She found the experience -- I think she said,
6  "Mr. Grant took his shoes off.  It was disgusting."  She was
7  upset he took --
8     Q.  She couldn't see past the --
9     A.  The shock.
10    Q.  Okay.
11    A.  Yeah.
12        MR. HOPKINS:  You said the shock of the fact
13  that he would take his shoes off in the office?
14        THE WITNESS:  Yes.
15        MS. PLANTE-NORTHINGTON:  If you need to
16  clarify, you can clarify.  But please don't coach,
17  Mr. Hopkins.
18    Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  Who was the
19  supervisor he took his shoes and shocks off in front of?
20    A.  Miss Malveaux.
21    Q.  Miss Malveaux?
22    A.  Yes.
23    Q.  Okay.  Do you remember when this was?
24    A.  I do not.
25    Q.  Do you believe a person that does that is abnormal?

Page 71

1     A.  That is an unusual thing to happen in the course of
2  our business.
3     Q.  If your feet are hurting -- put yourself in his
4  position.  If your feet are hurting and they're swollen and
5  you're doing work and you're asking for assistance and no one
6  will see the extent of your problem and you want to show them
7  because perhaps you have on long pants and they can't see
8  what's going on, is that abnormal?
9     A.  It would be abnormal.
10    Q.  Okay.
11    A.  Most people are pretty private about their medical
12  stuff.  God help us if it was a hernia.
13    Q.  Yeah, we don't want to see that.
14        But you have received -- or at least someone, based
15  on Mr. Grant's position, had received something from his
16  doctor regarding swelling of the feet, edema of the feet,
17  neuropathy of the feet.  And Mr. Grant's position was they,
18  in essence, never took him seriously or the accommodation
19  seriously.
20    A.  That information about his medical condition was
21  also on his FMLA forms.  And I'm not --
22    Q.  Of course.
23    A.  I'm not doubting the veracity of his medical
24  claims.
25        Can you repeat the question?  I'm starting to go

Page 72

1  off on a tangent.
2     Q.  No, no, that's fine.
3         MR. HOPKINS:  Yeah.
4     Q.  (BY MS. PLANTE-NORTHINGTON)  You stated that
5  because it was he said, she said, in essence, regarding this
6  incident that occurred between January 5th and February 19th,
7  2013 that you felt like there was not enough evidence to
8  terminate?
9     A.  Yes.  And I also thought he was invoking his right
10  to go use the restroom, and the agency was not responsive to
11  him at that point in time.
12    Q.  Okay.  So, that is not a write-up at all?
13    A.  No.
14    Q.  Okay.  Did you notice in looking at Exhibit 3 that
15  it looks like Mr. Grant received not even a write-up but just
16  something that says on April 17, 2010 "Failure to Sign Up in
17  a Timely Manner"?  Do you see that?  It's at the bottom.
18    A.  The very first one.
19    Q.  Okay.  And then the next one would be almost two
20  years later on February 2nd, 2012, "Supervision of Youth
21  Policy."
22    A.  Uh-huh.
23    Q.  Were you aware that Mr. Grant filed a complaint of
24  retaliation and discrimination in writing in December of
25  2011?

Page 73

1     A.  Yes.
2     Q.  Okay.  Do you see -- and knowing human nature and
3  in being an HR person, do you see the connection between him
4  not being really previously written up for almost two years
5  and now suddenly write-ups start and we have, like, one, two,
6  three, four, five, six, seven within a year's time span?
7         MR. HOPKINS:  Object to the form of the
8  question.
9     Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead and answer.
10        MR. HOPKINS:  Answer to the extent you can.
11    Q.  (BY MS. PLANTE-NORTHINGTON)  Do you see the
12  connection?
13        MR. HOPKINS:  Same objection.
14    A.  No.
15    Q.  (BY MS. PLANTE-NORTHINGTON)  You don't see the
16  connection with -- do you understand the law of retaliation?
17    A.  I do.
18    Q.  When you exercise a right of a protected activity,
19  you engage in a protected activity, and subsequently things
20  start happening that didn't happen before?
21        MR. HOPKINS:  Objection, form.
22    Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead.
23    A.  That's absolutely accurate.
24    Q.  Okay.
25    A.  There's also when behavioral issues are noted and

Page 74

1  there's problems after that, you also need to deal with the
2  problems.
3     Q.   And I'm not saying that there are not cases where
4  the person -- the employee was at fault and did do something
5  wrong. But I'm saying him having only one write-up based
6  upon his tenure there. And I'm assuming it says -- it looks
7  at the last three years. So, I don't know what happened
8  before that. But if we say within a three-year period there
9  is -- the majority -- all but one, rather, of the write-ups
10  occur after he lodged or engaged in protected activity.
11        MR. HOPKINS:  I'm going to object again. I'm
12  not sure what the question is.
13     Q.   (BY MS. PLANTE-NORTHINGTON)  I mean, would you
14  agree that within a three-year period, this particular
15  document, there's not even -- yeah. There's no write-up for
16  2011 you can see on here; correct?
17     A.   Correct.
18     Q.   And, so, 2012 February. Do you see the connection
19  between him engaging in protected activity, which you say he
20  did in December 2011, and a write-up occurring in February
21  2012?
22        MR. HOPKINS:  Objection, form.
23     Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead. Do you see
24  how a retaliation case can form? I'm not saying it may be
25  valid, but how it can look -- you can look at it and say,

Page 75

1  "Hmm, why?"
2        MR. HOPKINS:  Objection, form.
3     Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
4     A.   Yes. If someone engages in a protected act and
5  they are disciplined after that protected act, yes, I can see
6  how that could be the basis for a retaliation claim.
7     Q.   And as an HR person, a person who has oversight of
8  HR, if someone came in to you and said that said he
9  started being written up after his protected activity, would
10  something in your head go off as to, "Hmm, it might be valid;
11  but I hope it's not retaliation"?
12     A.   That same complaint is where Erika Owens was doing
13  the outside investigation into his complaints that he was
14  being retaliated against. So, in my mind we were also
15  investigating at that point in time. There was also
16  some major changes in administration that happened in the
17  facility where it became much more tight. I think if you
18  look across the board at write-ups, they would have spiked
19  significantly during that time period.
20     Q.   Why do you believe that? Change in manager or
21  supervisor?
22     A.   Change in management. This is shortly after
23  Dr. Quintana took over the division.
24     Q.   When did Dr. Quintana take over the division?
25     A.   2011 maybe. Either late 2010 or early 2011. She

Page 76

1  implemented major changes in the facility, and things became
2  significantly more strict during that time period.
3     Q.   Okay. So, you would say that you saw a spike in
4  complaints -- or, rather, disciplinary action, some type of
5  counseling, warnings --
6     A.   Yes.
7     Q.   -- terminations, suspensions --
8     A.   Yes.
9     Q.   -- in 2011?
10        Do you have a progressive disciplinary policy in
11  writing?
12     A.   We do not.
13     Q.   You do not?
14     A.   We do not.
15     Q.   Why?
16     A.   We treat every incident individually. There can be
17  situations that you may get terminated on your first offense,
18  particularly since we're charged with the protection of
19  children. The county has no -- and neither do we locally --
20  any progressive discipline policy. I guess that's probably
21  the most direct answer.
22     Q.   Okay. So, you would agree that that particular
23  policy allows a lot of discretion or latitude?
24     A.   Yes.
25     Q.   And discretion unchecked can lead to discrimination

Page 77

1  or retaliation; correct?
2        MR. HOPKINS:  Objection.
3     A.   We have some checks and balances.
4     Q.   (BY MS. PLANTE-NORTHINGTON)  Is that "yes" or "no"?
5  Either you believe it doesn't or it does.
6     A.   You're asking my belief?
7     Q.   Yes.
8     A.   I can't answer that with a "yes" or "no."
9     Q.   If a person's given the discretion to do something
10  just using common sense, can they abuse that discretion?
11     A.   Theoretically, yes.
12     Q.   Okay. And can one of those abuses be retaliation
13  or discrimination?
14     A.   Theoretically, yes.
15     Q.   Okay. So, did you ever validate any of the
16  write-ups or disciplinary action on Exhibit 3, I mean, where
17  you actually looked at the complaint or the write-up to see
18  whether it was legitimate or the facts supporting it?
19     A.   Management would have presented the one on
20  October 23rd, 2012 that involved a suspension.
21     Q.   Okay.
22     A.   It would have been presented to me.
23     Q.   Presented to you in writing or they would just call
24  you?
25     A.   It tends to be both. There is usually a

20  (Pages 74 to 77)

Page 78

1    conversation much like the same scenario I just described
2    previously where they would sit down, kind of present their
3    evidence case to me, ask me if they think it's -- or if I
4    think it's enough for a suspension. I ask them, "What have
5    you done with other cases?" Kind of have that conversation.
6    Then usually the only thing that would be e-mailed to me
7    would be the actual copy of the letter to kind of approve is
8    this good to go out.
9         Q.   And you remember receiving a copy of this letter?
10        A.   This particular one, I do not.
11        Q.   Do you know if a letter exists of the October 23rd
12   written reprimand and suspension, a letter to you asking you
13   to go over it, oversee it, approve it, or whatever?
14        A.   I don't know.
15        Q.   Would that be out of the ordinary for you not to
16   receive a suspension?
17        A.   It would be extremely out of the ordinary for me
18   not to review a suspension. There has been cases where I've
19   been in the office, they've given me the letter, I've looked
20   over the letter and handed it to them.
21        Q.   Do you remember getting a letter for Mr. Grant on
22   the suspension for the October 23rd, 2012 incident?
23        A.   I do not remember that specific letter, no.
24        Q.   Okay. Do you remember receiving it by e-mail --
25        A.   No.

Page 79

1         Q.   -- similar to what we described in a prior exhibit
2    where you received the investigation with Miss Owens?
3         A.   I receive and approve literally hundreds of these.
4    I do not remember the specific one, no, I do not.
5         Q.   You do not. Would you agree suspension is pretty
6    serious?
7         A.   Yes.
8         Q.   Okay. And you would want all the facts on both
9    sides to determine whether the person should be suspended or
10   whether you would approve the recommendation of suspension?
11        A.   The division does the investigation, and then they
12   present their findings to me.
13        Q.   Okay. And when they present their findings to you,
14   do you just take them as, okay, that's -- you just, you know,
15   check off the box or do you go in and try to assess whether
16   things were done properly?
17        A.   It depends. If they present me with video and
18   statements from everybody involved and present their side,
19   I have approved the suspensions at that level.
20        Q.   Okay. Did they present a video to you for the
21   October 23rd, 2012 suspension of Mr. Grant?
22        A.   I do not remember that.
23        Q.   You remember specifically the video you reviewed of
24   the termination -- that led to the termination; correct?
25        A.   I do.

Page 80

1         Q.   Okay. And that would have occurred maybe four or
2    five months before. Do you remember receiving -- seeing a
3    video?
4         A.   It would have been approximately one year before.
5         Q.   October 23rd, 2012 and February 19th are only about
6    five months --
7         A.   Oh, I thought you -- that was not the termination.
8    November 2013 was the termination.
9         Q.   Okay. The warning letter. Okay. I'm sorry. I'm
10   sorry. That is correct.
11             So, as it relates to Mr. Grant, do you remember
12   seeing a video? Because he would be the one that has his
13   legs probably propped up. So, do you remember receiving --
14   seeing any other video with any other employee's legs propped
15   up other than the one you saw for the termination?
16        A.   I've watched hundreds of videos. I only remember
17   Mr. Grant's feet being propped up. I don't know whether I
18   watched -- I don't remember watching the video of that
19   particular incident.
20        Q.   The October 23rd, 2012?
21        A.   October 23rd, 2012.
22        Q.   And you stated before, you would want to see the
23   video and you would want to read the statements; correct?
24        A.   Correct.
25        Q.   And you've already admitted that you didn't see

Page 81

1    Mr. Alfred's statement for the termination; correct?
2         A.   I don't remember seeing it, whether I saw it or
3    not.
4         Q.   Do you know if it exists?
5         A.   I do not.
6         Q.   So, you would agree that -- if we assume it
7    doesn't -- I'm just saying assume for argument's sake. If it
8    doesn't exist, you didn't see it?
9         A.   If it doesn't exist?
10        Q.   Yeah.
11        A.   Yeah, definitely.
12        Q.   Okay.
13        A.   And I did drink this water a little bit too fast.
14   So, whenever you get to your next cut point.
15        Q.   Okay. You can go now. I need to drink this and
16   probably go myself. So, let's take a break. It's a good
17   time.
18             (Recess taken)
19        Q.   Would you agree that, when you look at Exhibit 3,
20   from 2002 [sic] --
21        A.   Give me just one second.
22        Q.   Okay.
23        A.   I'm out of order all of a sudden.
24             Okay. I got it.
25        Q.   That February 2nd, 2002 [sic] --

21 (Pages 78 to 81)

Page 82

1       MR. HOPKINS: '12.
2       Q.  -- 2012 through February 19th, 2013 when this was
3    given to him, that that is a substantial number of
4    write-ups --
5       A.  I would concur, yes.
6       Q.  -- in that small period of time?
7       A.  Yes.
8       Q.  And would you agree that Mr. -- were you aware,
9    rather, that Mr. Grant was out on a workers' comp injury and,
10   therefore, not at work from the latter part of April 2012 to
11   the beginning of September 2012?
12      A.  I'm aware of that from preparing for the case.
13      Q.  Okay.
14      A.  I'm not sure I was in the loop at the time.
15      Q.  Okay.
16      A.  But I am aware of that, yes.
17      Q.  Now that you know and you take that gap, as it
18   appears, out of there between the April 2nd, 2012 to the
19   October 23rd, 2012 write-up or suspension, will you agree
20   they can't retaliate against you if you're out on leave?
21         MR. HOPKINS:  Objection.
22      Q.  (BY MS. PLANTE-NORTHINGTON)  If you're not at work,
23   they can't retaliate against you?
24         MR. HOPKINS:  Same objection.
25      Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead.

Page 83

1       A.  Yes, you can retaliate.  You can't -- he's not at
2    work to be exposed to day-to-day retaliation.
3       Q.  Yes.
4       A.  But I can think of scenarios where he could be
5    retaliated against.
6       Q.  What scenario if he's not at work?
7       A.  We fired him in the middle of the workers' comp
8    leave.
9       Q.  Oh, that wouldn't have been good.  But you --
10      A.  Yes.  You would have had a --
11      Q.  Okay.  So, what appears to be a gap or some type
12   of, you know, maybe relief from disciplinary action is
13   really, would you agree, time where he was out on workers'
14   comp?
15      A.  He was out on workers' comp during that time
16   period.
17      Q.  Okay.  And as soon as he returns from workers'
18   comp, they give him a written reprimand and suspension; is
19   that correct?
20      A.  On October 23rd, 2012 they gave him a written
21   reprimand and suspension.  I'm not sure exactly the date he
22   came back.
23      Q.  I'm thinking it's late August, early September.
24      A.  Yeah, that occurred after he returned back to work.
25      Q.  Okay.  When you look at this document as an HR

Page 84

1    person, do you see any pattern there to sort of build a file
2    to terminate?
3         MR. HOPKINS:  Objection.
4    You can answer.
5         THE WITNESS:  Okay.
6       A.  I'm not sure what the motivations were behind who
7    was doing -- who was giving the reprimands and suspensions.
8    All I can say is it was a lot in a relatively short period of
9    time.
10      Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.
11      A.  I can't speculate on others' motives.
12      Q.  But as a regular person -- maybe I got too much
13   lawyer in me.  But as a regular person looking at it, the
14   period of time in which he is terminated, do you believe that
15   this could be -- it could not be, but it could be a way to
16   sort of build a file?
17         MR. HOPKINS:  Objection.
18      A.  It could or it could not.
19      Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  There is in
20   this Exhibit 3 written warnings, suspension, verbal
21   counseling.  Where do those terms come from if you don't have
22   a progressive disciplinary policy?
23      A.  They are -- the best I can answer that is they
24   predate me.  The department has always given written
25   reprimands, verbal counseling/coaching.  I think the coaching

Page 85

1    piece got added on when Dr. Quintana took over.  She's a
2    psychologist.  So, she probably added the "coaching" to the
3    end of it.
4       Q.  Do you know she added it or do you think she added
5    it?
6       A.  I don't know that.  I'm speculating.
7       Q.  Okay.
8       A.  Yeah, I don't know the history of the nomenclature.
9       Q.  Do you know -- are you aware of just general
10   progressive disciplinary policies?
11      A.  In other organizations?
12      Q.  Yes.
13      A.  I'm aware of the concept.
14      Q.  Yeah, the concept.  Where you go from, you know,
15   the counseling to a verbal to a written to maybe a suspension
16   to maybe a termination letter or maybe skip that and then go
17   to termination; correct?
18      A.  Yes.
19      Q.  Okay.  So, you don't see a certain pattern
20   within -- or a certain practice, even though there's not a
21   policy for progressive discipline?
22      A.  I think there's a natural tendency to try to -- if
23   you've counseled somebody once, if they do it again, they go
24   back and give them a written reprimand.  I think there's a
25   natural progression of severity there, and I think that may

Page 86

1  be what you're seeing reflected here.
2      Q.  Okay.
3      A.  And it does play out in some cases that way.
4      Q.  Okay.  Do you know if there is a policy to cancel
5  out -- for a better term, if someone -- let me give you an
6  example.  If someone had an incident in their file, that
7  incident would fall off over time where it couldn't be used
8  against you in the future.  Do you know if there is a policy
9  like that during Mr. -- if there was a policy during
10  Mr. Samuel's [sic] employment?
11      A.  Samuel or Grant?
12      Q.  Mr. Grant's employment.
13      A.  No.  For both of those, no, there is no policy.
14      Q.  Okay.  Do you know why there is not a policy?
15      A.  I do not know.
16      Q.  Have you ever asked?
17      A.  No, I have never asked.
18      Q.  Do you believe it's fair to take an incident that
19  occurred five years ago and it's the sole incident -- I'm not
20  saying that's the case here, but it's the sole incident --
21  and use it as grounds for termination five years later?
22      A.  My answer is going to be yes, particularly if it
23  involves child abuse.
24      Q.  Of course.  Of that nature.  But, I mean, if it's
25  a --

Page 87

1      A.  Typically you're going to look at more recent
2  things.  But if you ask me if I can hypothesize on an outlier
3  where, "Oh, you did this.  At some time in the history we
4  told you.  We almost fired you for it.  We were 99 percent
5  there.  You got something that said you can never do anything
6  remotely" --
7      Q.  Yeah.
8      A.  And then if you do the same thing, I don't care how
9  long --
10      Q.  Yeah.
11      A.  Sexual harassment.  If you sexually harass somebody
12  five years ago and we've got a second complaint that we can
13  verify, you're gone.
14      Q.  Okay.
15      A.  I mean, you're probably gone anyway, unless it was
16  something really mild on the front end that we did an EAP and
17  did those types of sanctions with you.
18      Q.  Did you notice that when Miss Quintada took over --
19  is her name Quintada?
20      A.  Dr. Quintana.
21      Q.  When Dr. Quintana took over, did you notice that
22  you were reviewing a lot of individuals who were nonwhite
23  being recommended for termination?
24      MR. HOPKINS:  Objection.  This is an ADA
25  case.

Page 88

1      Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead.
2      A.  I did not notice that.
3      Q.  You didn't notice that.  Okay.
4      Did you review the -- do you remember Tyrone Allen?
5      A.  I remember the name.  I don't remember anything
6  about.
7      Q.  Do you remember him being terminated?
8      A.  I do not remember him being terminated.  I remember
9  pulling his name as part of getting ready for this case as
10  somebody that was terminated, but I do not remember the
11  facts.
12      Q.  Is he black?
13      A.  I've never met the individual.
14      (Sotto voce discussion between Mr. Grant
15      and Ms. Plante-Northington)
16      MR. HOPKINS:  Let the record reflect
17  Mr. Grant doesn't know if Mr. Allen is black or not.
18      Q.  (BY MS. PLANTE-NORTHINGTON)  What about --
19      MS. PLANTE-NORTHINGTON:  Well, I'm asking
20  him.  I mean, it's --
21      Q.  -- Marcus Gordon?
22      A.  I've never --
23      Q.  Do you remember him being terminated?
24      A.  No, I do not.
25      MR. GRANT:  Oh, Gordon.

Page 89

1      MS. PLANTE-NORTHINGTON:  No, no, no.  You can
2  speak to me.
3      (Sotto voce discussion between Mr. Grant
4      and Ms. Plante-Northington)
5      Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  Do you remember
6  Mr. Allen having a hearing problem?
7      A.  Similar to my last response.  When we looked out
8  for -- I believe it was this case where we reached out and
9  asked administrators, anybody that worked in their divisions
10  that had any kind of disability, his name was part of that.
11  So, I don't recall at the time anything about him.  So, I
12  couldn't tell you whether he had a hearing impairment or not.
13      Q.  Okay.
14      MS. PLANTE-NORTHINGTON:  And let the record
15  reflect that Mr. Grant has stated that Mr. Allen is black.
16      Q.  (BY MS. PLANTE-NORTHINGTON)  Mr. Gordon, you said
17  you don't recall him?
18      A.  I do not recall him.
19      Q.  Did you receive any information on him before you
20  terminated him as you did with Mr. Grant?
21      A.  I don't recall the entire situation around --
22      Q.  Did you receive any information?  Because you said
23  you review terminations.
24      A.  Yes, I would have -- I don't remember receiving
25  that specific one.  But course of practice, I would have

Page 90

1   received it.
2       Q.   Okay.  So, it should be in your e-mail database if
3   you had received something similar to what you received with
4   Mr. Grant?
5       A.   I could look.  It may be in there.  I don't know.
6       Q.   But it would be inconsistent with your normal
7   practice not to receive something --
8       A.   That is correct.
9       Q.   -- for someone's termination like you did with
10  Mr. Grant?
11      A.   That is correct.
12           What was the date?
13      Q.   It looks like June 2013 for --
14      A.   Yes.  I just want to make sure it wasn't before --
15      Q.   -- Tyrone Allen.
16      A.   -- 2012.
17      Q.   Okay.  For Eric Bernard, do you remember that,
18  November 24th, 2013?
19      A.   I remember the name, and that's the extent.
20      Q.   Do you remember if he had a disability?
21      A.   I do not.
22           (Sotto voce discussion between Mr. Grant
23            and Ms. Plante-Northington)
24      A.   And for Tyrone Allen, I just remembered why I --
25      Q.   Okay.

Page 91

1       A.   He was a comparator in the hearing impairment case.
2       Q.   Hearing impairment case?
3       A.   The Natasha Colbert case we talked about at the
4   beginning.
5       Q.   Okay.
6       A.   We pulled his information.  That's why --
7       Q.   Okay.  So, with the DaSean case?
8       A.   Yeah, with the DaSean case.
9       Q.   Okay.
10      A.   That's where that --
11      Q.   Okay.  Based on what my client says, Mr. Gordon is
12  black.  Do you remember talking about his termination with
13  Miss Watson?
14      A.   I do not.
15      Q.   Do you remember -- it looks like one person was
16  suspended, Mr. Gordon.  Do you remember reviewing his
17  suspension?
18      A.   I do not remember that, no.
19      Q.   Do you know if any of these individuals had ever
20  engaged in a protected activity?  Mr. Gordon?  Mr. Allen?
21  Let's see who else I have here.  Mr. Punch?
22           MR. HOPKINS:  You're still asking the
23  question; but we object to the form, protected activity.
24           MS. PLANTE-NORTHINGTON:  Yeah, let me finish
25  my question first.

Page 92

1       Q.   (BY MS. PLANTE-NORTHINGTON)  Mr. Bernard?
2       A.   Other than by name, I don't remember those
3   individuals.  I don't know their --
4       Q.   You can't say whether they engaged in protected
5   activity?
6       A.   Yeah.  I don't know their stories.
7       Q.   Okay.
8       A.   I'm sorry.
9            (Sotto voce discussion between Mr. Grant
10           and Ms. Plante-Northington)
11           MS. PLANTE-NORTHINGTON:  Let the record
12  reflect that Mr. Bernard and Mr. Punch are black as well
13  based on what my client said.  I don't know.
14      Q.   (BY MS. PLANTE-NORTHINGTON)  In Mr. Grant's
15  termination, was there any discretion in you not recommending
16  termination?
17      A.   Yes.
18      Q.   Okay.  Why did you choose to recommend termination?
19      A.   We looked at kind of the totality of the situation.
20  As I mentioned earlier, the two key pieces of evidence that
21  I looked at was the previous suspension that happened
22  approximately a year before and that final -- the video that
23  came along with that and their description of what happened.
24      Q.   Okay.  Let's look at the video so we can get
25  through this.

Page 93

1            MR. HOPKINS:  I'm going to object.
2       I believe you had also given other reasons earlier
3   in your testimony.
4            MS. PLANTE-NORTHINGTON:  No, I don't think he
5   said any other reasons.
6            THE WITNESS:  I mentioned the cell phone
7   earlier.
8       Q.   (BY MS. PLANTE-NORTHINGTON)  Yeah.  But you said
9   that was not -- if you removed it, it wouldn't have changed
10  your mind.
11      A.   That is correct.
12      Q.   Okay.
13           MS. PLANTE-NORTHINGTON:  I want the record to
14  reflect that now I am attempting to try to play the video
15  that was produced to me on I believe yesterday.
16      Q.   (BY MS. PLANTE-NORTHINGTON)  Did you review this
17  video?
18      A.   I did review this video.
19      Q.   It has no audio; correct?
20      A.   The system has no audio.
21      Q.   Okay.
22      A.   None of our video has audio.
23      Q.   What did you perceive Mr. Grant to be doing at this
24  time?
25      A.   I'm probably not the best person to describe

Page 94

1  exactly what he's doing, but I can attempt to do it from my
2  perspective.
3      Q.   Yes.
4      A.   And the reason I'm doing it, it's been explained to
5  me.  So --
6      Q.   No.  I want you to explain it based on what you see
7  and not what someone else is telling you.
8      A.   Okay.
9      Q.   Okay.
10             MR. HOPKINS:  So, you're wanting him to
11  describe --
12             MS. PLANTE-NORTHINGTON:  Yeah, yeah.
13      Q.   (BY MS. PLANTE-NORTHINGTON)  Is he on constant
14  watch at this time?
15      A.   He is watching the child that's in that first room,
16  I believe.
17      Q.   Okay.
18      A.   He has paperwork in front of him.  He has the radio
19  in front of him.
20      Q.   When you say "radio," is that a Harris County
21  radio?
22      A.   Yeah.
23      Q.   Okay.  I just want to make it clear for the record
24  that it's not some boom --
25      A.   No.  It's a communication device that all of the

Page 95

1  staff use to communicate.
2      Q.   Okay.  And the papers, can you see what's on them
3  from the video?
4      A.   I cannot.
5      Q.   What else can you see from the video?  Can you see
6  the top of his head?
7      A.   Yes, I can.
8      Q.   Do you see what direction it's turned?
9      A.   Slightly to the right.
10      Q.   Slightly to the right toward the room; correct?
11      A.   Correct.
12      Q.   And why was he -- I'm just going to continue.  Oh,
13  I don't think I'm moving it.  I was like, "What is going on?
14  He seems to be" -- do you see his leg elevated?  He puts his
15  leg up; correct?
16      A.   Correct.
17      Q.   At that time, that had been approved; correct?  As
18  of November 2013 that had been approved for him to elevate
19  his feet?
20             MR. HOPKINS:  I'm going to object.  I don't
21  think that's what the documents show, but --
22      Q.   (BY MS. PLANTE-NORTHINGTON)  Did he elevate -- did
23  he put his foot up in the chair?
24      A.   He did put his foot up in his chair.
25      Q.   Was that a violation?

Page 96

1      A.   That was not a violation that we considered in any
2  of our processes.
3      Q.   Okay.  He had elevated his feet before, correct, in
4  a Facebook page?
5      A.   Yeah.
6      Q.   Keep looking.  It looks like he takes his foot down
7  now; correct?  And his head is still turned towards the door;
8  correct?
9      A.   Yeah.
10      Q.   Based on what you can see?
11      A.   Yes.
12      Q.   It looks like he is writing something.  Can you
13  determine what he's writing?
14      A.   No, I cannot.
15      Q.   Okay.
16           So, he moves again.  We will continue here.
17           Someone comes in now.  Do you know who that is?
18      A.   I do not know who that individual is.
19      Q.   Did you ask Miss Watson who that was?
20      A.   I've been told what his name is watching the video.
21  Everybody else knows.
22      Q.   Alfred?
23      A.   No.
24      Q.   That is not Alfred?
25      A.   That is not Alfred.

Page 97

1      Q.   What would he be doing?
2      A.   He is making the rounds, basically checking on the
3  kids that aren't on one-on-one.
4      Q.   Is that the 15-minute watches, 15-minute interval
5  watches?
6      A.   Yeah.
7      Q.   Okay.
8      A.   Each one of the kids has a form on their door.  And
9  they are basically looking in the window, writing the code of
10  at this time probably sleeping.
11      Q.   Yeah.  It's 11:07; correct?
12      A.   Yeah.
13      Q.   What time is lights -- are lights out?
14      A.   On the main unit, the lights don't really go out.
15      Q.   No, not lights out, but I mean the children are
16  supposed to go to sleep.
17      A.   I hate to tell you this.  I --
18      Q.   You don't know?
19      A.   I don't know.
20      Q.   Okay.
21      A.   It's different at each one of the facilities, but I
22  don't know that.
23      Q.   It looks like he's drinking water.  Is that a
24  violation?
25      A.   No.

Page 98

1    Q.   His head is still, based on what you can see,
2  turned towards -- well, now he turns to the left.  His head
3  turns back to the right towards the door is what you can see?
4  Is that what you can see?
5    A.   Yeah, kind of down towards the door.
6    Q.   Okay.
7    A.   It's hard to see from the video from the back of
8  his head.
9    Q.   When they say constant watch, are you supposed to
10 sit there and just look at them, like, stare?
11   A.   I've never been trained on being a JSO.  So, I'm
12 not really -- you're supposed to keep eyes on them.  I don't
13 think right now this is particularly atypical behavior.  I
14 assume the child is probably sleeping in the room.
15   Q.   Yes.
16   A.   So, gazing over.
17   Q.   Were you aware this child was on suicide watch?
18   A.   That is one of the reasons you can be put on
19 constant watch.
20   Q.   Okay.
21   A.   So --
22   Q.   You don't know?
23   A.   I don't know for sure, but he could be.
24   Q.   Where is the clock in proximity to this?
25   A.   It's in the booth in the window, but --

Page 99

1    Q.   Can you see it in this picture?  In this video can
2  you see it?
3    A.   I cannot see the clock.
4    Q.   Okay.
5    A.   I do want to say I have spent very little time on
6  the floors.  So, the layout of it is --
7    Q.   But if you're assessing a video, it's going to be
8  important that you understand this, even if it's from Miss
9  Watson's perspective?
10   A.   Yes.
11   Q.   Okay.
12        He turns.  It looks like he elevates his foot on
13 top of the chair.  Do you see that?
14   A.   Yes.
15   Q.   And he turns more towards the door, I guess at an
16 angle toward the door.  Do you see that?  Did you see him
17 move his table and turn --
18   A.   I saw him move the table.
19   Q.   Okay.
20        MR. HOPKINS:  But you were not agreeing that
21 he was looking at the door?
22   A.   You can't see his eyes.
23   Q.   (BY MS. PLANTE-NORTHINGTON)  Well, if you can't see
24 his eyes, how can you tell he's not looking at the door?
25   A.   Exactly.

Page 100

1    Q.   Exactly.
2        He's writing something at this time; correct?
3    A.   Yes.
4    Q.   You don't know what he's writing.  He's writing
5  something.  You're assuming he's entering something onto the
6  observation checklist?
7    A.   That is correct.
8    Q.   And I'm not sure how much time would have
9  transpired and if this is actually accurate, but it says that
10 it is about 1:21 on 10/29/2013.  Do you remember that to be
11 the date of the incident?
12   A.   The date, yes.
13   Q.   Okay.
14   A.   And approximately we're within the right hour.
15   Q.   Okay.
16        There's someone else.  Looks like the same person.
17 I'm not sure.
18   A.   I think he's making his --
19   Q.   Comes back in.
20   A.   Yes.
21   Q.   Okay.
22        For checks on constant watch, what's the interval?
23 10 minutes sound --
24   A.   I believe it's 10 minutes.
25   Q.   Okay.

Page 101

1    A.   There's two different levels, 10 and 15.  I think
2  CW is 10.  And CO I believe is 15.  This is not my area of
3  the agency.
4    Q.   Now, it looks like this young man passes by a
5  second time.  He's just doing his rounds it appears?
6    A.   Yes.
7    Q.   Okay.  Maybe somebody else comes in.  Did she tell
8  you where she saw Mr. Alfred come in on this video?
9    A.   We watched it for a while.  It was near the end of
10 the video.
11   Q.   Okay.
12   A.   I wish I could remember the time.
13   Q.   That's okay.
14   A.   It would speed this up.
15   Q.   I don't think it's very long.  I don't know.
16        Do you know if the person that was walking around
17 observed Mr. -- or gave a statement, rather?
18   A.   I do not know.
19   Q.   Did you ask Miss Watson had he given a statement
20 after looking at him on the video?
21   A.   I do not recall the information she pulled together
22 at the end.
23   Q.   I mean, did you ever ask her, "Who is this guy?
24 Did you take a statement from him?"
25   A.   Her assistant deputy, Keith Branch, knows everybody

Page 102

1    in the building; and he's been present while we watched this.
2    He tells you --
3        Q.   Because she didn't know?
4        A.   I don't know if she knew or not.  But whenever we
5    watch these, he does the narrative of them and he points --
6    he knows everybody in the building by name and what their
7    role is.
8        Q.   Do you remember receiving -- you said you don't
9    recall receiving anything related to Mr. Alfred's statement.
10   Do you remember anything -- and you see head movement here.
11   So, we know he's not sleeping --
12       A.   Yes.
13       Q.   -- based on his head movement.
14           This person walks in.
15           MR. HOPKINS:  Objection.  I don't think he
16   said "yes" or "no" either way.
17       Q.   (BY MS. PLANTE-NORTHINGTON)  Is that "yes" or "no"?
18   I think you said "yes."
19       A.   I shook my head.  I'm sorry.  I saw the head move.
20       Q.   Yes.  Okay.
21       A.   And for clarity, we're not accusing him -- no one
22   accused him of sleeping on this video.
23       Q.   Okay.  But if he's not keeping watch, that's not a
24   good thing; correct?
25       A.   Correct.

Page 103

1        Q.   Okay.  And based upon the documentation, he needs
2    to keep watch in order to validate what he's putting on
3    there; correct?
4        A.   That is correct.
5        Q.   Okay.
6        A.   These shifts can be fairly slow at times.
7        Q.   Just watching it put me to sleep, especially 11:00
8    to 7:00.
9            Do you know if this camera only picks up movement
10   or if it picks up everything?
11       A.   You're absolutely correct that it picks up
12   movement.  I'll put my IT hat on for a minute.  For video
13   storage purposes, the cameras, they click on as soon as it
14   senses any kind of movement and then will cut off and then
15   resume as soon as it has movement again.
16       Q.   Okay.
17           This person, is that Mr. Alfred?
18       A.   No.
19       Q.   Okay.  So, it appears that he might be doing watch
20   too?
21       A.   He's not writing anything down.  So, my guess is
22   he's a supervisor coming by just looking at the forms.
23       Q.   Okay.  So, did he look at Mr. -- would he be a
24   person that was responsible for looking at Mr. Johnson's --
25   Mr. Grant's form?

Page 104

1        A.   I do not know.
2        Q.   Okay.
3            (Sotto voce discussion between Mr. Grant
4            and Ms. Plante-Northington)
5        Q.   Now, if Mr. Grant has been already counseled on
6    this -- if we consider them to be valid -- February 2nd,
7    February 23rd, and February 5th, three times, and a video is
8    looking at him, do you see that that would lend to a person
9    sort of doing what they need to do --
10           MR. HOPKINS:  Objection.
11       Q.   -- if they know a video is looking at them?
12           MR. HOPKINS:  Objection.
13       Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
14       A.   I personally certainly would.
15       Q.   Yeah.  I would too.
16           Okay.  We see this guy come back.  I'm going to go
17   on to some more testimony.  At this point we can't really see
18   his head, but we know it's sort of in the direction of the --
19   his body sort of is in the direction of the door; correct?
20           MR. HOPKINS:  Objection.
21       A.   His foot is in the direction.  There's his head,
22   yes.
23       Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  His head peeps
24   out there.
25           What do you see later on in the video when we get

Page 105

1    to it?
2        A.   This may make it a little bit easier.
3        Q.   Okay.
4        A.   Nothing until Mr. Bryant walks in was used to
5    terminate Mr. Grant.  He was -- he appears to be --
6        Q.   Documenting something, writing something?
7        A.   -- documenting something.
8        Q.   Okay.
9        A.   Mr. Bryant comes in near the end of the shift.  I
10   think it's probably about 10 minutes before Mr. Grant leaves
11   the floor.  He might have been reassigned someplace else.
12   So, it might not have been at the end of the shift.  But he
13   comes in.
14       Q.   Is Mr. Alfred the same as Mr. Bryant?
15       A.   Alfred Bryant.
16       Q.   Alfred Bryant.  Okay.  I just want to make sure for
17   the record.
18       A.   They call him AB.
19       Q.   Okay.
20       A.   So, he comes in and he approaches the table where
21   Mr. Grant is sitting and he talks with Mr. Grant for a
22   minute.  He goes over and enters a code that he's come by and
23   said that everything was okay with the form.  He enters -- or
24   if something is unusual about the form.
25           MR. HOPKINS:  You're speaking hypothetically

27 (Pages 102 to 105)

Page 106

1   this is what happens?
2        MS. PLANTE-NORTHINGTON: No. He's saying
3   what happens.
4        Q.  (BY MS. PLANTE-NORTHINGTON) Correct?
5        A.  That's what the shift supervisors do.  They go by
6   and they check and mark that they have done their rounds and
7   whether the paperwork they are looking at looks accurate and
8   the intervals are correct.  You'll have to ask them exactly
9   what they're looking for.
10        But they have a code 88 and a code 99.  I may get
11   this in reverse, but one of those means everything looks
12   great.  The other one means there's some issue with something
13   that they saw.  And they'll usually ask -- back to your
14   Exception Report -- to please fill out an Exception Report.
15        Q.  Okay.  I believe it's an 88 if something is wrong.
16        A.  Don't hold me to that.
17        Q.  That's fine.
18        A.  I believe there's a key at the bottom of the form
19   that --
20            (Sotto voce discussion between Mr. Grant
21             and Ms. Plante-Northington)
22        Q.  Do you know how JSOs make corrections to the forms?
23        A.  No, I don't personally know that.
24        Q.  Would that be important, if he did make a
25   correction, in assessing the termination?

Page 107

1        A.  It would be.  But in this case the change on the
2   form was the supervisor's code.  So, I don't think a JSO
3   would ever correct a supervisor's code, changing an 88 to a
4   99, that everything was okay to that there was a problem.
5        Q.  You're saying he changed an 88 to a 99?
6        A.  That is why he was terminated.  That's why I'm
7   saying watching all this --
8        Q.  Did you do a handwriting type of -- you're just
9   going on the word of -- who is this?
10        A.  Another JSO.  I don't know who that is.  That's not
11   Alfred Bryant.
12        Q.  So, you have no problem -- we can fast forward
13   through this -- with the video until Mr. -- well, I've done
14   something wrong here.  I knew I shouldn't mess with it.
15        Was it 1:55, 1:50?  Ring a bell?
16        A.  You're ballpark.
17        Q.  Okay.  No, no, no.  I was thinking something
18   happened at 1:50 or 1:55.  Okay.  Maybe not.  I've read a lot
19   of documents.
20        All right.  Is that Mr. Bryant?
21        A.  I can't see it.
22        No, I don't believe so.  He's a bigger guy.
23        Q.  Okay.
24            (Sotto voce discussion between Mr. Grant
25             and Ms. Plante-Northington)

Page 108

1        A.  The blue metal, that's glass.  That's, like, the
2   framed glass.
3        Q.  Right here?
4        A.  See closer this way?
5        Q.  Right here?
6        A.  Yeah.
7        Q.  Okay.
8        A.  I'm not positive, but I think it sets right inside
9   the glass in the booth.
10        Q.  Okay.
11            MR. GRANT: That would be correct.
12            MS. PLANTE-NORTHINGTON: So, it's to the left
13   of you?
14            MR. GRANT: To the left.
15            MS. PLANTE-NORTHINGTON: Okay.
16        Q.  (BY MS. PLANTE-NORTHINGTON) Can an employee make a
17   mistake and correct it?
18        A.  Yes.
19        Q.  Okay.  And you said that goes with the -- not
20   special exception -- Exception Report?
21        A.  I am not positive.  I'm not sure exactly how they
22   deal with that procedure.  I have seen them with a single
23   line drawn through and a change next to that line.
24        Q.  Okay.
25        A.  Miss Watson, when you depose her, will be able to

Page 109

1   give you much more information around that.
2        Q.  Okay.  Let's see if we can cover some more bases
3   until the heavyset guy comes in.  You said that is the reason
4   for the termination?
5        A.  Yes.
6        Q.  Okay.  So, we'll assume everything else is normal.
7        Do you use your cell phone while at work at Harris
8   County, your personal cell phone?
9        A.  Yes, I do.
10        Q.  Do you report your time that you use your cell
11   phone to HR for deductions in pay?
12        A.  No, I do not.
13        Q.  Are you also -- is this it?
14        A.  I'm having trouble seeing from this angle.
15        Q.  Oh.
16        A.  That looks like it, yes.
17        Q.  Okay.  You said he's a big guy.  Maybe he's tall.
18        A.  Wait till you see him.
19        Q.  Okay.
20        A.  You've got it narrowed into the --
21        Q.  Okay.
22        A.  It's, like, halfed.
23        Q.  Well, this is the main part.
24        A.  Yeah.
25        Q.  Okay.

28 (Pages 106 to 109)

Page 110

```
1     A.  You're seeing everything you need to.
2     Q.  You don't know what's being said?
3     A.  I do not know.  I was not there.
4         (Sotto voce discussion between Mr. Grant
5         and Ms. Plante-Northington)
6     Q.  Did you see Mr. Alfred Bennett --
7     A.  Bryant.
8     Q.  -- Bryant look at the clock?
9     A.  Yes, I did.
10    Q.  You saw him look at the clock?
11    A.  They both seemed to be pointing over at what I
12  assume is the clock.
13    Q.  You don't know?
14    A.  They were pointing --
15        MR. HOPKINS:  I think he's just testified
16  that's where the clock is located.
17    Q.  (BY MS. PLANTE-NORTHINGTON) But you don't know?
18    A.  They were pointing to the left side of the room.
19    Q.  But you don't know?
20    A.  No.
21        MR. HOPKINS:  Objection.
22    Q.  (BY MS. PLANTE-NORTHINGTON) So, you are
23  speculating.  You weren't there; correct?
24    A.  That is correct.
25    Q.  Okay.  And even if we open this up -- I'm having
```

Page 111

```
1   some technical difficulties -- you still couldn't see --
2     A.  That's the frame.
3     Q.  Okay.  Would it be important to see that in order
4   to assess what they're looking at and the time?
5         MR. HOPKINS:  Objection.
6     Q.  (BY MS. PLANTE-NORTHINGTON) Go ahead.
7     A.  It was explained to me on.
8     Q.  Okay.
9     A.  Because the clock --
10    Q.  I mean --
11    A.  Do you want me to --
12    Q.  -- not explained to you.  I'm talking about would
13  it be important to you just based upon just understanding,
14  "Okay.  What are they looking at and why can't I see it?"
15  Just like you said you weren't going to say he didn't ask for
16  a 15-minute break.  You couldn't say it because you weren't a
17  party to that conversation.
18        MR. HOPKINS:  Objection.
19    Q.  (BY MS. PLANTE-NORTHINGTON) So, applying that same
20  rationale, if you couldn't see the clock, you're saying that
21  that wasn't important to you.
22        MR. HOPKINS:  Objection.
23    A.  It was not important to me.
24    Q.  (BY MS. PLANTE-NORTHINGTON) Okay.  And that's
25  because of statements that were made to you?
```

Page 112

```
1     A.  No.  It's because the clock is completely
2   irrelevant.  What we are looking for is intervals between
3   times that he's looking over and recording on the sheet.
4   They were not in accordance with -- whether it's 10 or 15
5   minutes -- in accordance to what he was supposed to be doing.
6   So, the supervisor was saying -- well, I don't know what the
7   supervisor was saying.  But it was explained to me that it
8   doesn't matter if the clock was 10 minutes fast, 5 minutes
9   slow.  What they are looking for is that's the official time
10  on the unit and whether those intervals were followed
11  correctly.
12    Q.  Okay.  And what was described to you?  Do you see
13  him -- at some point do you see him mark something out and
14  put a 99?
15    A.  He marked something.  I don't know what exactly he
16  did.  Alfred Bryant said that he put the 88 there and -- I
17  may be reversing that.  Either the 88 or the 99 was switched
18  to the alternative.
19    Q.  Okay.  Whichever was saying he was noncompliant was
20  put by Alfred.  And you're saying Mr. Grant changed it to
21  what was compliant?
22    A.  Yes.
23    Q.  And you have no evidence other than what Mr. Alfred
24  said to you that you could validate on this video?
25        MR. HOPKINS:  Objection.
```

Page 113

```
1     A.  The video is the evidence that we had along with
2   Mr. Bryant's --
3     Q.  (BY MS. PLANTE-NORTHINGTON) Yeah, the video.  But
4   you don't see him mark through --
5         MR. HOPKINS:  I don't think you were
6   finished.  The video was evidence along with ...
7         THE WITNESS:  Mr. Bryant's complaint that it
8   had been changed.
9         MS. PLANTE-NORTHINGTON:  Do we have
10  Mr. Bryant's complaint?
11        MR. HOPKINS:  I don't know.  We have the
12  observation form.  We have everything in the personnel
13  record.
14    A.  I believe he went to Mr. Beasley the following
15  morning.
16    Q.  (BY MS. PLANTE-NORTHINGTON) He didn't document it
17  that day?
18    A.  I don't know.
19    Q.  Let me look.  Would Mr. -- would Mr. -- let me
20  withdraw that until I get my thoughts together.
21        (Sotto voce discussion between Mr. Grant
22        and Ms. Plante-Northington)
23        MR. HOPKINS:  Can we take a break?
24    A.  While you do that, I'll be back in two minutes.
25  I promise.
```



Page 114

1    Q.   (BY MS. PLANTE-NORTHINGTON)  Has everything --
2    okay.  I just want to make sure.  Has everything regarding
3    the video that you know of been looked at?
4    A.   Absolutely.
5    Q.   Okay.  So, I don't have to continue looking at it?
6    A.   No.
7    Q.   Okay.  All right.  I don't want to waste time.
8         (Recess taken)
9    Q.   We were talking about electronic devices.  We're
10   finished with the video.  You said you use your cell phone at
11   work.  Do you know people in administration who do use their
12   personal cell phones at work?
13   A.   People in detention or in the administrative part?
14   Q.   In the administrative part.
15   A.   Yes.
16   Q.   Okay.  So, there's a different rule for the people
17   in detention; correct?
18   A.   That is correct.
19   Q.   Why?
20   A.   I'm probably not the right person to answer why
21   there is a policy for that, but there is a longstanding
22   policy for that.
23   Q.   You don't know why?
24   A.   Do you want me to speculate?
25   Q.   No.

Page 115

1         Do you have a Harris County issued cell phone?
2    A.   I do not.
3    Q.   Do you know if Mr. Samuel had a Harris County
4    issued cell phone?
5    A.   I don't know for sure.
6    Q.   Okay.
7    A.   I do not believe he would have.  It's just the
8    field officers that have the Harris County.
9    Q.   Okay.  Why is there a policy against recording
10   other people if it's related to -- if it's trying to negate
11   something that you did?
12        MR. HOPKINS:  Objection.
13   Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
14   A.   It often has to do around filming kids.  And
15   there's some pretty strict guidelines we get from the State
16   about photographing kids and having them accidentally show up
17   in videos.  We've had issues with people giving their phones
18   to kids to make phone calls.  We've got issues with kids
19   getting on, like, Facebook and posting stuff while they're in
20   detention.  Like, at TJJD -- not TJJD -- TDCJ, at those
21   facilities you literally have to be scanned as you walk in to
22   make sure every day that you don't have a phone.  I think
23   it's pretty standard in correctional facilities no cell
24   phones.
25   Q.   Okay.  Standard in correctional facilities

Page 116

1    throughout the nation or are you just saying that's your
2    speculation?
3    A.   I don't know about throughout the nation.
4    Q.   Yeah.
5    A.   The ones I have visited in Texas, yes.
6    Q.   Okay.  And you said this is for the protection of
7    the children?
8    A.   (Nods head)
9    Q.   If no children are seen and this is in an
10   environment where you're in an office of a supervisor and no
11   children are around, where are children being protected since
12   they are in another area?
13   A.   There would be no children in that situation, you
14   are correct.  The policy is a blanket policy for the
15   facility, though.
16   Q.   Okay.  I understand that.  But I'm trying to make
17   that comply with what you just stated, that the children --
18   the protection of the children --
19   A.   Yes.
20   Q.   -- is what is important.
21   A.   Uh-huh.
22   Q.   And, so, if he is in the office with Mr. Beasley or
23   Miss Phillips or Mr. Samuel, how would children be in that
24   environment?
25   A.   Children are not in that environment.

Page 117

1    Q.   Okay.  Do you believe that it is wrong for him if
2    he's trying to show disparity or difference in treatment,
3    like, if he said -- okay.  For instance, if he was accused of
4    being on the phone and then he saw others on the phone and he
5    took a shot of that while they were working and no children
6    were in sight, do you believe he has a justifiable reason to
7    use that to eliminate discrimination if it exists?
8         MR. HOPKINS:  Objection.
9    Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
10   A.   I believe it's a violation of the policy.  And it's
11   a slippery slope when we get away from that, when we start
12   making exceptions on greater good determinations, past that.
13   Q.   So, you would rather discrimination go on at the
14   facility and not be aware of it --
15        MR. HOPKINS:  Objection.
16   Q.   -- than --
17   A.   No, I would not.
18   Q.   -- to just follow the policy.  You don't care?
19        MR. HOPKINS:  Objection.
20   A.   I would prefer that was reported and sent through
21   the appropriate channels, which would have ended up in my
22   lap.
23   Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  Do you
24   understand that he said, she said becomes a lot of this when
25   you get people coming in telling you, "Well, I say this," and

Page 118

1  then another person says something totally opposite and you
2  have to determine who to believe?  And if you can't determine
3  who to believe, then you say, "Well, I can't substantiate
4  your claim"?
5          MR. HOPKINS:  Objection.
6  Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead.
7          MR. HOPKINS:  That's -- I'm not sure --
8  Q.  (BY MS. PLANTE-NORTHINGTON)  Did you understand?
9          MR. HOPKINS:  I don't think that's a
10  question.
11  A.  Could you rephrase it?
12  Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  When two people
13  come into your office, if they are lodging a complaint in HR,
14  let's say they are before you, if one person says this
15  happened and another person says this happened, would it be
16  more believable if the person who said what happened had a
17  recording that verified what he said happened?
18          MR. HOPKINS:  Objection.
19  A.  In a vacuum, yes.
20  Q.  (BY MS. PLANTE-NORTHINGTON)  Okay.  So, this
21  policy, regardless of whether it eliminates discrimination or
22  harassment or it serves to eliminate that as a form of
23  evidence, you don't care -- or Harris County doesn't care.
24  They don't want any recordings; correct?
25          MR. HOPKINS:  Objection.

Page 119

1  Q.  (BY MS. PLANTE-NORTHINGTON)  You can answer.
2          MR. HOPKINS:  Yeah.  I'm objecting for the
3  record.
4          THE WITNESS:  Okay.
5  A.  We have enforced the cell phone policy
6  unilaterally.  I'm not going to say we don't care about
7  discrimination or any other thing.  But that policy is in
8  place to protect kids, and we stick by it.
9  Q.  (BY MS. PLANTE-NORTHINGTON)  Have you seen any
10  videos of Mr. Grant that he's produced that had children in
11  them?
12  A.  Give me a second.
13  Q.  Okay.
14  A.  I do not believe there are any children in any of
15  the videos that --
16          MR. HOPKINS:  I'm going to object because we
17  have an ongoing discovery dispute about exactly how much he
18  recorded and what his phone records show.  So, we may not
19  have everything.
20  Q.  (BY MS. PLANTE-NORTHINGTON)  Well, based on what
21  you've seen is what I asked.
22  A.  I don't --
23  Q.  Can you recall any child?
24  A.  I'm not recalling any child --
25  Q.  Okay.

Page 120

1  A.  -- on the videos that I have seen.
2  Q.  Okay.  Do you remember people appearing to be at
3  work on their cell phones?
4  A.  I do.
5  Q.  And Mr. Grant was accused of that.  Do you know if
6  those individuals were disciplined?
7          MR. HOPKINS:  Objection.
8  A.  I do not believe those individuals were
9  disciplined.  We did not find out about those individuals
10  until whenever we got the videos two, three months ago.  And
11  at that point it's too late to do anything about that almost
12  five years later.
13  Q.  (BY MS. PLANTE-NORTHINGTON)  But do you see where
14  that leads to one person using their phone without penalty,
15  but another person may be using his device -- phone,
16  whatever -- and it is with penalty?  Do you see how that
17  doesn't appear to be fair to one person?
18          MR. HOPKINS:  Objection.
19  A.  The people that we caught using their cell phones
20  or electronic devices were dealt with.  The stuff that came
21  up as part of discovery in this case, we had a discussion
22  about what to do with that being so far back; and we did not
23  do anything with those.
24          (Sotto voce discussion between Mr. Grant
25          and Ms. Plante-Northington)

Page 121

1  Q.  (BY MS. PLANTE-NORTHINGTON)  So, you would say
2  there's sort of a graded violation-type system.  You said if
3  somebody molests a child or abuses a child, it's going to be
4  a higher --
5  A.  Yes.
6  Q.  -- type of violation than somebody who uses their
7  cell phone?
8  A.  I would weight that more as I was evaluating what
9  to do with that, yes.
10  Q.  Okay.  So, there is a discretion?
11  A.  Yes.
12  Q.  And where does this graded violation come from?
13  A.  Group discussion.
14  Q.  Group discussion.  Is it in writing?
15  A.  No.
16  Q.  Falsification of records, are you accusing him of
17  intentionally falsifying a record?
18  A.  Yes.
19          MS. PLANTE-NORTHINGTON:  Okay.  I'm going to
20  note that Mr. -- I saw you nod.
21          MR. HOPKINS:  I'm sorry.  I was looking down.
22          MS. PLANTE-NORTHINGTON:  You should not nod
23  yes.  You nodded yes.  I saw you on the record.  Please do
24  not coach the witness.
25          MR. HOPKINS:  Ms. Plante --

31 (Pages 118 to 121)

Page 122

1    MS. PLANTE-NORTHINGTON:  I saw you on the
2  record.
3    MR. HOPKINS:  Mr. Shelton, were you looking
4  at me?
5    THE WITNESS:  I was looking over there.
6    MS. PLANTE-NORTHINGTON:  You're looking to
7  the left.  Out of my peripheral vision, I can see Mr. Grant
8  without even looking there to know when he's nodding if I'm
9  in his peripheral vision.
10   MR. HOPKINS:  Okay.  Ms. Plante, I was not in
11  any way intending to coach Dr. Shelton.  Dr. Shelton knows a
12  whole lot more about this case than I do.
13   MS. PLANTE-NORTHINGTON:  I understand.  But
14  you were nodding.  So, yes, your head was going up and down.
15  So, please.
16   (Sotto voce discussion between Mr. Grant
17   and Ms. Plante-Northington)
18   MS. PLANTE-NORTHINGTON:  You'll have to read
19  back my question because I totally lost my thought.
20   (The following was read:
21   "QUESTION:  Falsification of records, are you
22   accusing him of intentionally falsifying a
23   record?
24   ANSWER:  Yes.")
25   Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  You said

Page 123

1  intentionally.  What do you mean by intent?  And you are red.
2  Do you need some water?
3    Q.   Okay.
4    A.   No.  I'm good.
5    A.   What do I mean by intent?  It wasn't an accident,
6  that he changed one code to another code on purpose.
7    Q.   Did you ever ask him about his version of the
8  facts?
9    A.   No.  It was -- residential services conducted the
10  investigation, and they talked to people.  I did not talk
11  to --
12   Q.   Did they talk to Mr. Grant about it?
13   A.   I do not know if Mr. Beasley talked to Mr. Grant as
14  part of this or not.
15   Q.   If Mr. Grant testifies that no one ever talked to
16  him about what happened with this allegedly crossing out a
17  code on -- I think it's October 29, 2013, would you disagree
18  with that?  Do you have any evidence to disagree with that?
19   MR. HOPKINS:  Objection.
20   Do you feel it's within -- whatever your knowledge
21  is.
22   A.   I have no knowledge of it.  So, no, I --
23   Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  You don't have
24  anything to refute it?
25   A.   Yeah.

Page 124

1    Q.   Okay.  Do you believe in an investigation it's
2  important to get that other person's point of view before you
3  make a conclusion?
4    A.   Uh-huh.
5    Q.   Is that "yes"?
6    A.   Yes.
7    Q.   Exhibit -- I believe I prematurely marked it as
8  Exhibit 4.  Would you perceive that Mr. -- based on what you
9  know of his termination, would you believe falsifying a
10  document is misconduct?
11   A.   Yes, I would.
12   Q.   Okay.  And do you understand under unemployment
13  standards, misconduct would render you ineligible to receive
14  benefits?
15   A.   Yes, I do.
16   Q.   Okay.  And you would agree that it is within Harris
17  County's best interest to keep all claims they have to pay --
18  well, let me rephrase that.  Will you agree that when
19  employers get a number of claims, their rates go up with
20  unemployment?
21   MR. HOPKINS:  Objection.
22   Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
23   A.   I'm not involved at that level.  So, I don't know
24  how that rate system works.
25   Q.   Okay.  I can tell you as a self -- as a person who

Page 125

1  employs someone, the rate --
2    A.   I assume it does.
3    Q.   -- does go up when you have --
4    MR. HOPKINS:  Object to the side-bar.
5    Q.   -- a number of claims.
6    If you assume that to be factual -- and you can go
7  and check.  But if you assume that to be factual, do you
8  believe that it is in Harris County's best interest to fight
9  anything that would increase its rates --
10   MR. HOPKINS:  I object to this question --
11   Q.   -- in unemployment?
12   MR. HOPKINS:  -- this line of questioning.
13   Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
14   A.   Yes.
15   Q.   Okay.  And you would agree that Harris County did
16  not contest Mr. Grant's unemployment benefits?
17   A.   I have not looked at ERISA.  But, yes, I assume
18  that's correct.
19   Q.   You were given -- look at Exhibit 3, I believe.  Or
20  4.  I'm sorry.  Shelton 4.  Is that exhibit to you from Keith
21  Branch?  It's a memo -- I'm sorry -- an e-mail from Keith
22  Branch to you on January 17th.
23   A.   That is correct.
24   Q.   And if you look at the third page, it says that
25  Mr. Grant could receive benefits.  Do you see that in the

Page 126

1  decision on Page 3 of that exhibit, Exhibit 4?  It's going to
2  be under "Decision."
3      A.  Yes, I see that.
4      Q.  So, if a person can receive benefits, at least the
5  Texas Workforce Commission has concluded there is no
6  misconduct?
7          MR. HOPKINS:  Objection.
8      Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead.  Deductive
9  reasoning?
10     A.  The Texas Workforce --
11     Q.  Yes.
12     A.  I don't know how they come to those decisions,
13  but --
14     Q.  If they pay benefits, do you believe that they pay
15  benefits on misconduct?
16         MR. HOPKINS:  Objection.
17     A.  I do not believe they pay benefits on misconduct.
18     Q.  (BY MS. PLANTE-NORTHINGTON)  Exhibit 4, which is an
19  e-mail, I guess, from Lester Jones, do you know who he is?
20     A.  He is the Texas Workforce Commission -- I'm not
21  sure if this is his exact title -- coordinator at the county
22  level.
23     Q.  Okay.  And he's addressing this to Michael Prince.
24  Who is he, his job title?
25     A.  He is a human resources officer with our

Page 127

1  department.
2      Q.  Okay.  And he says "Good Morning, TWC sent in the
3  Determination Letter on Otis J. Grant.  If you disagree with
4  the decision, please contact me within 14 calendar days of
5  the notice's mailing date.  Please read and print the
6  attachment for your records.  Thanks."  Okay?
7      A.  Okay.
8      Q.  When it was forwarded to you, did you express any
9  interest in contesting Mr. Grant's unemployment?
10     A.  I would not have.
11     Q.  Okay.  Why?
12     A.  Mr. Grant, during the course of his employment, had
13  threatened several times that he was going to get attorneys
14  involved to several different people throughout the
15  organization.  When we usually have one that we think has the
16  potential of going to a lawsuit, we don't contest that.
17     Q.  Well, if you feel you have a valid claim and a
18  defense, are you saying that just having the presence of a
19  lawyer makes Harris County not contest it?
20     A.  In some cases, yes.
21     Q.  Do you believe that would make the employee
22  less apt to file a complaint?
23     A.  Could you rephrase that?  What are you trying to
24  get at?
25     Q.  You're saying that you don't contest where the

Page 128

1  person has threatened to get an attorney involved.  I said do
2  you believe that threatening an attorney makes -- I don't
3  know what I said.  Let me go back.  I'm tired.
4          Is it Harris County's policy if you have an
5  attorney or you threaten an attorney not to contest
6  unemployment benefits?
7          MR. HOPKINS:  I object.
8          I believe you can only speak for your department;
9  right?
10     Q.  (BY MS. PLANTE-NORTHINGTON)  Your department, yeah.
11     A.  We don't have any policy that governs that.  Some
12  of the ADA trainings that I've been to with various
13  attorneys, that has been their universal suggestion.
14     Q.  Okay.  Not to contest it.  Why?
15         MR. HOPKINS:  Objection to the --
16         MS. PLANTE-NORTHINGTON:  Well, he said he
17  knew.
18         MR. HOPKINS:  Well, hold on.  Attorney-client
19  privilege.
20         I mean, are you saying that attorneys have advised
21  you?
22     Q.  (BY MS. PLANTE-NORTHINGTON)  In what way, your
23  attorneys or just people speaking?
24     A.  No, not my attorneys.
25     Q.  Okay.

Page 129

1      A.  The reason -- and you're going to get a nonlegal
2  response to this -- is it's free -- some attorneys use this
3  process as kind of an open early deposition and discovery in
4  the process.  I really can't go any deeper than that.
5      Q.  Okay.  I understand what you mean.  You're saying
6  that he may get a hearing.  You may be called to testify
7  under oath.  And you're not prepared to do that at that time?
8      A.  I don't participate in these directly.  It would be
9  my staff.  But, yes, that they're not prepared at that time.
10     Q.  Okay.  If you're telling the truth and you stand by
11  your position 100 percent, why wouldn't you -- why would you
12  be apprehensive as a person to testify?
13     A.  Not being an attorney, I tend to take advice from
14  attorneys when given to me.  That's what I was doing.
15     Q.  Is it so the attorneys defending you can get their
16  ducks in a row before they have to go to this hearing, which
17  is somewhat expedited?
18         MR. HOPKINS:  Objection.
19     Q.  (BY MS. PLANTE-NORTHINGTON)  Go ahead.
20     A.  No, it's not.  At that point typically the
21  attorneys that are involved are not the attorneys that would
22  defend us in court.
23     Q.  Well, if they're not the attorneys that would
24  defend you, why would you listen to them if they're not the
25  attorneys for you?



Page 130

1       MR. HOPKINS: Objection.
2       A.   We've gotten that advice.  I've gotten that advice
3   multiple times.  That's why I made that decision.
4       Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  Did you get
5   that decision from any attorney in Harris County?  You don't
6   have to tell me what they said.  But were you led to do that
7   based on anybody in Harris County that's an attorney?
8       A.   I was not.
9       Q.   Okay.  Mr. Samuel's termination, Mr. Samuel had
10  prior write-ups in his file; is that correct?
11      A.   I don't know off the top of my head.
12      Q.   Did you review his file before you terminated him?
13      A.   I don't believe I did review his file.  The actual
14  event, in my opinion, was so egregious, it stood on its own.
15      Q.   Okay.  Why was it so egregious?
16      A.   On multiple levels.  As a building administrator,
17  you cannot take pictures of employees and post them online
18  with comments on them.  I was extremely angry when it came
19  across my desk.  It's not how I want people --
20      Q.   Okay.  The record will reflect whatever it reflects
21  regarding Mr. Samuel's --
22      A.   Okay.
23      Q.   -- employment records.  But did it lead you to
24  believe that that was a terminable offense, regardless of
25  what he had in his record?

Page 131

1       A.   Yes.
2       Q.   Okay.
3       (Exhibit No. 7 was marked)
4       Q.   I'm placing before you what's been marked as
5   Shelton Exhibit 7.  Is this the -- what is this?
6       A.   It's a response to a grievance that he had filed.
7       Q.   Okay.  Did you -- he had filed.  Mr. Grant had
8   filed?
9       A.   Mr. Grant.  I'm sorry.
10      Q.   Okay.  And it's from you; correct?
11      A.   That is correct.
12      Q.   It's in memo format and it says "Grievance
13  Response" and it's dated August 6, 2013; correct?
14      A.   Correct.
15      Q.   Had Mr. Grant been approved to elevate his feet at
16  that time?
17      A.   His supervisors allowed him to elevate his feet.
18  I don't think that was ever a formal accommodation by the
19  department.
20      Q.   So, to your knowledge, Mr. Grant had been
21  elevating his feet prior to Mr. Samuel even getting there?
22      A.   That predates me.
23      Q.   You don't know?
24      A.   Yeah, I don't know.
25      Q.   Okay.  Who do you believe approved him of that?

Page 132

1       MR. HOPKINS: Objection.
2       MS. PLANTE-NORTHINGTON: It's not conjecture.
3   I said, "Who do you believe?"  He can say, "I don't know."
4       MR. HOPKINS: Okay.  To which?  Raising the
5   feet?
6       MS. PLANTE-NORTHINGTON: Yeah, raising the
7   feet.
8       MR. HOPKINS: Okay.
9       A.   I don't know.
10      Q.   (BY MS. PLANTE-NORTHINGTON)  Okay.  You say that --
11  in this report you say that -- this memo, rather, you say
12  "I have found that Shift Supervisor Anthony Samuels' behavior
13  was totally unacceptable in regards to posting a picture of
14  you at work on his personal Facebook page."
15      A.   Yes.
16      Q.   Did you find that a form of harassment against
17  Mr. Grant?
18      A.   Yes.
19      Q.   Mr. Grant had complained of Mr. Samuel harassing
20  him before; correct?
21      A.   Yes.
22      Q.   Did you say, "Hmm, maybe Mr. Grant's -- based on
23  what Mr. Samuel had just done with this Facebook post, maybe
24  Mr. Grant's claims of harassment has some credence"?
25      A.   No.  We were primarily dealing with Mr. Samuel at

Page 133

1   that time.
2       Q.   I understand that.  But if Mr. -- so, you never
3   said that?
4       A.   No, I never said that.
5       Q.   Okay.
6       A.   No, I guess.
7       Q.   Never thought that?
8       A.   I thought Mr. Samuel crossed the line in this
9   instance.  And it did give, in my mind, some credence to some
10  of the stuff that had happened in the past.
11      Q.   When you say "some of the stuff," what stuff are
12  you talking about?
13      A.   Mr. Grant has made complaints -- going back in
14  2011 is where we started -- of him not assigning -- or
15  assigning him to 4A more frequently than other people, that
16  Mr. Grant -- I'm sorry -- Mr. Samuel -- I'm doing it now --
17  gave him a hard time.  And in my mind, this -- I was very
18  angry with Mr. Grant -- or Mr. Samuel.
19      Q.   Okay.
20      A.   I was not angry with Mr. Grant.
21      Q.   And did you know of Mr. Samuel to do this for any
22  other employee?  Did you get word of him posting something
23  about any other employee?
24      A.   Posting, no.
25      Q.   Okay.  You say "posting, no."  Was there something

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 134

1   else?
2       A.   There were no formal complaints.
3       Q.   Okay.
4       A.   The general word was Mr. Samuel was very hard and
5   difficult to work with and those type of things.
6       Q.   And you believe that that's a manager you want to
7   work for Harris County?
8       A.   We wrote up termination letters and were in the
9   process of getting rid of him when he retired.
10      Q.   Yeah. I understand that. But I'm saying that in
11  knowing that about him, him having a reputation like that,
12  that is something that Harris County values?
13      A.   That is not something Harris County values.
14      Q.   You permitted him to resign because of his long
15  tenure?
16      A.   It was a decision by our executive director.
17      Q.   Miss Watson?
18      A.   No. Thomas Brooks.
19      Q.   Mr. Brooks. Okay.
20      A.   He had -- Mr. Brooks had approved the termination.
21  They were trying to find Mr. Samuel. They could not locate
22  him in the building. He had gone over to HRRM and basically
23  retired over there in the retirement system and everything
24  and came back in and notified us at the front desk he just
25  retired. So, that went back up to Mr. Brooks to see if he

Page 135

1   would accept that retirement; and he said that he would.
2       Q.   Okay. So, if Mr. Grant had done the same thing,
3   you would have allowed him to resign?
4       A.   I would have.
5       Q.   That means you've got to be on the end that you
6   think you will be terminated to know if you need to apply
7   for -- I mean to resign or retire?
8       A.   (Nods head)
9       Q.   Is that "yes"?
10      A.   Yes.
11      Q.   Okay. Do you know how Mr. Samuel would know that?
12  Did you have a conversation with him that said this is
13  terminable?
14      A.   We were kind of shocked by it.
15      Q.   You say in the next paragraph "I sincerely hope
16  that the department's actions have resolved the issues that
17  you have experienced while at work." What issues are you
18  referencing?
19      A.   His issues with Mr. Samuel and particularly the
20  event that immediately preceded this with the Facebook photo
21  posting.
22      Q.   But you say "issues." You don't say "one issue."
23  You say "issues" with an "s." So, that means that there's
24  more than one. So, what issues other than the Facebook post?
25  And you talked about something earlier, I think, regarding

Page 136

1   him giving him a hard time or something; but you'll have to
2   tell me.
3       A.   In that complaint at the end, it was Mr. Grant
4   saying, "I'm sick and tired of this. He's giving me a hard
5   time. He's harassing me. Here's my evidence that he did
6   it."
7            We took that. So, to me -- and probably why I used
8   the "s" on "issues" -- it was the culmination of --
9       Q.   Everything he said Mr. Samuel was doing to him?
10      A.   Yeah. And I -- yes.
11      Q.   Okay. And you say "After speaking with you this
12  morning, I am optimistic that your situation will improve."
13  Were you aware that he was on a termination warning at the
14  time?
15      A.   Yes.
16      Q.   Okay. So, why were you optimistic that his
17  situation would improve if he is literally on the block to be
18  terminated?
19      A.   Because I talked to Mr. Grant, and he was --
20  excited might not be the right word, but he was happy that
21  Mr. Samuel was no longer with us. It was kind of this is a
22  fresh start. I mean, it was a positive conversation. And I
23  was trying to capture that we talked earlier, and we both
24  seemed optimistic at that time that Mr. Samuel being out of
25  the equation would improve things for Mr. Grant.

Page 137

1       Q.   Did you ever at any time say, "I'm going to go back
2   and look at those write-ups where Mr. Samuel had written
3   Mr. Grant up to really see what's going on because I don't
4   want those to be in his record if they were based on what I
5   saw with this Facebook page"?
6       A.   No, we did not.
7       Q.   Why?
8       A.   I'm not sure I've got a concise answer other than
9   at that point we thought that the situation and crisis had
10  been dealt with.
11      Q.   You thought it had been dealt with. But this young
12  man -- based on Exhibit 1 -- I'm sorry -- Exhibit 3, this
13  young man had received a lot of write-ups. And you don't
14  know which ones -- could you tell me which ones were based
15  upon Mr. Samuel reporting it?
16      A.   No, I could not.
17      Q.   In hindsight, would you have done that now?
18      A.   No. I think I would have let the process we
19  have -- the appeals process that we have that's in place
20  where he could have came to us and done a written request for
21  us to go back in and evaluate any former written reprimands
22  or anything in the personnel file to see if that can be
23  removed.
24           (Sotto voce discussion between Mr. Grant
25           and Ms. Plante-Northington)



Page 138

1    Q.   Did you know that a manual had been requested by
2    Mr. Samuel -- Mr. Grant and he did not receive it, an HR
3    manual?
4    A.   I know that through the course of discovery.  He
5    spent a lot of time on his audiotapes talking about that.
6    I believe at one point in time he had requested the personnel
7    manual and that he received the county personnel handbook and
8    that's not what he had requested and had gone back and
9    requested our local policies.
10    Q.   Okay.
11    A.   It is posted on the Internet -- on the intranet for
12    all employees to have access.
13    Q.   The personnel manual?
14    A.   Yes.
15    Q.   Okay.
16        (Sotto voce discussion between Mr. Grant
17         and Ms. Plante-Northington)
18    Q.   Do you remember a union lawyer sending a certified
19    letter requesting the HR manual?
20    A.   That sounds familiar.
21    Q.   Okay.  Did you ever respond to it or produce it?
22    A.   I don't remember that sequence of events.
23        (Exhibit No. 8 was marked)
24    Q.   Okay.  I'm placing before you Shelton Exhibit 8.
25    Did you assist Miss Garcia in getting facts related to this?

Page 139

1    It's a position statement to the EEOC.
2    A.   Yes, I cooperated with the attorney.
3        MR. HOPKINS: I'm sorry.  May I see it?
4        MS. PLANTE-NORTHINGTON: Yes.  Here you go.
5        MR. HOPKINS: Thank you.
6    Q.   (BY MS. PLANTE-NORTHINGTON) You cooperated with
7    the attorney?
8    A.   Yeah.
9    Q.   And in reading her response -- and I'll give you a
10    few minutes to read her response -- is there anything
11    factually incorrect regarding only her response?  You will
12    see it says "RESPONSE."
13    A.   The nonbolded areas?
14    Q.   Yeah, the nonbolded areas, yes.
15    A.   (Reading)
16    Q.   Okay.  After reviewing this statement, do you find
17    everything in this statement by Miss Garcia in the "RESPONSE"
18    areas are true and correct?
19    A.   For the second response about Miss Phillips and the
20    vacation piece, I don't recall much about that situation.  I
21    assume that's correct.
22    Q.   So, you cannot verify the part about Miss Phillips
23    granted the request realizing that -- not realizing that
24    May 27 was a holiday?
25    A.   I can verify that that sequence happened.  As far

Page 140

1    as dates and everything being exact, it was verified at the
2    time.  So, I assume that it is correct.
3    Q.   Other than the vacation issue in Paragraph 3 under
4    Roman numeral II, is there anything else that is not
5    factually correct?
6    A.   She focused more on the response in the first
7    paragraph of the second page.  She didn't talk about
8    Mr. Bryant in that section.
9    Q.   Okay.  So, do you want to add that to her position
10    statement?
11    A.   If I was doing it over, I would add that to her
12    position statement.
13    Q.   Okay.  You will agree that this position statement
14    was written more near the time of the termination than after
15    a lawsuit's been filed a year or two later?
16    A.   I would agree with that.
17    Q.   Okay.  So, is it legally beneficial for you to add
18    that in now?
19        MR. HOPKINS: Objection.  I mean, are you
20    asking for a legal --
21    Q.   (BY MS. PLANTE-NORTHINGTON) I mean, is it legally
22    beneficial for you to say, "I want to sort of pad more
23    reasons as to why the termination was valid"?
24        MR. HOPKINS: Objection to that.
25        I mean, you're not an attorney in this case.  I

Page 141

1    would advise you not to give a legal opinion.
2        MS. PLANTE-NORTHINGTON: I withdraw the
3    question.
4    Q.   (BY MS. PLANTE-NORTHINGTON) Are you attempting to
5    add reasons to the termination?
6        MR. HOPKINS: Objection, form.
7    A.   No.
8    Q.   (BY MS. PLANTE-NORTHINGTON) Okay.  So, all the
9    reasons listed by Miss Garcia in Exhibit 8 are complete with
10    the exception of you saying the part about the vacation?
11        MR. HOPKINS: Objection.
12    A.   As I said before, I don't think this goes enough
13    into Alfred Bryant's role.
14    Q.   (BY MS. PLANTE-NORTHINGTON) Okay.  Well, if you
15    didn't have Alfred Bryant's statement, maybe that's why she
16    didn't put it in there because she had no exhibit to
17    reference.  Would you say that is accurate?
18        MR. HOPKINS: Objection.
19    A.   That's speculation.
20    Q.   (BY MS. PLANTE-NORTHINGTON) Okay.  It says here
21    "Mr. Grant failed to properly perform his constant watch
22    duties.  Surveillance video revealed that Mr. Grant sat back
23    in his chair with his feet propped up on a table with the
24    observation sheet untouched for an extended period of time."
25    Did you see that in the video?

Page 142

1    A.  His feet being propped up?
2    Q.  No.  I mean the sheet untouched for an extended
3  period of time.
4         MR. HOPKINS:  And, again, we're going to
5  object.
6         MS. PLANTE-NORTHINGTON:  Would you just do
7  objection?
8         MR. HOPKINS:  No.
9         MS. PLANTE-NORTHINGTON:  Just object, and
10 then you can bring it up at trial.
11        MR. HOPKINS:  Then objection.
12        MS. PLANTE-NORTHINGTON:  Okay.
13   A.  I was not going through it with a watch to see if
14 there was -- to see if he was on point on each one of those.
15 I can say he was making notations on the paper in front of
16 him on the video that I watched.
17   Q.  (BY MS. PLANTE-NORTHINGTON)  You did see him making
18 notations?
19   A.  I did.
20   Q.  How many notations did you see him make on that
21 video?
22   A.  I don't know.
23   Q.  Okay.  Well, the video will speak for itself.
24   A.  Yes.
25   Q.  Why do you believe she didn't put the Alfred stuff

Page 143

1  in there?
2    A.  I don't know.
3    Q.  Could it have been manufactured after the fact?
4         MR. HOPKINS:  Objection.
5    A.  No.
6    Q.  (BY MS. PLANTE-NORTHINGTON)  Why don't you believe
7  that?
8    A.  Because it was explained to me at the time of
9  termination.
10   Q.  And you said that you helped Miss Garcia with this
11 position, helped provide facts for this position statement;
12 correct?
13   A.  She would have called and asked me questions.
14   Q.  Okay.  And you also helped her with the ongoing
15 investigation related to the first EEOC complaint that was
16 going on in 2013.  Do you recall that?
17   A.  Yes.
18   Q.  Okay.  Do you recall an investigator requesting to
19 come out to the facility where Mr. Grant worked to see his
20 environment?
21   A.  Yes, I do.
22   Q.  Okay.  And did the EEOC investigator, I think her
23 name was Miss Guerrera, come?
24   A.  I believe that she did.
25   Q.  Okay.  And was her focus to find a reasonable

Page 144

1  accommodation for Mr. Grant?
2    A.  I do not know what her focus was.
3    Q.  Okay.  Were you attempting at that time to assist
4  her in helping to see what reasonable accommodation you could
5  afford Mr. Grant or had there already been one provided?
6    A.  My discussions with her were primarily around
7  Mr. Grant's schedule and access to the building and when she
8  could come out and observe.  I think her primary contact
9  would have been the County Attorney, and I was just kind of
10 coordinating.
11   Q.  Do you believe Mr. Grant was treated fairly by
12 Mr. Samuel?
13   A.  No.
14   Q.  Did Mr. Samuel have a reputation among his
15 subordinates for being harsh and abrasive?
16   A.  Yes.
17   Q.  Could that lead to hostility in the workplace?
18   A.  Maybe.  It could.
19   Q.  Was that ever investigated?
20   A.  I don't think we were ever presented with any
21 concrete --
22   Q.  Let's look at Exhibit 1.
23   A.  It was investigated when Erika Owens from HRRM came
24 over.  I think she even commented on that on her report.
25   Q.  Okay.  She said he was abrasive and stringent.  Did

Page 145

1  you take any measures with him as far as counseling?
2    A.  Yeah.  Aaron Beasley talked with him on multiple
3  occasions.  I believe Dr. Quintana also had some discussions
4  with him about what her expectations were regarding his
5  behavior in the facility.
6    Q.  Now, I have his HR file.  So, would that be in his
7  HR file?
8    A.  I do not know.  But it would have been informal
9  counseling.  Usually write-ups and suspensions and
10 terminations are in the personnel file.  I don't know what
11 she would have collected around that.
12   Q.  So, are you saying on Exhibit 3, following your
13 reasoning, that the February 2nd verbal counseling would not
14 have been in writing?
15   A.  It would have been --
16   Q.  It's Exhibit 3.  I'm sorry.  I'll let you find it.
17   A.  I'm way out of order here.
18   Q.  It looks like this, "MEMORANDUM."
19   A.  Okay.  The verbal counseling/coaching --
20   Q.  Yeah.
21   A.  -- on March 3rd?
22   Q.  Would that be in writing in Mr. Johnson's --
23 Mr. Grant's file?
24   A.  Probably not.  Usually the supervisor does kind of
25 a summary and gives it to the employee, but it doesn't come

Page 146

```
1    to HR.
2        Q.  Okay.  What about the February 11th counseling?
3    Would that be in his file?
4        A.  Probably not.
5        Q.  What about the March 3rd, 2012 verbal
6    counseling/coaching?  Would that be in his file?
7        A.  They used to do that sometimes and sometimes not.
8    So, it might be in there.
9        Q.  So, how would you know that the 2nd and the 11th
10   occurred when Miss Watson brought it to you if she had no
11   documentation?
12       A.  She would have had copies of everything at that
13   point in time as we reviewed kind of that final meeting.
14       Q.  Okay.  So, Mr. Grant wouldn't have had to sign for
15   the incidents on February 2nd -- or the counseling on
16   February 2nd or February 11th?
17       A.  It's kind of supervisor preference on how they do
18   that.  So, I don't know whether he signed for those or not.
19   Some supervisors will kind of do a summary and have them sign
20   that, that they agree that they participated in the meeting.
21   Some supervisors will write up, like, an e-mail and send them
22   an e-mail that just kind of documents we talked about this,
23   this, and this on that day.  It's informal.
24       Q.  Okay.  How do you know that Mr. Samuel had been --
25   when had -- let me ask you this:  When had he been counseled
```

Page 147

```
1    on his abrasiveness and whatever she states in Exhibit 1?
2        A.  The best person to talk to about that would either
3    be Dr. Quintana or Keith Branch, who is the consistent
4    between both deputies that would have been present for that.
5        Q.  Who is his direct supervisor?
6        A.  Melissa Watson.
7        Q.  Okay.
8        A.  It was previously Dr. Quintana.
9        Q.  Okay.  But in 2012 Watson was not his direct
10   supervisor?
11       A.  I'm trying to think of when that transition between
12   Quintana and Watson occurred.  It was around two thousand
13   and -- I think it was sometime in 2012 maybe, 2012, 2013.
14            (Sotto voce discussion between Mr. Grant
15             and Ms. Plante-Northington.)
16       Q.  Mr. Grant states that it was in 2012 Miss Watson
17   would have known and, based on what you said --
18       A.  Okay.
19       Q.  -- would have been the person to have spoken with
20   him.  So, she's the best person to talk with?
21       A.  Yes.  And Aaron Beasley was his immediate
22   supervisor.  So, he was kind of in the middle.
23       Q.  He would have talked to him.  Okay.  Did you
24   monitor his behavior afterwards?
25       A.  Not directly.
```

Page 148

```
1        Q.  Okay.  This would have been after February 2012
2    when the report comes out about some things that he did that
3    were not so nice to employees.  You did not monitor him?
4            MR. HOPKINS:  You're asking whether he
5    himself personally monitored?
6            MS. PLANTE-NORTHINGTON:  Yes.
7        A.  No.
8        Q.  (BY MS. PLANTE-NORTHINGTON)  As HR manager, you
9    would be -- ultimately the buck stops with you; correct?
10       A.  Yeah.  The --
11       Q.  Is that "yes"?
12       A.  Yes.
13       Q.  Okay.
14       A.  Well, did I monitor?
15       Q.  Yeah.
16       A.  No.  Did the buck stop with me?
17       Q.  Yes.
18       A.  Yes.
19       Q.  That's it.  I've got to get my court reporter out
20   of here.
21            Oh, let me ask you just about your training in
22   FMLA/ADA.  What's your last training course you took?
23       A.  It would have been 2014ish.  It was -- I think it
24   was an ADA class over at the Omni by The Galleria.  Then I've
25   participated in a couple of different FMLA and ADA trainings
```

Page 149

```
1    that the county puts on.
2        Q.  When was the last one?
3        A.  '12, '13ish.  I'm sorry.  I don't --
4        Q.  Okay.  I have your records.
5        A.  Okay.
6        Q.  On the training at least.
7        A.  Okay.
8        Q.  Other than that 2013, 2014 --
9        A.  That would be an accurate reflection --
10       Q.  Okay.
11       A.  -- on the training.
12            (Sotto voce discussion between Mr. Grant
13             and Ms. Plante-Northington)
14       Q.  Did you tell Mr. Grant that because of his report
15   regarding the Facebook post, you let Mr. Samuel go?
16       A.  No.  I said that Mr. Samuel is no longer with us.
17       Q.  Okay.
18       A.  It was our intention to let him go, but he
19   resigned.
20       Q.  You could have terminated him, but Mr. Thomas said
21   no?
22       A.  Yes.
23       Q.  Brooks.  I'm sorry.  Mr. Brooks.
24       A.  Yes.
25       Q.  Would you characterize Mr. Samuel as an honest
```

Page 150

1   person?
2       A.   I don't know him that well.
3       Q.   Based on the amount you've known him, the little
4   bit you've known him, do you believe him to be honest?
5       A.   His honesty?
6       Q.   If you don't know, you don't know.
7       A.   I don't know.
8       Q.   Okay.
9       A.   I may have had two or three conversations with the
10  man in the course of my employment here.
11      Q.   Okay.  Would you characterize Mr. Grant as an
12  honest person?
13          MR. HOPKINS:  Objection.
14      Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
15      A.   Yes.  I have nothing to doubt that.
16      Q.   You're saying you were not the final decision
17  maker, that you only reviewed it before you said there was
18  enough evidence to --
19      A.   That is correct.
20      Q.   Okay.
21      A.   I'm sorry I cut you off.
22          THE WITNESS:  That's probably hard to report.
23      Q.   (BY MS. PLANTE-NORTHINGTON)  Before coming to
24  this -- oh, let me ask you this:  What kind of computer
25  system -- you're over IT.  So, what kind of computer system

Page 151

1   does Harris County have?
2       A.   Like, the back-end servers or --
3       Q.   Yeah.  It's on a server?
4       A.   Yeah.
5       Q.   Does it have a backup server?
6       A.   Yes.
7       Q.   When things are deleted, does it put into the
8   backup server?
9       A.   It is.  And that's done at the county level, not
10  the local level.
11      Q.   Okay.
12      A.   There's a county department called ITC.  It used to
13  be called something different back then.  And they host all
14  the servers.  So, we have the desktop computers and printers
15  and scanners and everything on our local network.  But they
16  host the main network across the street from us.  And that is
17  backed up -- I don't know what it was at the time; but right
18  now they use a facility called FIBERTOWN, which is up by
19  Greenspoint.  And that rolls -- the backups are rolled over
20  there.  I don't know -- from retrieving information from
21  them, it's every day for a while.  And then they keep a
22  one-week snapshot.  And then as you get further out, the
23  amount of time between those snapshots increases.
24      Q.   Okay.  What's the retention policy here?  How many
25  years do you keep information?

Page 152

1          MR. HOPKINS:  Objection.
2       Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
3       A.   It's complex.  If you look at the Harris County
4   retention policy, it breaks it down from everything from one
5   year to -- I think there's one in there that's 75 years.  I
6   mean, it --
7       Q.   Okay.  Well, give me for HR.
8       A.   For personnel stuff, it's typically five years.  I
9   believe doctors' notes and, like, supporting documents for
10  leave is less than that.  But typically for 99 percent of the
11  stuff we have, it's five years.  We usually keep everything
12  for five years.
13      Q.   Okay.  And then after that, you destroy it?
14      A.   Yeah.  It depends what it is.  If it's a personnel
15  file, we will keep it here usually for about six months after
16  that employee leaves, unless there's something going on with
17  that case.  We send that over to the county's long-term
18  storage, and they archive it in bankers boxes.  I always
19  envisioned that it looked like that warehouse from the end of
20  Raiders of the Lost Ark.  I mean, you put stuff in there.
21  They have got some code that they stamp it with.  And then if
22  you request stuff, it takes, like, three months for them to
23  go in there and pull the stuff back out.
24      Q.   Okay.
25      A.   And they -- when I mentioned the retention policy

Page 153

1   from one to 75 years, that's their policy.  That's when they
2   actually -- I'm not sure they shred anymore because it's not
3   environmentally safe.  But whatever the county has set up as
4   their destruction process, that's what they do.
5       Q.   And you don't know how many years they keep that
6   stuff in storage?
7       A.   Five years.
8       Q.   Five years.  Okay.
9       A.   For our stuff, I think that policy dictates they
10  do other things for other parts of the county.
11      Q.   Is that for handbooks and manuals and job
12  descriptions, stuff like that too?
13      A.   All of that is laid out in that policy on how long
14  they keep that.  But we don't -- we send personnel files over
15  there.  The other stuff are kept in-house with us.
16      Q.   Okay.  Do you believe Mr. Grant had a disability
17  under the ADA?
18      A.   I do.
19      Q.   What did you do to prepare for this deposition?
20  Did you review documents?
21      A.   Yeah.  I basically went through the stuff we pulled
22  as discovery.  I didn't go through all of that stuff, but I
23  tried to kind of put it in a chronological order of what I
24  was involved with so I kind of knew the sequence -- or
25  remembered the sequence a little bit correct -- or better.

Page 154

1    Q.   Okay.  In your history as HR director or in your
2  position --
3    A.   Yeah.
4    Q.   -- I've forgotten the name of it -- have you ever
5  found that an employee through your investigation has been
6  retaliated against?
7    A.   I'm thinking back through.
8    Q.   Yeah.  That's fine.
9    A.   No.
10    Q.   What about discriminated against on a protected
11  class?
12    A.   No.
13    Q.   The only one harassed you think was the one -- the
14  female that you oversaw the --
15    A.   Yes.
16    Q.   Other than that, is there any other harassment?
17    A.   Sexual harassment?
18    Q.   Yeah.
19    A.   Not to that level.  We have dealt with people that
20  said that they feel uncomfortable around a co-worker, and we
21  have talked to that co-worker.
22    Q.   I mean, but has there been disciplinary action?
23    A.   No, not discipline.  We have tried to intervene on
24  kind of mild --
25    Q.   But there was no finding of sexual harassment?

Page 155

1    A.   No, no, no.
2    Q.   Okay.  So, other than that one case, there has been
3  nothing for retaliation, nothing for discrimination.  Would
4  you say that you have a tendency to side with your employer,
5  Harris County, based on that?
6         MR. HOPKINS:  Objection.
7    Q.   (BY MS. PLANTE-NORTHINGTON)  Go ahead.
8    A.   I would say we have a tendency to side with the
9  evidence that's in front of us.
10    Q.   And you are policing yourselves; correct?
11         MR. HOPKINS:  Objection.
12    A.   We have multiple people look at it.
13    Q.   (BY MS. PLANTE-NORTHINGTON)  I mean, but you're
14  policing yourselves when you say that you do an internal --
15    A.   Correct.
16    Q.   Okay.  Thank you.
17         MS. PLANTE-NORTHINGTON:  Pass the witness.
18         MR. HOPKINS:  We reserve our questions.
19         (Deposition concluded at 1:49 p.m.)
20
21
22
23
24
25

Page 156

1              CHANGES AND SIGNATURE
2  WITNESS NAME: MATTHEW SHELTON, Ph.D.
3  DATE: OCTOBER 19, 2017
4  PAGE LINE      CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20      I, MATTHEW SHELTON, Ph.D., have read the foregoing
21  deposition and hereby affix my signature that same is true
22  and correct, except as noted above.
23
24              _____
25              MATTHEW SHELTON, Ph.D.

Page 157

1  THE STATE OF TEXAS  )
2  COUNTY OF _____ )
3      Before me, _____, on this day
4  personally appeared MATTHEW SHELTON, Ph.D., known to me (or
5  proved to me under oath or through _____)
6  (description of identity card or other document) to be the
7  person whose name is subscribed to the foregoing instrument
8  and acknowledged to me that they executed the same for the
9  purposes and consideration therein expressed.
10      Given under my hand and seal of office this _____
11  day of _____, _____.
12
13              _____
14      Notary Public in and for
15      The State of Texas
16
17
18
19
20
21
22
23
24
25

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 158

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2               HOUSTON DIVISION
 3
 4    OTIS GRANT,        ) CIVIL ACTION NO. 4:16-CV-03529
 5        Plaintiff,   )
 6    VS.              ) JUDGE KENNETH HOYT
 7    HARRIS COUNTY,      )
 8        Defendant.   ) JURY TRIAL DEMANDED
 9
10          REPORTER'S CERTIFICATION
11        DEPOSITION OF MATTHEW SHELTON, Ph.D.
12             OCTOBER 19, 2017
13
14
15        I, Robin Potts, Certified Shorthand Reporter in
16    and for the State of Texas, hereby certify to the following:
17        That the witness, MATTHEW SHELTON, Ph.D., was
18    duly sworn by the officer and that the transcript of the oral
19    deposition is a true record of the testimony given by the
20    witness;
21        That the deposition transcript was submitted on
22    the _____ day of _____, _____, to the witness or
23    the attorney for the witness for examination, signature, and
24    return to Nell McCallum & Associates, Inc., by the _____ day
25    of _____, _____;
```

Page 159

```
 1        That the amount of time used by each party at the
 2    deposition is as follows:
 3        Ms. Victoria Plante-Northington, 3 hours, 57
 4    minutes
 5        That pursuant to information given to the
 6    deposition officer at the time said testimony was taken, the
 7    following includes counsel for all parties of record:
 8
 9    FOR THE PLAINTIFF:
10        Ms. Victoria Plante-Northington
11        Plante Law Firm, P.C.
12        5177 Richmond Avenue, Suite 1140
13        Houston, TX 77056
14
15    FOR THE DEFENDANT:
16        Mr. Seth Hopkins
17        Harris County Attorney's Office
18        1019 Congress, 15th Floor
19        Houston, TX 77002
20
21        I further certify that I am neither counsel for,
22    related to, nor employed by any of the parties or attorneys
23    in the action in which this proceeding was taken, and further
24    that I am not financially or otherwise interested in the
25    outcome of the action.
```

Page 160

```
 1        Certified to by me this _____ day of
 2    _____, _____.
 3
 4
 5                      _____
                        Robin Potts, Texas CSR No. 2491
 6                      Expiration Date: 12/31/17
                        Notary Expires: 4/27/20
 7                      Nell McCallum & Associates, Inc.
                        718 Westcott Street
 8                      Houston, Texas 77007
                        (713)861-0203/Fax(713)861-2324
 9                      Firm Registration No. 243
                        Expiration Date: 12/31/18
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```