**Plaintiff's Exhibit #20**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OTIS GRANT, | § | CIVIL ACTION NO. 4:16-CV-03529 |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | JUDGE KENNETH HOYT |
| | § | |
| HARRIS COUNTY, | § | |
| | § | |
| DEFENDANT. | § | JURY TRIAL DEMANDED |

### DECLARATION OF OTIS GRANT

My name is Otis Grant. My date of birth is April 4, 1973, and home address is 7427 Saxon Hill Lane, Richmond, Texas 77407. I am over eighteen years of age, of sound mind and have never been convicted of a felony or crime of moral turpitude. I am otherwise fully competent to make this Declaration. Each of the facts stated herein is known to me personally and is true and correct.

1. I was employed by Defendant in August 2005 as a Juvenile Supervision Officer (JSO). I worked without any write-ups or reprimands until 2010. My performance evaluations were very positive during this time. [Ex. 20].[1]

2. In the early to mid part of 2011, I remember observing how differently Anthony Samuel, my supervisor at the time, treated African employees. Mr. Samuel routinely checked the units where the African employees were assigned more frequently. Another employee had brought this to my attention, so I began observing Mr. Samuel interact with the African JSO's. I could see his anger when he came out of their units. He seemed to get very frustrated with them when he would have more patience with others. He spoke to them in a condescending and disrespectful way. I saw this multiple times for a significant period of time. He would go to their units first or either come out of their units irate about something he perceived they had not done properly. After a while, to spare them unnecessary hostility, I would alert them Mr. Samuel was on his way so they would be prepared for him. In 2011, I witnessed another incident between an African employee, Hugo Iwudfor in the administration office on the first floor. I did not hear clearly what Mr. Samuel, said but I heard the response of Mr. Iwudfor. He said something to the effect of "I am a man first and far most. You will respect me as such. For you to make a comment as 'you mother-fucking African' under your breath I will not allow." Mr. Iwudfor continued letting Mr. Samuel know that he did not appreciate the comment. I also saw Mr. Samuel

---

[1] Unless stated otherwise, exhibits cited in this declaration refer to the exhibits attached to Plaintiff's Response to Defendant's Motion for Summary Judgment.

and Mr. Ekpin disagree about a time-clock issue. This happened near the central control at the start of my shift. On the same day, I ran into Mr. Samuel in the elevator while on break. He seemed to be still agitated about Mr. Ekpin. He commented to me that he was going to get Mr. Ekpin fired. I was surprised he would say that in my presence and think it was okay. However, at the time we shared a cordial working relationship. The comment bothered me, and I told him that he should try to rectify the problem because everybody needed their jobs. He did not respond to my statement. The next incident that I can recall occurred on August 4, 2011. It is included in Exhibit 14. I would not have reported Mr. Samuel but for seeing his conduct against African employees repeatedly.

3. I officially reported the treatment against Mr. Ekpin (African) by Mr. Samuel in an exception report on August 4, 2014. [Ex. 4]. I later reported it verbally to Mr. Beasley, the building supervisor, to see if it could be resolved without involving anyone else. I specifically told Mr. Beasley that I felt African employees were being mistreated by Mr. Samuel because they are African. I told him what I had observed and heard over the past few months. Mr. Beasley said he would talk to Mr. Samuel about the problem. Subsequently, Mr. Samuel started changing my assignments to require me to walk and stand for long periods of time. [Ex. 15].

4. Prior to July 2011, my supervisors, including Mr. Samuel and Doris Phillips, knew about my diabetes. They knew about the swelling and pain in my feet, ankles, and legs when walking and standing for a while. I told them that I suffer from Type 2 Diabetes. Among others complications with diabetes, foot swelling, edema, and neuropathy are a few. As best as I can recall, I was diagnosed with diabetes in 2007. I don't remember noticing swelling in my legs and feet until probably 2008 or 2009.

5. After hearing about my illness from me, physically seeing how much my legs, ankles and feet had swollen, noticing I was in pain (as I limped or walked gingerly) and noticing that I was walking much slower than other JSO's, my supervisors at the time, Building Supervisor Cobb, Supervisor Stokes, Supervisor Ina, and Supervisor Johnson gave me work assignments that did not require me to stand or walk a lot. This helped lessen the pain and swelling. I did not have to ask for an accommodation, but they gave me these sedentary assignments (which I perceived as an accommodation) knowing that I had a disability, and they regarded me as disabled. I was very grateful and thankful. At that time, I was assigned to more sedentary JSO duties like central control, the control booth, inventory, intake, and one resident constant watch (CW). This continued until August 2011 even after Mr. Samuel and Ms. Phillips became my supervisors.

6. Before August 2011, I was still symptomatic at times. I took FMLA leave for diabetic complications, and I was rarely assigned to work the floors. Whenever I had to work them, I was typically on sitting on a CW. This accommodation was taken from me once I reported the discrimination by Mr. Samuel in August 2011.

7. I received an accommodation at Home Depot sort of the same way it happened at Harris County. At Home Depot, I worked the overnight shift with a crew of employees to get the store ready for opening the next morning. A part of my job required I go up steps on a ladder and stand and walk on cement floors for a prolonged period. The floors at Home Depot are cement like the floors at Harris County Juvenile Detention Center. Standing and walking on a cement floor is worse for me than walking on floors that are not cement. After a week or so at Home Depot, an employee noticed that I was limping, having trouble walking, in pain, and wasn't moving as fast as other employees. The employee (whose father suffered from diabetes) alerted my supervisor of the medical issues. I was placed in paint department which did not require me to walk about the store as much. When I first applied for the position, I put on my application that I was disabled and I did not request an accommodation in fear that I would not be hired or be kept for a long period of time. For this reason, I did not want to talk about it but would address it if it became a problem. It did. I know I need help but often I want do not want to be treated by others as abnormal. However, I am to the extent my feet affect my walking and standing on a daily basis. You would have to have this type of disability with my complications to understand.

8. I am a relatively young man, standing 6'6" and about 260 pounds. I received a collegiate scholarship to attend University of Houston where I played two sports, basketball and football (defensive position). I even played a short time for NFL-Europe before coming to Harris County. During that time, I was not diagnosed with diabetes. Diabetes is a disability you can hide for only so long. Many people do not have the same complications with diabetes. The condition is assessed on an individualized basis and affects people differently. My diabetes appears to be getting progressively worse. I take insulin and other medications to monitor it.

9. The medications that I take have had adverse side affects. Sometimes the side effects are so strong that I think it's better not to take meds at all. Specifically, the medications can be harsh on my stomach which causes me to use the restroom frequently. At Harris County, this was never an issue until after I made the national origin discrimination complaint for African employees in August 2011. Harris County made it hard for me to use the restroom at times by placing me in 4A, where I would have to work all alone. I had conversation with Beasley and Jones about the side effects of the medication and how I needed to use the restroom. Placing me in 4A and restricting me from being relieved caused me to great distress. At times, I did not think I would make it to the restroom and would very embarrassed if I defecated on myself while at work. I had defecated on myself several times in bed unbeknownst to me. The doctors said it may be the medications or the damage to my back (on the job injury) that I sustained in 2012. I do not know. That Harris County would place me in this position was cruel and evil. They knew I was suffering with diabetic complications but still wanted to make me suffer even more by allowing this type of behavior to continue. The harassment seemed never ending. I have listed some but not all of the harassment and hostile environment created by Harris County supervisors and management after August 2011.

a.  In or about the middle part of 2013, after the approval of another supervisor who was helping out on the shift, I relieved another employee on CW because the employee was sleepy after second shift. My feet were swelling and aching badly. When Phillips saw me relieving another employee on the camera, she came to the 6th floor and ordered me back to walking the floor to monitor and sign-in residents. I told Phillips by placing him on the CW, she was placing the employee's job in jeopardy. She quickly replied that he was not the only person whose job was in jeopardy, clearly threatening my job. She told the other employee that someone else would relieve him and he was given another floor assignment to help him stay awake. Thus, she intentionally refused to allow me to relieve him, but permitted another employee to relieve him.

b.  In or about the middle of 2013, I wrote an exception report on lost paperwork related to me requesting days off. For some reason, my paperwork came up missing. I was looking for leave to be granted, only to learn that Phillips said she did not receive my request. I talked to Beasley about it, and he admitted that Samuel and Phillips were messing with me. I recording this conversation. Beasley had to approve me getting paid the days Phillips did not approve the leave.

c.  I was assigned by Samuel and later Phillips to Unit 4A. Unlike other male units, 4A was in the female part of the facility completely isolated from the male section. Additionally, the juvenile residents in 4A were males with behavior problems that required closer attention. I was the only JSO assigned to 4A during my shift. Consequently, when I needed to be relieved or needed help with residents, I was required to call for male JSO's to relieve me. Often, it would take at several minutes for a male JSO to relieve him. After being assign to 4A, I complained to HR that he believed due to his disability that it posed a safety concern for the children. [Ex. 15]. HR claimed it conducted an investigation but did nothing to eliminate the retaliation, discrimination and harassment I would experience for two years. Instead, HR and management participated in the retaliation even after Samuel was terminated for degrading me in a Facebook post in July 2013.

d.  Dealing with the hostile working conditions for more than two years (August 2011 to November 2013) with Type 2 diabetes only made my ability to walk and stand impossible without pain. During the time while working 4A and on various floors, I could not stand or walk for an hour before my feet and leg would start hurting. The swelling would go all the way up my leg to my genitalia on days that I continued to walk and stand. My wife observed the effects of my job. The more I walked or stood after one hour, the more severe the pain would be. The pain would cause me to limp a lot.

e.  In July 2013, a picture of me elevating my feet to relieve the swelling was posted on Facebook without my consent. Samuel put a comment on his

Facebook post to make me look like a lazy worker. I was told by another coworker it was on Facebook. When I looked at it, it was a picture of me without showing my face. I reported it to HR. Matthew Shelton stated HR conducted an interview and Samuel was let go. I later found out that was not true. Samuel was permitted to resign rather than be terminated. This type of conduct by Samuel should have provided proof that Samuel was harassing me and mocking me for my disability.

f. Since my employment in 2007, I know of several employees who have made mistake on observation checklists, but I do not know anyone who was terminated solely for it. The protocol and practice is to inform your supervisor, which I did, and complete an exception report, which I also did. The exception report became a harassment tool used by Samuel and Phillips to build a file to terminate me. Prior to August 2011, I had an observation checklist that contained errors, and I was permitted to correct them without reprimand.

g. In or about January 2013, Giselle Jones accused me of leaving an assignment (unit duty) without giving notice to three other employees to cover for me. That was a blatant lie. I relieved another employee from the CW to eat his lunch. I had been working on the floors prior to relieving him. In the meeting, I told Jones that any statement that I left without telling three employees in the control booth that I was going to the restroom was a lie. I had never been accused of something like this. I would never leave a unit unattended for an extended period of time, especially when I knew I was being watched closely after complaining about retaliation, harassment and not being accommodated. I asked her to review the booth tape to confirm. She stated she had, but there was no audio to confirm what I stated. She stated they obtained statements against me. The statements were false and the three employees who signed them were signing to protect themselves. If they did not relieve me as I had requested, they would be subject to discipline. So they had their motives in lying about it. I note that one of the three employees has a hearing impairment, but he looked at me when I told him I was taking a restroom break so I find it hard to believe he did not know what I was doing. Samuel knew I was in the restroom at the time, because he saw me when I passed by to go to the restroom. Additionally to go to the restroom, I had to call (as everyone does) by hand radio the person who operates the elevator to send it for me. Thus, I knew everyone knew where I was. This was another incident to harass me and appear like I was not a responsible employee.

h. In April 2012, I called in sick under the FMLA. The policy was to call in at least four hours before I was scheduled to begin work. I have called in numerous times since 2007 or 2008, and I had never had a problem with the time that I called-in. Based on my recollection, I complied with the four-hour call-in rule for employees who worked overnight each time that I called in for

      leave under FMLA. Daytime employees had to call-in two hours before their shift was to start. The letter from the FMLA coordinator sent to me on numerous occasions did not say I had to call-in by a certain time, but it said to call-in as soon as practical. [Ex. 9]. I was told in or about April 2012, that I had not complied with the rule on April 1 and 2, 2012. Even assuming it was true that I did not make the 4 hour deadline (which I believe that I did), I believe that penalizing me for not calling within that window of time was a way to build a file against me to terminate me. I was never given a notice or any other written documentation stating my alleged failure to call-in within 4 hours was a "reprimand" as required by Harris County policy. [Ex. 31]. Thus, I believe Defendant did not follow its own policy. It included information in Exhibits 13 and 27 to make it appear as that I had a series of "reprimands" when in fact, I did not. All but one of the items listed on Exhibit 27 happened a few months after I complained about harassment, retaliation, discrimination, and failure to accommodate me.

i.    In the latter part of 2011, I approached the north door to go into the control booth for 4A. I was told by Tikidra Batiste, another JSO, that Mr. Samuel gave her specific orders not to let me in the control booth. I said okay, because I did not want to involve her. I knew it was retaliation and harassment. They allowed other employees into the booth, but he did not want me in the booth because she wanted all eyes on me through the Harris County camera in the unit. I was never informed that the restriction was lifted for me, and I did not try to go into the control booth for 4A again.

j.    Early part of 2012, I was called into the office by Jones to sign a supervision of youth policy. Mr. Melton Finley was present as well. He was a building supervisor for the morning shift (7am-3pm). Ms. Jones ordered me to sign the policy. I stated that I was afraid to sign the policy because of clock errors that would show three to four different times in units. You could not rely on the clocks to be accurate. Additionally the time was distorted because portions of the digital numbers were missing. Employees at Harris County had repeated complained about this but nothing was done. No other employee to my knowledge was made to sign the supervision of youth policy at the time that I was. After hearing this, Ms. Jones asked again if I was going to sign the policy. I said no for the same reasons. She then we will have to fire you because you refuse to sign. I told her Mr. Beasley said you to fill out an exception report stating the reason that you do not want to sign the supervision of youth policy and that would be okay. Due to being under duress of losing my job, I signed it and placed under it due to duress. I did not want to lose my job or health benefits. When the document was produced in this case by Harris County, it did not include the "under duress" comment which meant the document had been altered.

k.    In October 2012, I was suspended for five (5) days for an alleged violation of supervision of youth policy. After three (3) days, Ms. Jones called me and

asked me why wasn't I at work. I told her that I was suspended for five (5) days per the suspension notice. She then said it was error and said I only should have been suspended for three (3) days. Harris County never paid me for the additional two days although it was due to its error.

l. Early part of 2012, I asked Samuel if I could be switched to another unit because keep were swelling of my feet and pain when walking. He said that he would check on it but never did.

m. I provided my doctor's notes to Harris County requesting the accommodation that I be permitted to elevate my feet and take periodic breaks due to problems with my feet. Harris County ignored the request and did nothing for almost year until Harris County received notice and it was being investigated by the EEOC for their failure to accommodate me in 2013. I believe Harris County intentionally ignoring my doctor orders was another form of harassment and retaliation. I had never needed an excuse to elevate my feet before August 2011.

n. In early 2012, an employee (Pope) warned me that Samuel told other supervisors prior to starting the night shift that he was going to order me to move my table to watch me on camera. Since I had been warned, I recorded the harassment as this was not normal protocol and was outside the purpose of cameras in the facility. It happened later that night just as Pope had warned me. Samuel came to 4A and asked me to move my table so I could be seen by the camera. I called Ms. Batiste to witness it. She came. I asked Mr. Samuel in her presence and while recording him if it was common practice to ask for workers to be in camera view to watch them. He replied I don't know about everyone else, but I can do that. He said if I had any problems with it that I can take it up with his supervisor.

o. In the early part of 2013, another group employees and I were told by Samuel to go and cover another floor. When we arrived, there was no one there to supervise. I completed an exception report to cover myself just in case Samuel or Phillips decided to mark my unit late in signing in. Samuel would not sign the exception report. Phillips initially signed but later wanted to remove her name from it. This shows that I took every precaution to eliminate any claim that I was not timely in signing-up my unit. Signing-up the unit meant completing the observation checklist and the times placed on them.

p. In August 2012 when I returned back to work from a worker's comp injury, I was given a job description and told to sign it. I told them I was not refusing to sign (based on my prior experience with Ms. Jones and refusing to sign a document), but I would bring it back after later. I brought it back and wrote light duty only for work related injury. Harris County did not give me light duty.

q. In early part of 2012, Mr. Samuel came into a meeting with me and Mr. Beasley while we were discussing inaccurate clocks. Mr. Samuel said we try to work with you about your feet (but I am still assigned to 4A), but we told you that you can't take pillows or blankets in the units. This statement was odd and inaccurate. Employees would sit on pillow at times due to the hardness of the chairs. Pillows are authorized to be in the unit. I was not bringing my own blankets and pillows to the unit. These were Harris County issue items. When I was explaining to him that I was not violating any rule, he commented something to the effect that "I am going to put this paperwork in your life." This was a threat to me and later became a reality, because I received multiple write-ups thereafter.

r. In the early part of 2012, I had a conversation with supervisors Michael Dean and Ms. Phillips. I showed both of them my swollen my ankles, because I was in severe pain and needed to leave early. After seeing my ankle and a part of my calf, she said I see what you are talking about. I recorded this conversation and you could hear the pain and distress in my voice. She thought I was yelling but I was in severe pain near the end of my shift. I had worked the 7th floor on that day. Ms. Phillips said I could go, but she was not signing anything because she had to staff the building. Mr. Dean tried to gather an understanding to help me but came up with no immediate solutions. He stated there was no consistency in Harris County in how things are being operated. The issue with my foot was due to a FMLA qualifying illness; therefore, I would have been given intermittent leave. Ms. Phillips would not sign, and I did not want it to be said that I had abandoned my job.

s. In July 2013, I received a performance evaluation included negative and unwarranted comments by Ms. Phillips. It gave the appearance that I was not a teamplayer or working with others. It made me feel if you file complaint against your supervisors, you would not be considered a teamplayer. I was a teamplayer and had worked with others and performed my job duties in the most toxic and painful environment in which I had ever worked. I talked to Mr. Shelton about Ms. Phillips being permitted to conduct my evaluation when it was on the record that I believe she had retaliated, discriminated, and harassed me. He laughed in my face and said she was to do the evaluation. She's your supervisor.

t. When Mr. Samuel and Phillips passed me at work after August 2011, they typically had frowned, rolled their eyes, and avoided any cordial contact with me. This continued even when I sat in Mr. Samuel's deposition. He was very hostile during the deposition.

u. The write-up or "reprimands" referenced in Exhibit 13 and 27 were harassing, not true, or had an explanation. I had to constantly defend myself so I started documenting things. I recorded many conversations and took pictures to show for example the clock inaccuracies and malfunctions. HR

was no help and actually sided with management to terminate me. I knew that I had been treated unlawfully and I continued to report Harris County's unlawfulness in July 2013. [Ex. 19].

10. I was hospitalized for the first time due to diabetes in early 2014, shortly after my termination. I did not have insurance at the time due to termination. My wife did not know she could enroll me in healthcare insurance due to life changing circumstances.

11. I have been hospitalized four (4) times for complications related to diabetes and hypertension. My diabetes seemed to really flare-up even more around the time of several depositions in this case (October 2017 to December 2017). I attended each deposition. I was also affected by the aftermath of Hurricane Harvey. My home was flooded and I was displaced from my home for 3-4 months. Between Harvey, this case, my wife being laid off, and the walking and standing on cement floors for prolonged periods of time at Home Depot, my diabetes has become much worse.

12. After my last hospitalization in April 2018 (shortly after learning the court dismissed my case), I was very stressed. I was admitted to the hospital for swelling, pain and a very large blister on my foot. I took a picture of the blister and condition of my foot. Exhibit 22 was the condition on my foot shortly after I went to the hospital in April 2018. It is now healing, but I can only walk or stand for very short period of time. I am currently on a leave of absence from Home Depot. I cannot quit because I need the medical insurance since my wife is still looking for work. My hospital stays lasted anywhere from 3 days to more than a week. Renal and heart failure are two complications associated with Type 2 diabetes. Type 2 diabetes is related to a dysfunction or abnormality of my body's endocrine system.

I declare under the penalty of perjury that the foregoing is true and correct.

Signed  04-17-2018.

_____
Otis Grant