```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3

 4   OTIS GRANT,                 .  4:16-CV-03529
                                 .  HOUSTON, TEXAS
 5        PLAINTIFF,             .  FEBRUARY 21, 2018
     VS.                         .  10:00 A.M.
 6                               .
     HARRIS COUNTY,              .
 7                               .
          DEFENDANT.             .
 8   ...............................

 9

10     EXCERPT OF TRANSCRIPT OF MOTION HEARING - OPENING REMARKS
                 BEFORE THE HONORABLE KENNETH M. HOYT
11                   UNITED STATES DISTRICT JUDGE

12

13

14                         APPEARANCES

15

16

17   FOR THE PLAINTIFF:

18        Victoria Plante-Northington
          PLANTE LAW FIRM PC
19        5177 Richmond
          Suite 1140
20        Houston, Texas  77056

21   ALSO FOR THE PLAINTIFF:

22        Marjorie A. Murphy
          THE MURPHY LAW PRACTICE
23        3355 West Alabama
          Suite 670
24        Houston, Texas  77098

25
```

1                              *APPEARANCES - CONTINUED*

2

3

4    FOR THE DEFENDANT:

5
         David Adler
6        David Adler PC
         6750 West Loop South
7        Suite 120
         Bellaire, Texas  77401
8

9

10   ALSO FOR THE DEFENDANT:

11       Seth B. Hopkins
         HARRIS COUNTY ATTORNEY'S OFFICE
12       1019 Congress Street
         Fifteenth Floor
13       Houston, Texas  77002

14
     OFFICIAL COURT REPORTER:
15
         Mayra Malone, CSR, RMR, CRR
16       U.S. Courthouse
         515 Rusk
17       Room 8004
         Houston, Texas  77002
18       713-250-5787

19

20   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
21

22

23

24

25

1                          *PROCEEDINGS*

2              THE COURT:  Good morning, ladies and gentlemen.  I

3      came through the courtroom about 30 minutes ago and it felt

4      like I was walking into a refrigerator, so I called and asked

5      them to shut down the system for the time being.  After all,

6      the temperature is -- it's not that cold or that warm for that

7      matter, so we are going to probably feel the temperature

8      dropping -- I'm sorry -- rising -- maybe that's the way to say

9      it -- over the next few minutes.  And if it doesn't get better,

10     we will take a 20-minute break or something at some point so we

11     can give ourselves a break, give our sinuses a break.  You may

12     not have this trouble, but I do from time to time.

13             *(Off the record discussion held)*

14             THE COURT:  Very good.  All right.  This is Cause

15     Number 16-3529, Grant, Otis Grant, versus Harris County.

16                   Who is here on behalf the plaintiff, Mr. Grant?

17             MS. PLANTE-NORTHINGTON:  Good morning, Your Honor.

18     Victoria Plante-Northington.

19             MS. MURPHY:  And Marjorie Murphy.

20             THE COURT:  All right.  Very good.  Thank you.

21                   Representing Harris County?

22             MR. ADLER:  Good morning, Your Honor.  David Adler for

23     Harris County, along with Seth Hopkins.

24             THE COURT:  Let me get some clarification here.  I

25     understand Mr. Hopkins is the attorney, lead attorney in the

10:07   1   case and he is not surrendering that status.  You are here.

2   Explain for the record how your coming into the case, as should

3   be handled.

4          MR. ADLER:  Very well.  The plaintiffs made some very

10:07   5   serious allegations about witnesses in the case that are

6   employed by Harris County, to include Mr. Hopkins.  We filed a

7   paper, a motion the other day asking that attorneys in the case

8   not be called as witnesses.  The Court hasn't ruled on that

9   yet.

10:07   10          I was hired by the County because of the very

11   serious allegations against the county employees, including

12   potential criminal charges.  So I was asked to come in just for

13   the purpose of this sanctions motion.  I will not be on the

14   case after that.

10:07   15          THE COURT:  That was part of what I wanted to make

16   sure of, that the roles were not being reversed and that

17   Mr. Hopkins would continue, at least for the time being, and

18   whatever his judgment might be and Harris County's judgment

19   might be to continue in handling the case as the lead attorney.

10:08   20          MR. ADLER:  That's correct.

21          THE COURT:  You may have a seat.

22          The Court has -- actually, what I have done is I

23   have gone back through -- and we will get to what the main

24   business is and see whether some of this can be resolved by the

10:08   25   arguments of counsel or whether or not it has to be taken in

10:08   1   testimony.  But over the last 90 days, the activity in this

2   file has actually reached more than fever pitch.  Apparently,

3   it has now turned into arguments and finger pointing on both

4   sides regarding matters of discovery that ordinarily would have

10:09   5   been resolved.  The discovery matters would have been resolved

6   some time ago but for the Court's amending -- or permitting an

7   amendment to the docket, permitting more time for discovery,

8   which I generally grant without -- you know, liberally.  I

9   believe that clients are not necessarily responsible for the

10:09   10   conduct of their lawyers, and I generally try to make sure that

11   when I am looking at the case, I'm not simply looking at the

12   lawyer's conduct but also the conduct of the parties as to

13   whether or not some particular need exists to move the case

14   along, to try to have a full, complete day in court.  In other

10:09   15   words, that's my concern.  I don't want anyone to leave here

16   feeling that they have been cut off simply by a motion practice

17   and not being able to present their case in chief.

18            That brings me to -- and I might be doing this in

19   reverse, but that brings me to the plaintiff's motion to amend

10:10   20   the pleadings on a fourth -- for a fourth time.  And that

21   motion -- will you be speaking, Ms. Plante-Northington?

22            MS. PLANTE-NORTHINGTON:  Yes, Judge.

23            THE COURT:  Okay.  And that motion, I believe, was

24   filed perhaps last week.  Let me just make sure.

10:10   25            MS. PLANTE-NORTHINGTON:  Monday.

10:10     1          THE COURT:  Monday, this week, while I was out

          2  celebrating President's Day.  Right?

          3          MS. PLANTE-NORTHINGTON:  Yes.

          4          THE COURT:  Okay.  Certainly there has not been time

10:10     5  for Harris County to respond to this in a written fashion, but

          6  my concern is raised because there is not a motion that has

          7  been filed in the last 90 days that both sides are not just

          8  totally opposed to.  There is no agreement on anything, and I'm

          9  concerned about that.  I'm concerned about it from my own

10:11    10  perspective.  If I'm going the try this case, I have to have

         11  your cooperation.  And by that, I mean, I will not let you run

         12  over me in this courtroom and have it your way.  You can do

         13  each other any way you want.  I don't want to be pounded by

         14  tons of paper or motions that you can sit down and agree should

10:11    15  go forward, period.  You get your day in court.  You get to try

         16  your case, and it should be over.  Maybe that is old school.

         17          The point though is that I am concerned about

         18  that, so let me just, for the record -- and I will get back

         19  with you in just a minute on this.  Because I had to go back

10:11    20  through and take a look to see whether or not the motion was

         21  supported by the statements and facts or the documents that you

         22  indicated, which is, I believe, the Title VII documents that

         23  are now the focus of your motion for continuance.

         24          On November 9, the Court entered its order,

10:12    25  striking as untimely the designations of certain witnesses that

the plaintiff had requested and that, in the Court's view at that time, were outside the purview of discovery.  That order was entered on November 9.

On November 28, Harris County files its first motion -- go ahead and have a seat -- Harris County files its motion for sanctions.  And it was a little bit of a mystery because I know I had stricken those witnesses, but this motion goes to other things that Harris County is claiming, or was claiming that Mr. Grant was withholding from him -- from them; that they were entitled -- Harris County is entitled to certain discovery.  Harris County is entitled to certain information. And the attitude was, he is holding back some stuff, Judge, that we need to make sure we can try this case appropriately.

Well, that -- I'm sorry -- yeah -- November 28th motion for sanctions has worked its way through, but before any responses and rulings could be made on that, Harris County filed a motion to quash the deposition of certain witnesses. The Court granted that.  Then there was a motion to amend. There was a third amended petition by the plaintiff, and the Court granted that, that motion.

On the heels -- or somewhere in between, the plaintiff then files a motion for sanctions, and that was, I believe, filed somewhere toward the latter part of -- I don't have the docket date.  Let me just take a quick look here.

MR. ADLER:  January 25th, Your Honor.

10:14    1            THE COURT:  You are probably right.  Harris County was

2    November.  Now it is the plaintiff's turn and we have got a --

3    I believe it is Document 57.  I believe that's the one I'm

4    referring to.  It's a motion to supplement motion for

10:14    5    sanctions, Number 49.  This is just further supplementation

6    after supplementation.  And there is a reply to that in Number

7    58 by -- or for that motion for sanctions by Mr. Grant.

8            Then we have -- we have Harris County, the one I

9    just spoke to, Number 57, Harris County's motion to supplement

10:14    10    and a response filed and reply, all of this on December 12.

11    There was an order granting the motion for sanctions.

12            So who was the sanction that I granted,

13    Mr. Hopkins?

14          MR. HOPKINS:  Simply that plaintiffs were not to come

10:15    15    up with new evidence at summary judgment or at trial.  They

16    were to produce their evidence within the discovery period.

17    That's all that we requested.

18          THE COURT:  Right.  And there was no, quote, real

19    sanction.  It was mostly a cutting off, an attempt to cut off

10:15    20    and to establish that the discovery timeframe had passed.

21          MR. HOPKINS:  Yes, Your Honor.

22          THE COURT:  Right.  Following that, we have at

23    Number 67, Mr. Grant's motion for sanctions.  That was on

24    January 25.  That motion now, I believe, is primarily the focus

10:15    25    of our proceedings, our telephonic proceedings last week, week

10:15  1   before last and now the timeframe -- or the focus of the

2   proceeding here today.

3           After that was filed, Harris County then files

4   its motion for summary judgment, I believe, on the 29th of

10:16  5   December.  I'm sorry.  January.  And this motion seems to have

6   attempted to gather every conceivable piece of evidence that in

7   and of itself simply creates a serious issue of disputed fact.

8   I mean, there is no way that any judge in his right mind could

9   grant a motion for summary judgment with all of this added in.

10:16  10  I mean, all of these issues, many of them are issues in

11  dispute.  This is what the lawsuit is about.  So there is no

12  way for me to take the answer to interrogatories or the

13  affidavits of persons which may or may not be admissible and

14  grant a motion for summary judgment.  So I will say straight

10:16  15  up, the motion for summary judgment is going to be denied.  If

16  we are going to waste our time, we are going to waste it in the

17  courtroom, so I'm going to enter a short order on that sometime

18  later on.  But that motion for summary judgment is before the

19  Court.

10:17  20          I believe Ms. Victoria Plante-Northington has not

21  filed a response to it, and I don't expect to receive a written

22  response to it because I think this case needs to be tried.

23          At Number 70, that was the response.  At

24  Number 71 was the reply filed by the plaintiff.  And at

10:17  25  Number 75, we get now the motion, Harris County's motion to

10:17   1   file a sur-reply.  As though I don't already have enough to

2   read.  This is four or five documents concerning a motion for

3   sanctions.  And then at 81, we have the motion to strike and to

4   limit testimony, which is part of the focus of the proceedings

10:17   5   here today.

6              My patience with this is certainly wearing thin

7   in light of the fact that this is an issue that needs to be

8   resolved, but does not require the paper that is being

9   generated to resolve it.  And after our telephonic conference

10:18  10   last week, it certainly seemed to me that that would have been

11   a sufficient signal to the parties that we were going to have a

12   hearing on this.  In fact, I set it for a hearing, and the

13   papers continue to fly.

14              On top of that, plaintiff has filed a fourth

10:18  15   motion to amend, indicating that out of error, I gather, on her

16   part, that she failed to include claims presented that are

17   germane and were central to the plaintiff's cause of action.

18              I'm not of the opinion that a limitations issue

19   bars the amended claims.  I am concerned as to whether or not

10:19  20   and how the lawsuit has been prepared, so I will -- so there is

21   a question, let's say, of latches as opposed to the issue of

22   whether or not statute of limitations has run.  Mr. Grant has

23   brought his lawsuit.  It is based upon a Title VII

24   investigation.  That investigation, as I understand it, reveals

10:19  25   his opinion that there are at least two bases.  I say two

10:19    1    bases, meaning one having to do with -- one basis has to do

2    with his claim of disability and how he was not accommodated

3    appropriately.  The other has to do with his claim of Title

4    VII, retaliation and termination.  So those issues have been

10:19    5    out there all the time.

6              The question of whether or not the discovery and

7    the depositions, et cetera, have covered this is one of the

8    issues that I need to have the parties speak to, so -- and that

9    will go some distance in my trying to determine whether or not

10:20    10    Mr. Grant's claim of Title VII is barred by latches, his

11    failure to get this done in a timely fashion.  And certainly

12    under the circumstances, I'm not sure what timely means

13    anymore.  This has really gone past a point where it should

14    have been tried.  I think that's what I'm trying to say.

10:20    15             So let me hear about that first.  What is it --

16    what is the basis of the motion, as they say, in 50 words or

17    less?  And then I have some questions I need to ask and then I

18    will get a response.  And I need a response from you,

19    Mr. Hopkins.

10:20    20             MS. PLANTE-NORTHINGTON:  Yes, Judge.  The Title VII

21    claim is based on Mr. Grant complaining of national origin

22    discrimination against other African employees back in August

23    of 2011.  That action started the process of the retaliation,

24    harassment, discrimination.  And so we have been so focused on

10:21    25    the ADA accommodations and disability Mr. Grant had, I lost

10:21  1    track of what really started it.  And the EEOC charges that are
       2    attached to the motion specifically have a claim for Title VII.
       3         THE COURT:  What is the date of that?  Do you have
       4    that handy?
10:21  5         MS. PLANTE-NORTHINGTON:  Yes.
       6         THE COURT:  The date of the Title VII EEO notice.  I
       7    think we got a copy of it here.
       8         MS. PLANTE-NORTHINGTON:  The charges -- the first
       9    charge is November 8, 2012.  It alleges Title VII violations.
10:22 10         THE COURT:  Well, I'm trying to see what the date is
      11    that he received -- I don't think there is any claim that these
      12    were not made and were not made timely.  I think the question I
      13    have is whether or not notice of right-to-sue was filed --
      14    prepared and presented to Mr. Grant on either or both of these
10:22 15    at the same time or separately.
      16         MS. PLANTE-NORTHINGTON:  Yes.  Because he is a
      17    governmental employee, we had to go through the Department of
      18    Justice, and the Department of Justice issued the right-to-sue
      19    letter that included Title VII and ADA.
10:22 20         THE COURT:  And when was that issued?
      21         MS. PLANTE-NORTHINGTON:  That was issued on
      22    February 16, 2016, I believe.
      23         THE COURT:  So the 2011 complaint to EEOC and the 2000
      24    -- let's see.  What is the other one?  -- the 2014 complaint to
10:22 25    EEOC, those ended up in the same -- being investigated, and one

10:23   1   letter was sent out for the two of those?  Is that your

2   understanding?

3   MS. PLANTE-NORTHINGTON:  No.  There were two letters

4   sent out.

10:23   5   THE COURT:  That's what I'm asking.

6   MS. PLANTE-NORTHINGTON:  Okay.  One was sent out

7   sometime, I think, in 2014, I believe.  One was sent out, I

8   believe, in 2014, and the other was sent out in 2016.

9   Now, as to whether he got a Department of Justice

10:23   10   letter for his notice of rights on the first one, I did not

11   receive one.

12   THE COURT:  So you don't recall receiving -- and

13   Mr. Grant might have to tell us that.  You don't recall

14   receiving a notice of right to sue on the 2011 claim, but you

10:23   15   did -- you say there was a right-to-sue letter issued?  Is that

16   what you are saying?

17   MS. PLANTE-NORTHINGTON:  There was a right-to-sue

18   letter but just not one from the U.S. Department of Justice.

19   THE COURT:  And this lawsuit was then filed in

10:24   20   November of 2016 so that -- with that notice of right to sue,

21   are we not outside the period within which he could bring that

22   Title VII lawsuit?

23   MS. PLANTE-NORTHINGTON:  I don't believe we're outside

24   of that period because there is a continuing violation theory

10:24   25   of the retaliation.  Retaliation is something that happens not

10:24   1   just one time but is a continual action.  And so while he

2   appealed -- I mean, while he filed the first charge in 2012 for

3   his suspension, in 2013, he filed another one relating to his

4   termination.

10:24   5          THE COURT:  If I understand the -- let me step back

6   here.  If I understand the 2011 complaint that was filed in

7   November 2012, he alleged discrimination based upon national

8   origin.  That is, that he was an African of African descent

9   or -- I guess he is a citizen?

10:25   10          MS. PLANTE-NORTHINGTON:  No, Judge.

11          THE COURT:  He is an African national?

12          MS. PLANTE-NORTHINGTON:  He was complaining about

13   someone else who are of African descent.  He was standing up

14   for other employees that had been discriminated against.

10:25   15          THE COURT:  He did not make -- well, he did not make a

16   formal complaint except for retaliation?

17          MS. PLANTE-NORTHINGTON:  Correct.

18          THE COURT:  I guess that's the way to say it.  And his

19   retaliation against his -- his claim of retaliation was based

10:25   20   upon his claim that he was standing up for other people who

21   were being discriminated against?  I believe that's the correct

22   way of saying it?

23          MS. PLANTE-NORTHINGTON:  Yes.

24          THE COURT:  I'm looking at that as paragraph three and

10:25   25   I gather he talks about things that happened to him or happened

10:26   1   to other people during that period of time.  And so, again, if

2   he makes his complaint on November 8, 2012, and he is claiming

3   retaliation based on reporting violations of federal law under

4   Title VII, that statute of limitations cause of action, would

10:26   5   it not -- does it not have a two-year window on it?

6            MS. PLANTE-NORTHINGTON:  The initial complaint for the

7   EEOC has a 300-day period.

8            THE COURT:  Well, that's not an issue because we know

9   what day he filed it.  He filed it on November 8, 2012.

10:26   10   Assuming that he received a notice of right to sue, then I

11   gather he received a notice of right to sue back on February 14

12   of -- you said February 14, didn't you?

13            MS. PLANTE-NORTHINGTON:  February 16, I believe, 2016.

14            THE COURT:  I thought you gave me another date.

10:27   15            MS. PLANTE-NORTHINGTON:  We filed within 90 days.

16            THE COURT:  No.  I thought you gave me a different

17   date for the first notice of right to sue.

18            MS. PLANTE-NORTHINGTON:  Yes.  I don't know when that

19   was issued, the specific date as to when that was issued.  But

10:27   20   I do know that that claim would have gone to the Department of

21   Justice, like his second complaint, and we never received that.

22   We never received a right to sue on that.

23            THE COURT:  Did you receive -- what did you receive a

24   right to sue on?

10:27   25            MS. PLANTE-NORTHINGTON:  We received notice from the

10:27  1  EEOC.  I believe he received notice, because that was his first

2  charge and I didn't represent him.

3          THE COURT:  Was there a notice of right-to-sue letter

4  issued for the February 2016 letter?  Was there a letter sent

10:27  5  out to you?

6          MS. PLANTE-NORTHINGTON:  Yes.

7          THE COURT:  Okay.  And I don't think you have included

8  that as a part of your documents.  That's what I'm saying.  I

9  see the charge itself, but I don't know if you gave me a copy

10:28  10  of the letter.

11          MS. PLANTE-NORTHINGTON:  I think I have no letter,

12  Judge.

13          THE COURT:  All right.  Tell me what the letter said

14  because I'm concerned about this amended petition request based

10:28  15  upon some events that occurred back in 2011, 2012, being swept

16  into this litigation, and his complaint is not that he was

17  discriminated against directly related to those activities, but

18  he was discriminated against because he reported it.

19          MS. PLANTE-NORTHINGTON:  Yes.

10:28  20          THE COURT:  That's a different violation.

21          MS. PLANTE-NORTHINGTON:  Yes.

22          THE COURT:  The person who is reporting some

23  discrimination, discriminatory conduct still has a statute of

24  limitations period within which to bring that lawsuit, and the

10:28  25  investigation into that should have ended in some kind of

10:28    1   notice of right to sue.  So tell me what you have there.

2           MS. PLANTE-NORTHINGTON:  I have -- hold on a second,

3    Judge.

4           THE COURT:  Let me ask Mr. Hopkins while you are

10:29    5   looking whether or not he has an answer.

6           MR. HOPKINS:  I'm sorry.  What was the question, Your

7    Honor?

8           THE COURT:  The question is whether or not you are

9    aware that a notice of right to sue was issued to Mr. Grant on

10:29   10  the original -- I say original -- the first claim of

11   discrimination?

12          MR. HOPKINS:  I'm not aware either way.

13          THE COURT:  You don't know one way or another?

14          MR. HOPKINS:  No, Your Honor.

10:29  15        THE COURT:  Are you aware that a right-to-sue letter

16   was issued on the second charge of discrimination?

17         MR. HOPKINS:  I believe so.  Mr. Grant's counsel has

18   made that representation.  I take her word for it.

19         MS. PLANTE-NORTHINGTON:  Yes.

10:29  20      THE COURT:  But you have not alleged as a defense to

21   any of these a statute of limitations, have you?

22        MR. HOPKINS:  We were not aware of the Title VII

23   claim.

24        THE COURT:  Pull that microphone close.

10:29  25      MR. HOPKINS:  We were not aware of the Title VII

10:29   1   claim.  We certainly would have alleged that if we had known

2   there was a Title VII claim.

3          THE COURT:  Well, Title VII, I don't believe, was a

4   part of the second -- it did not state "retaliation" or I don't

10:30   5   believe the second claim or charge to EEOC -- the national

6   origin issue in retaliation to that national origin was -- I

7   don't believe that's a part of it.

8          MS. PLANTE-NORTHINGTON:  Yes, Judge.  Excuse me,

9   Judge.  It is a part of that.  It's the EEOC charge dated,

10:30   10  signed --

11         THE COURT:  I believe I see what you are referring to.

12  First paragraph says, I believe -- he is claiming, that is, the

13  plaintiff is claiming that he believes he has been

14  discriminated against in retaliation for filing this charge

10:30   15  back in 2012 and the grievances -- he believes he has been

16  retaliated against because of his disability and need for a

17  reasonable accommodation.  So that is part of his original --

18  he did sweep it in.  And then he talks about the letter that he

19  received, and he says he has been discriminated against, a

10:31   20  Title VII of civil rights as amended.  Title VII is a different

21  claim, so you are aware that there was a Title VII claim being

22  made in the charge.

23         You are saying, I gather, that you were not --

24  you have not seen it in the pleadings?

10:31   25         MR. HOPKINS:  Yes, Your Honor.  The EEOC provided a

10:31   1   right to sue and plaintiff had an election.  They could choose

2   to sue under the ADA or they could choose to sue under Title

3   VII.

4          THE COURT:  What do you mean, he had a choice?

10:31   5          MR. HOPKINS:  When they drafted the pleadings, they

6   made the decision not to include Title VII in the pleadings but

7   only the ADA.  And that's the premise --

8          THE COURT:  Is that how the letter is crafted?

9          MS. PLANTE-NORTHINGTON:  No, Judge.

10:32   10          THE COURT:  I'm not sure I understand what you are

11   saying.

12          MR. HOPKINS:  So when they actually filed their

13   lawsuit --

14          THE COURT:  I'm not talking about the lawsuit.  We are

10:32   15   talking about EEOC.  I thought you said they gave him a choice.

16          MR. HOPKINS:  Oh, when Mr. Grant received the

17   right-to-sue letter, he could have certainly picked to file a

18   petition that was in state court originally under the ADA or

19   Title VII, or both.  He made the decision to file the lawsuit

10:32   20   under ADA, and that's the premise that we have used up to this

21   point.

22          THE COURT:  What was your basis for removing the case

23   then?

24          MR. HOPKINS:  ADA.

10:32   25          THE COURT:  Federal claim?

10:32    1              MR. HOPKINS:  Yes, sir.

         2              THE COURT:  It is Title VII, right?

         3              MR. HOPKINS:  I believe ADA is separate.

         4              THE COURT:  I'm sure of that, but I'm saying there is

10:32    5      nothing to prevent him from bringing both causes of actions --

         6      both claims in one cause of action.  You are not saying that,

         7      right?

         8              MR. HOPKINS:  If he had chosen to do so, yes, Your

         9      Honor.  Now we are six weeks past discovery, and there is a new

10:33   10      claim being claimed in the proceedings.

        11              THE COURT:  And I gather his deposition has been

        12      taken?  Mr. Grant's?

        13              MR. HOPKINS:  Yes, Your Honor.

        14              THE COURT:  Did you ask him about that?

10:33   15              MR. HOPKINS:  We touched on it very briefly, but not

        16      in nearly as much detail as I would have if I had realized

        17      there was an active Title VII claim out there.

        18              THE COURT:  Why did you ask him any questions at all?

        19              MR. HOPKINS:  I don't remember exactly what I asked

10:33   20      him.  I didn't ask him much, and I didn't touch on Title VII.

        21      There were just some fact issues he had --

        22              THE COURT:  Did you join in that deposition?  Did you

        23      ask your client any questions?

        24              MS. PLANTE-NORTHINGTON:  No, I did not ask him

10:33   25      questions.

10:33  1      THE COURT:  It was simply Mr. Hopkins or one of the

2    Harris County attorneys asking the questions?

3            MS. PLANTE-NORTHINGTON:  Yes.

4            THE COURT:  All right.  You might have to

10:33  5    supplement -- or give me some short response to that in

6    writing, a couple pages or so, but I'm not interested in

7    reading reams of paper about this matter.  And so I will make a

8    decision on that as a separate item.

9                All right.  Let's then move to the issue -- there

10:34  10   is another -- the issue that's front and center here is the

11   allegation -- if I state it incorrectly, please help me -- is

12   the allegation that the plaintiff makes in his motion for

13   sanctions that Harris County, one of its employees, has, quote,

14   destroyed evidence, including emails and handwritten documents

10:34  15   that were allegedly a part of the investigation that went on?

16   And this investigation apparently was being conducted by

17   Ms. Owens, I believe.

18                Is Ms. Owens the person who was doing the

19   investigation?

10:34  20           MS. PLANTE-NORTHINGTON:  Yes.  The emails don't relate

21   to Ms. Owens per se.  The emails relate to Ms. Malveaux who

22   testified that she destroyed some emails.  So the emails that

23   are referenced in there are not for Ms. Owens but for

24   Ms. Malveaux who is also an HR representative.

10:35  25           THE COURT:  Who did the investigation?  Was it both of

10:35    1    these ladies?

2         MS. PLANTE-NORTHINGTON:  No.  Ms. Owens, from what I

3    understand, did the deposition -- I mean, the investigation.

4         THE COURT:  Let me ask you then to frame for the Court

10:35    5    and for response what you contend to be the problem with

6    documents.  Whether they are emails or whatever, you can

7    separate out responsibility as you choose.

8         MS. PLANTE-NORTHINGTON:  Okay.  The timing of the

9    documents being one which they were produced only two days

10:35    10    prior to the discovery deadline of December 31.

11         THE COURT:  When you say "they," tell me what you are

12    talking about.

13         MS. PLANTE-NORTHINGTON:  They would be witness

14    statements that Ms. Owens said she took.  They are not -- they

10:35    15    are typewritten statements.  She destroyed --

16         THE COURT:  Who did the typing?  Who typed the

17    statements?

18         MS. PLANTE-NORTHINGTON:  Ms. Owens.

19         THE COURT:  So these are statements that she prepared

10:35    20    based upon her interviews?

21         MS. PLANTE-NORTHINGTON:  That's what she states.

22         THE COURT:  Okay.  Go ahead.

23         MS. PLANTE-NORTHINGTON:  And we have since learned

24    because of the way the things transpired in the document

10:36    25    production, because I consistently asked other witnesses about

10:36   1   the seven witnesses in the letter, the investigative finding by

2   Ms. Owens, I asked what seven witnesses were these.  And nobody

3   could tell me.

4           THE COURT:  So Ms. Owens refers to having interviewed

10:36   5   or spoken to seven witnesses in her report?

6           MS. PLANTE-NORTHINGTON:  Yes.

7           THE COURT:  And no one has identified -- you took

8   Ms. Owens's deposition, right?

9           MS. PLANTE-NORTHINGTON:  Yes.

10:36   10          THE COURT:  Couldn't she identify the seven people

11   herself?

12          MS. PLANTE-NORTHINGTON:  She did identify the seven

13   people on the 29th of December, yes, with new documents that

14   sort of corroborated her statement that she took those

10:36   15   statements.  But since then, I have learned that two of the

16   witnesses stated they never met with Ms. Owens about anything

17   related to Mr. Grant.

18          THE COURT:  Are those witnesses here today?

19          MS. PLANTE-NORTHINGTON:  I believe --

10:37   20          THE COURT:  What are their names?

21          MS. PLANTE-NORTHINGTON:  Ms. Washington, Inthera

22   Washington.

23          THE COURT:  And who else?

24          MS. PLANTE-NORTHINGTON:  And Ms. Batiste.  I forget

10:37   25   her first name.

10:37  1          THE COURT:  Were they part of the people that you

2    wanted to take testimony on today?

3          MS. PLANTE-NORTHINGTON:  Yes, Judge.

4          THE COURT:  All right.  Are they present, Mr. Hopkins?

10:37  5    I'm sorry.

6          MS. PLANTE-NORTHINGTON:  No.

7          THE COURT:  Mr. Hopkins?

8          MR. HOPKINS:  I don't believe they are county

9    employees, so it would have been Ms. Plante's responsibility to

10:37  10   get them here.

11         MS. PLANTE-NORTHINGTON:  They have been subpoenaed.

12         THE COURT:  All right.  And do you know whether or not

13   they are here?  Anyone in the courtroom by the name of

14   Washington?

10:37  15              Have the subpoenas been served?

16         MS. PLANTE-NORTHINGTON:  Yes.

17         THE COURT:  And Ms. Batiste?

18         MS. PLANTE-NORTHINGTON:  I can check outside.  I

19   talked to Ms. Batiste this morning, and she said she was on her

10:38  20   way.

21              I talked -- I have not spoken to Ms. Washington,

22   but I did leave a voice mail for her, just to let her know she

23   is supposed to come.

24         THE COURT:  So assuming that what you say is true --

10:38  25   and I don't mean you are being untruthful.  I mean, assuming

1    the report you are making to the Court about what these

2    witnesses said is true, and I gather that Washington and

3    Batiste say they were not interviewed?  Or what are they

4    saying?

5              MS. PLANTE-NORTHINGTON:  Correct.

6              THE COURT:  Did you reveal to them what the report --

7    Ms. Owens's report stated that they said to her?

8              MS. PLANTE-NORTHINGTON:  Yes.

9              THE COURT:  And their response was?

10             MS. PLANTE-NORTHINGTON:  Their response was some of

11   the information was accurate.

12             THE COURT:  What do they mean by some of it being

13   accurate?

14             MS. PLANTE-NORTHINGTON:  Well, the issue with

15   Mr. Grant --

16             THE COURT:  No.  Here is what I'm asking.  Are they

17   saying it is accurate because they did give her some

18   information?  Or are they saying it is accurate because they

19   are aware of what the information is about?

20             MS. PLANTE-NORTHINGTON:  The latter.  They are aware

21   of --

22             THE COURT:  All right.  Go ahead then.

23             MS. PLANTE-NORTHINGTON:  And we believe that this

24   information shows there was not a proper investigation done.

25   And with a hostile work environment/harassment claim, you have

10:39   1   to show you complained.  You have to show that the employer

2   actually investigated it.  And I think that becomes the pivotal

3   part in this case is whether there was an investigation, a true

4   investigation.  She did not find any wrongdoing, of course, and

10:39   5   so we are wanting to know about that investigation.

6       THE COURT:  What about the other five?  Did you have a

7   chance to speak with them?

8       MS. PLANTE-NORTHINGTON:  Yes.  Mr. Beasley in his

9   deposition -- he is still with Harris County -- stated that he

10:40   10   had not spoken to Ms. Owens about Mr. Grant.

11       THE COURT:  So -- but there is something in the report

12   indicating that he spoke to her, that he gave her a statement?

13       MS. PLANTE-NORTHINGTON:  At that point, it was

14   December 29.  I had taken Mr. Beasley's deposition two months

10:40   15   before.  So I didn't have enough time to come back and say

16   whether this was something that he believes to be factually

17   accurate.

18       THE COURT:  It doesn't matter whether it is factual or

19   not.  I'm concerned about the conduct because conduct is what

10:40   20   we are talking about here.  If Ms. Owens did not interview

21   these people, then it would mean that she just made it up.

22   That's conduct.  That's her conduct that's at risk or that is

23   exposed.  And my concern has to do with what kind of conduct

24   are we talking about?  Are we talking about conduct where she

10:40   25   actually interviewed these people and they just don't remember?

10:40  1   Or are we talking about people she didn't interview at all but

2   made it all up?  What are we talking about?  That's what I'm

3   trying to get from you so I understand who should testifying,

4   if anybody, in this proceeding.

10:41  5            MS. PLANTE-NORTHINGTON:  We are talking about the

6   conduct of Ms. Owens and her credibility.

7            THE COURT:  Is Ms. Owens here today?

8            MR. ADLER:  She is, Your Honor.

9            THE COURT:  Where is Ms. Owens?

10:41  10            MR. ADLER:  She's in the hallway.

11            THE COURT:  I should have done this earlier.  I just

12   don't know who to not ask to be in.  But go ahead.

13            MS. PLANTE-NORTHINGTON:  So her conduct becomes

14   pivotal to the sanctions motion as well as to what a jury would

10:41  15   hear about what type of investigation was done, whether it was

16   a sham investigation.

17            THE COURT:  All right.  What other persons have you --

18   are you asking or have you asked to be present?  We know of

19   Washington and Batiste.  Who else?

10:41  20            MS. PLANTE-NORTHINGTON:  I have an IT expert,

21   Mr. Townson that will only testify as to what is needed to

22   determine whether a document existed at that time.  And he is

23   just an expert.  We may or may not need him, but he is just

24   here just in case the Court needs some expert knowledge on --

10:42  25            THE COURT:  All right.  Anyone else?

10:42    1        MS. PLANTE-NORTHINGTON:  I attempted to serve

2   Mr. Samuels, who is no longer with Harris County, but was

3   unable to.  So we do have deposition excerpts we would just

4   like to read into the record.

10:42    5        THE COURT:  Okay.  Is that it?  I understand from

6   Mr. Hopkins that you wanted to take some testimony from him.

7   That was the focus of his motion or the motion --

8        MS. PLANTE-NORTHINGTON:  Only to the extent

9   Mr. Hopkins and I got into a lot of conversation during

10:42   10   Ms. Owens's deposition regarding his knowledge and that he

11   didn't know, and, you know, it was just a little weird that he

12   wouldn't ask his client about information, and this information

13   would all of a sudden pop up.  So he is not so much --

14        THE COURT:  How did the information come up at the

10:43   15   last of the month -- the last of December?  In other words, did

16   you have a motion for sanctions pending at that time regarding

17   these documents?

18        MS. PLANTE-NORTHINGTON:  No, Judge.  I didn't even

19   know they existed.  I asked for them but I didn't know --

10:43   20        THE COURT:  When did you ask for the documents?  When

21   we are talking about documents, I think we are talking about

22   notes that would support the statements made in the report

23   itself?  Is that what we are talking about?

24        MS. PLANTE-NORTHINGTON:  Yes, Judge.

10:43   25        THE COURT:  Anything else?  You said emails, but that

10:43 1   would be transmissions between individuals perhaps regarding

2   any number of matters.  But other than these notes that

3   Ms. Owens -- I gather she said she made and that she utilized

4   them to do her report?

10:43 5              MS. PLANTE-NORTHINGTON:  Correct.

6              THE COURT:  These notes are the focus in part of what

7   you, I believe, claim to be fabricated now.  Right?

8              MS. PLANTE-NORTHINGTON:  Yes.

9              THE COURT:  Okay.  And they are also typed reports,

10:44 10  typed statements?

11             MS. PLANTE-NORTHINGTON:  Correct.

12             THE COURT:  Okay.  So when I say "typed," they are not

13  handwritten.  They are not her handwritten notes?

14             MS. PLANTE-NORTHINGTON:  They were printed from her

10:44 15  computer.

16             THE COURT:  So what happened?  You were -- what caused

17  this to come up?  What did you do?

18             MS. PLANTE-NORTHINGTON:  During her deposition, she

19  had a bunch of documents in front of her.  And this is in the

10:44 20  deposition transcript.  And so I asked her what was she

21  testifying from, to the best of my recollection.  And she said,

22  "I was able to find more documents this morning.  I was able to

23  do a more thorough" --

24             THE COURT:  This deposition was being taken when?

10:44 25             MS. PLANTE-NORTHINGTON:  December 29.

10:44   1           THE COURT:  Okay.

2           MS. PLANTE-NORTHINGTON:  And so I said, Well, can I

3   look at the documents since they are before you?  I want to see

4   them.

10:44   5           Over many objections of privilege, Mr. Hopkins

6   would not allow it until he reviewed all the documents.  And so

7   then when he reviewed them, I believe he turned them over to me

8   and then I was able to review them to realize that these were

9   typewritten statements that I had no knowledge of.

10:45   10          At that point, I did request metadata of the

11  document electronically because I wanted to see when it was

12  actually created.  Was it after the case or before the case?

13          THE COURT:  Uh-huh.

14          MS. PLANTE-NORTHINGTON:  And I have not received that

10:45   15  information.

16          THE COURT:  Okay.

17          MS. PLANTE-NORTHINGTON:  So that's why I have the

18  expert here.

19          THE COURT:  How would the expert be able to help me

10:45   20  know that?  They would have to look at the -- they would have

21  to examine the computer.  Would they not?

22          MS. PLANTE-NORTHINGTON:  They would have to examine

23  the computer and the server.

24          THE COURT:  And that has not happened?

10:45   25          MS. PLANTE-NORTHINGTON:  That has not happened.

10:45   1           THE COURT:  Is there any way, as far as you know, any

2      way for that part of, quote, your investigation to be defeated?

3      Is there any way to change or modify or alter the metadata in

4      such a way that it would be able to reflect different times or

10:46   5      a different time being placed in there?

6           MS. PLANTE-NORTHINGTON:  Yes.

7           THE COURT:  Okay.  So she just turns these over, hands

8      these over?

9           MS. PLANTE-NORTHINGTON:  Yes.

10:46   10          THE COURT:  And these are not the report?  These are

11     the documents that support her conclusion or report.  Right?

12          MS. PLANTE-NORTHINGTON:  They are her interview

13     questions.

14          THE COURT:  You asked her some questions about them?

10:46   15          MS. PLANTE-NORTHINGTON:  I did ask her questions about

16     them, yes.

17          THE COURT:  Okay.  And when you were done asking

18     questions, other than the issue of whether or not these are

19     recent fabrications or recently, whatever, prepared -- recent

10:46   20     documents prepared, other than that, did you have any concerns

21     at all about the interview notes, let's call them?

22          MS. PLANTE-NORTHINGTON:  Yes, I did.  About maybe some

23     of the substance of it.  I have only verified one statement

24     with Ms. Batiste.  She did touch on a few things that Ms. Owens

10:47   25     mentioned, but those statements were provided by Mr. Grant in

10:47   1  his actual complaint that started the investigation.  So it's

2  not like something she would know -- she would not know

3  independent of speaking to Mr. Grant or looking at his report.

4        THE COURT:  Okay.  But I gather from what you said

10:47   5  Ms. Batiste is saying without reservation that she did not have

6  any interview with Ms. Owens on the subject matter that was

7  recorded in her final -- in Ms. Owens's final report?

8        MS. PLANTE-NORTHINGTON:  Based on my knowledge, yes.

9        THE COURT:  That's what you are saying, but I'm

10:47  10  asking:  Is that what she told you?

11        MS. PLANTE-NORTHINGTON:  She told me that she did not

12  meet with Ms. Owens.  Ms. Owens testified that they met at the

13  Prairie View -- not Prairie View -- 1310 Prairie address in

14  Suite 230 in a conference room, and she said that, actually, in

10:48  15  the deposition.

16        THE COURT:  It did not happen?

17        MS. PLANTE-NORTHINGTON:  It did not happen.

18        THE COURT:  And Ms. Washington essentially makes the

19  same statement?

10:48  20        MS. PLANTE-NORTHINGTON:  Correct.

21        THE COURT:  All right.  Have you been served a copy of

22  what I believe -- I would say Mr. Hopkins, but we have counsel

23  stepping in, I gather, on this issue, on the issue of the

24  expert question concerning -- let me see.  What is the date

10:48  25  here?  Mr. Adler made an appearance, I believe, on the 19th,

10:48   1   which is the day before yesterday.  Today is the 21st, I

2   believe.  He gave -- he entered an appearance and then he filed

3   a document with the Court, which is Document Number 84, called

4   a statement of forensic computer examiner document alteration,

10:49   5   which I gather was served upon you.  Have you received that?

6                   MS. PLANTE-NORTHINGTON:  Yes, Judge.

7                   THE COURT:  Have you reviewed it?

8                   MS. PLANTE-NORTHINGTON:  I have reviewed it.

9                   THE COURT:  Has your expert looked at it?

10:49   10                  MS. PLANTE-NORTHINGTON:  He has looked at it.

11                  THE COURT:  All right.  Is there anything in that

12   report that your expert takes issue with?

13                  MS. PLANTE-NORTHINGTON:  Well, he can't take issue

14   with it until he inspects the actual server and computer.  He

10:49   15   did have some issues of concern as to protocol or procedure as

16   it relates to what this IT expert did.  That's it.  But he

17   would have to look at the server and computer to determine

18   whether the information that opposing counsel's expert has

19   included is credible.  Because we're just relying on the

10:50   20   credibility of --

21                  THE COURT:  But I gather what you are saying then is

22   that just looking at the report as it exists, he cannot say

23   that the outcome -- or the report is inaccurate because whether

24   or not it should be received will depend upon him being able to

10:50   25   independently -- I mean, whether or not he would challenge it

10:50   1   would be based upon him being able to look at the document

2   independently?

3           MS. PLANTE-NORTHINGTON:  Yes.

4           THE COURT:  And what would that require?

10:50   5           MS. PLANTE-NORTHINGTON:  From what I know, he would

6   have to go and look at Ms. Owens's -- the same files I guess

7   that Mr. -- the other expert --

8           THE COURT:  Let me ask Mr. Hopkins.  Maybe Mr. Adler

9   can tell us.

10:50   10           What would this expert have to look at in order

11   to follow the steps and trace the steps, let's say, of the

12   expert that you are presenting here?

13           MR. ADLER:  From what I know, I think he would

14   probably want to look at Ms. Owens's computer and the

10:51   15   mainframe.  We do not have a problem with that.

16           We do have a problem with his qualifications and

17   his ability to make the determination that it sounds like the

18   Court wants to hear from the plaintiff's side.

19           THE COURT:  Well, that's what -- you want to hear what

10:51   20   the plaintiff wants the Court to hear.  You are saying he may

21   not be qualified to do that?

22           MR. ADLER:  Well, here is why, Judge.  He is a systems

23   administrator.  He is not a licensed private investigator for

24   computer forensics.  That's a criminal violation and civil

10:51   25   violation in the state of Texas, to conduct this type of

10:51   1   investigation without having a license.

2            Additionally, he is on probation and, obviously

3   engaging in investigative work, which is a violation when you

4   are on probation, could result in him going off to prison.

10:51   5            So he is not certified --

6        THE COURT:  The terms of his probation would mean that

7   he would not be able to engage in what?

8        MR. ADLER:  It is the same as if you were practicing

9   law without a license while you are on probation.  It is a

10:51   10   state requirement that you have a private investigator license.

11   I have the statutes here, if anybody wants to see them.  So he

12   doesn't have a license to do this work.  He has not been

13   authorized by the --

14        THE COURT:  What kind of license would he have to

10:52   15   have?  A private investigator's license wouldn't be necessary,

16   would it?

17        MR. ADLER:  Yes, it actually is, Judge.

18        THE COURT:  So that would be the kind of qualification

19   that your witness has, a private investigator type of

10:52   20   qualifications or license?

21        MR. ADLER:  In order to be employed as a computer

22   forensic examiner in the state of Texas, you need to have a

23   license -- a license from the state of Texas from the

24   Department of Public Safety.  Their individual does not have

10:52   25   that.  I don't think he would qualify for one because he is not

10:52  1   certified.  He has no experience in this area.  And he is on

2   probation, which would prohibit him from getting that license.

3            THE COURT:  Okay.  Now I get what you mean by "he is

4   on probation," meaning whether or not he could qualify for the

10:52  5   license is an issue, as well, in addition to the fact --

6            MR. ADLER:  And I will say, Judge, with a qualified

7   licensed investigator, a computer forensic person who is

8   certified to do this work, we have no problem with them

9   examining -- I have no doubt they are going to come up with the

10:53  10  same information that our expert has and that we --

11           MS. PLANTE-NORTHINGTON:  I just want to note for the

12  record, Mr. Carlos Townson does not have a criminal record.

13  His son does.  So I'm not sure if you are getting that mixed

14  up, but just for the record.

10:53  15           THE COURT:  Let's assume that he doesn't.  That is

16  still an issue of qualification; that is, having a license to

17  do this kind of work.  That's an issue I believe -- in addition

18  to the -- that's why I tried to make sure that Mr. Adler was

19  not saying that probation would prevent -- being on probation

10:53  20  meant that he would be violating his probation if he did this

21  work.  I understand the link now.  The link is that if he is

22  not licensed, he would be violating a state statute, which

23  could be a violation of a term or condition of probation; that

24  is, violating the law.  That's not an issue, you are saying?

10:53  25           MS. PLANTE-NORTHINGTON:  No, that's not an issue and

10:53  1    it is not an issue of a license.  I had this very same thing

2    come up two years ago in spoliation.

3              THE COURT:  I don't want to go there.

4              MS. PLANTE-NORTHINGTON:  Okay.  But I did -- we did --

10:54  5    the judge did conclude that did not matter.

6              THE COURT:  What did not matter?

7              MS. PLANTE-NORTHINGTON:  That he was not a private

8    investigator.

9              THE COURT:  Well, we are talking about a state statute

10:54  10   and I'm convinced that certainly if I want to authorize him to

11   do it, I don't know that that violates the statute or not, but

12   it would be a question of qualifications to do it, whether or

13   not the person has the skills.  And you can have skills and

14   ability to do things as an expert that you don't have, quote, a

10:54  15   license to do because, you know -- you just know the field.

16   And so the question has to do certainly with whether or not

17   there is some basis for the Court to permit it.

18             But that aside for the moment, let's assume,

19   first of all, that if he were permitted to do it, he arrived at

10:55  20   the same conclusion that the Harris County's expert arrived at,

21   or came to those same conclusions.  I'm not interested in

22   creating issues that just keeps us moving down this trail.

23             My question is:  That would take out the question

24   of -- that would basically eliminate the question of

10:55  25   fabrication?

MS. PLANTE-NORTHINGTON:  Yes.

THE COURT:  It does not obviously address the question of production, which I gather you -- and why he is being produced at the end of discovery when you, I gather, had requested, I gather, these documents?  Had you requested them by discovery some time before that?

MS. PLANTE-NORTHINGTON:  Yes, Judge.

THE COURT:  So it does not eliminate that issue.

MS. PLANTE-NORTHINGTON:  The issue then would become the credibility of her statements, I assume.

THE COURT:  Well, I think -- I'm trying to get to the point of saying, Here are the witnesses I want to hear.  And I'm going to hear your expert, the person.  I want to hear why and what his qualifications are and what he believes to be a problem.

I don't think I need to hear -- I think the report itself is probably self-explanatory.  I haven't read it because I haven't had time to go through it, so I don't need to hear an expert necessarily as to why he or she -- I don't know if it is a male or female.  I think it's a female?  No, male. I had done this -- it speaks for itself.  Whatever it is, it is.

Then the question becomes whether or not Mr. Hopkins should be testifying at all about anything.

MS. PLANTE-NORTHINGTON:  At this point --

10:56  1          THE COURT:  If so, what would that be?

       2          MS. PLANTE-NORTHINGTON:  Maybe what he asked his

       3   client to provide, the length of due diligence he used in

       4   trying to obtain the documents.

10:57  5          THE COURT:  Let me ask you:  When did you make your

       6   request?  Was this an interrogatory or production request?

       7          MS. PLANTE-NORTHINGTON:  It was a production request

       8   made back in August of 2016, I believe.

       9          THE COURT:  Mr. Hopkins, were you in the case at that

10:57 10   time?

      11          MR. HOPKINS:  Yes, Your Honor.

      12          THE COURT:  All right.  Do you recall receiving a

      13   production request for -- I gather this would have included the

      14   report?  You didn't have the report even at that time, did you?

10:57 15          MS. PLANTE-NORTHINGTON:  At that time, no, I did not

      16   have the report.

      17          THE COURT:  So it would have been the report, and I

      18   don't know how you fashioned the question, but it implicated

      19   the notes that were taken, at least?

10:57 20          MS. PLANTE-NORTHINGTON:  Yes.

      21          THE COURT:  And so you didn't -- what was your

      22   appreciation of that?

      23          MR. HOPKINS:  Well, first of all, we had a contact

      24   person with juvenile probation and he gathered all the

10:57 25   documents for us.  We produced them.  After the

first production --

          THE COURT:  What is all documents?  What are you

saying?

          MR. HOPKINS:  We responded to Mr. Grant's request for

production.

          THE COURT:  I know, but what is all those documents?

Because I have separated out what I'm concerned about being a

report, which, I gather, is a three-, five-, 10-page document.

Whatever it is.

          MR. HOPKINS:  The juvenile probation department did

not have any of Ms. Owens's files in its office because she is

in a separate department.  So juvenile probation department, in

going through the discovery after our first production, saw a

single page in a file that indicated that Ms. Owens in her

office might have responsive documents.

          THE COURT:  Right.

          MR. HOPKINS:  So Ms. Owens was contacted by, first of

all, juvenile probation.  It was our understanding that there

were three documents in her office.  We produced them.

          THE COURT:  In her office, meaning Ms. Owens's office?

          MR. HOPKINS:  Yes, Your Honor.  We produced them.

          THE COURT:  And what were those documents that were

produced?  The report?

          MR. HOPKINS:  The report, a letter to Mr. Grant

indicating the results of the investigation and a memo to

10:58   1   juvenile probation indicating the investigation had been

2   complete and the results.  It was that single memo out of, I

3   guess, about 3,000 pages, maybe 4,000 pages of documents, that

4   clued Dr. Shelton to reach out to Ms. Owens.

10:59   5           And so we reached out and had several

6   conversations with her.  And up until very recently, we thought

7   we had produced everything from Ms. Owens.

8           THE COURT:  What brings to your attention in December

9   of 2017 that you get her the documents?

10:59   10           MR. HOPKINS:  I met -- well, in October, at the very

11   first deposition, opposing counsel began asking Dr. Shelton

12   about Ms. Owens's report.  And I advised opposing counsel on

13   the record, You need to depose Ms. Owens because Dr. Shelton

14   doesn't know about this report, and we are willing to make

10:59   15   Ms. Owens available.  Ms. Owens was not deposed until the very

16   last day of discovery.

17           THE COURT:  Right.  But you had a duty to produce

18   these documents back then.

19           MR. HOPKINS:  Yes, Your Honor.

10:59   20           THE COURT:  In October, if you had them.

21           MR. HOPKINS:  And we reached out to Ms. Owens several

22   times and we were always told, This is all that I have, up

23   until December.  And Ms. Owens --

24           THE COURT:  Is that her statement?  This is all I

11:00   25   have?  Or, I have destroyed them, I don't have them anymore?

11:00  1            MR. HOPKINS:  Yes, Your Honor.

2            THE COURT:  What was she saying?

3            MR. HOPKINS:  She said, These are all the documents.

4    I didn't retain anything else.  I just have these documents.

11:00  5            THE COURT:  So she is actually misrepresenting what

6    she had?

7            MR. HOPKINS:  No, Your Honor.  Well, she can testify a

8    little bit better.

9            THE COURT:  I'm just saying she misrepresented,

11:00 10    apparently, because she comes up with some new stuff,

11    additional stuff in December.  Right?

12            MR. HOPKINS:  I think she conducted her search a

13    different way.

14            THE COURT:  Let's not speculate as to what she did.

11:00 15    She can tell us what she did.  She misrepresented that

16    apparently to you, and then you misrepresent that, I gather, to

17    Miss Plante-Northington, that you don't have anything else?

18            MR. HOPKINS:  That was our understanding.

19            THE COURT:  That's what you told her, right?

11:00 20            MR. HOPKINS:  Right.

21            THE COURT:  Okay.  So that's why I'm trying to figure

22    out why all of this shows up in December and why she would go

23    back and go searching for other things.  She has already said,

24    I didn't have any other stuff.

11:01 25            How did she go back?  Does she ever explain that

11:01   1   to you?  I won't ask you to tell me what she said, but did she

2   explain it to you?

3         MR. HOPKINS:  In her deposition, she explained it.

4         THE COURT:  That was this December?

11:01   5         MR. HOPKINS:  Yes, Your Honor.  At her deposition, she

6   showed up with new documents that I had not seen and that

7   was -- I think Ms. Plante will tell you, I was the most

8   surprised person in the room when that happened.

9         THE COURT:  Okay.  Okay.  So I don't hear anything

11:01   10   here that requires -- that would seem to trigger Mr. Hopkins

11   testifying about anything unless -- I mean if his client -- not

12   his client, but if his witnesses made some misrepresentations,

13   I don't know if you have something other than what he told you

14   as a basis for questioning him.

11:01   15         Is there something other than that?

16         MS. PLANTE-NORTHINGTON:  No.  I don't believe it would

17   go to anything material to this case.

18         MR. ADLER:  And, Judge, if I could, just to clarify.

19   I think if Ms. Owens testifies, I don't think she made a

11:02   20   misrepresentation.  She made a statement that she believed was

21   true at the time and subsequently found additional documents

22   and immediately produced them to --

23         THE COURT:  I get that.  I get the flow.  But I'm

24   trying to figure out why would she keep looking, if she has

11:02   25   already said, I don't have them?

11:02   1          MR. ADLER:  I talked to her about that.  And if the

        2   Court wants to talk her to about it, the Court will hear from

        3   her.  But some of the documents triggered her to look other

        4   places, including searches --

11:02   5          THE COURT:  But there was no other documents to look

        6   for.  All she is looking for -- because in October -- by

        7   October of 2017, you have got the report.

        8          MS. PLANTE-NORTHINGTON:  I have the report.

        9          THE COURT:  But she doesn't have the underlying notes.

11:02   10   And if that was a part of the request -- and it seems to be

        11   that that would have been a part of it -- she has already said

        12   to Mr. Hopkins, I have given you everything I have got.  That's

        13   a misrepresentation.  It doesn't matter whether it was

        14   intentional or not.

11:02   15          MR. ADLER:  It was an incorrect statement.  I agree,

        16   Your Honor.  It was not an accurate statement, but she did not

        17   know it was accurate at the time she was saying it.

        18          THE COURT:  I don't know.  I will have to hear from

        19   her as to whether or not she knew anything.  But what I'm

11:03   20   saying is that that is the issue, it seems to me, because even

        21   if the testimony of the IT expert says -- is that I can -- if

        22   he walks us through what he says is an appropriate way to

        23   examine the computers to determine whether or not these

        24   documents had been backdated -- and I gather that would be

11:03   25   apparent.  And I gather your expert is saying they have not

11:03   1   been backdated?

2   MR. ADLER:  Absolutely.

3   THE COURT:  Right.  Like I said, I haven't read the

4   report and haven't had time to really look at it.  Then it

11:03   5   seems to me this question -- the two people that we need to

6   hear from at least -- maybe three -- one is Ms. Owens.  The

7   other is your IT person and then perhaps the IT person for

8   Harris County.

9   MS. PLANTE-NORTHINGTON:  Yes.  I believe Ms. Garcia,

11:04   10   as well, because she gave an affidavit attached to a reply --

11   THE COURT:  I think so.  I think I saw that.  There

12   were two affidavits.  And what is the nature -- is Ms. Garcia

13   in the courtroom?

14   MR. ADLER:  She is not in the courtroom.  She is in

11:04   15   the building, Your Honor.

16   THE COURT:  What is Ms. Garcia's --

17   MS. PLANTE-NORTHINGTON:  Ms. Garcia was the attorney

18   who drafted the EEOC position statements.

19   THE COURT:  Is that part of your motion?  She is

11:04   20   not -- Ms. Garcia is not --

21   MR. ADLER:  Which motion are you talking about?

22   THE COURT:  I'm talking about the motion that was

23   filed -- I don't think you filed it.  I think it was filed by

24   Mr. Hopkins.

11:04   25   MR. ADLER:  We are asking the Court to not require any

11:04   1   attorneys to get up on the stand out of respect for the

2   attorney-client privilege.

3         THE COURT:  Well, that wouldn't be an attorney-client

4   privilege, unless she is representing somebody.

11:04   5         MR. ADLER:  She represents the Harris County entity

6   itself, Your Honor.

7         THE COURT:  But everybody in the office does, right?

8   This is not the trial.  This is a question of examination, so I

9   will have to deal with that.  But I think that -- yeah, I get

11:05   10   your -- that's what I'm saying.  I was trying to find the

11   motion to see whether or not the motion -- Ms. Garcia --

12   Ms. Garcia has already made some statements in this case about

13   what she did, apparently, and did not do.  I think to the

14   extent that she has already spoken up on this issue, she can

11:05   15   certainly be questioned about that.  Is there another?

16         MS. PLANTE-NORTHINGTON:  I have my client who will

17   testify for about two minutes.

18         THE COURT:  On what matter?

19         MS. PLANTE-NORTHINGTON:  Ms. Owens represented that

11:05   20   she took notes during the interviews.

21         THE COURT:  Okay.  All right.  That area.  Any others?

22         MS. PLANTE-NORTHINGTON:  And only Dr. Shelton's

23   knowledge of -- maybe this is not an issue -- of their

24   understanding that way back before they terminated Mr. Grant,

11:06   25   they had reason to believe he was going to file a lawsuit.  So

11:06    1    under the rules of the EEOC, the retention policy --

2    THE COURT:  I'm not going to go there.  That's your

3    lawsuit, if it's a part of it.  If it's not, it doesn't have

4    anything to do, it seems to me, with documents.

11:06    5    MS. PLANTE-NORTHINGTON:  Well, it involves the

6    responsibility to retain the documents.  They are relying on a

7    five-year retention policy that Ms. Owens cited, and that's why

8    she shredded them.

9    THE COURT:  Well, she didn't shred them, according to

11:06    10    her.

11    MS. PLANTE-NORTHINGTON:  No.  She shredded them.  She

12    shredded the handwritten documents.

13    MR. ADLER:  Judge, the county's policy is a three-year

14    policy, not a five-year policy.

11:06    15    THE COURT:  Well, whatever it is -- what do you mean

16    she shredded her handwritten documents?  She never had any

17    handwritten documents.

18    MS. PLANTE-NORTHINGTON:  No.  She had handwritten

19    documents.  She admitted that she destroyed them.

11:06    20    THE COURT:  And she destroyed them?

21    MS. PLANTE-NORTHINGTON:  Yes.

22    THE COURT:  That's not a dispute.

23    MR. ADLER:  After she transcribed them into a computer

24    format, she destroyed them.

11:07    25    THE COURT:  Nobody has ever really put all of this

11:07  1    together in one place.  So she had handwritten notes that are

2    destroyed, and her testimony is that she transferred that into

3    these statements that she has typed up and then she did that to

4    transfer them into the report?  How did they get into the

11:07  5    report?  So this is at least a two- or three-step process?

6         MR. ADLER:  Correct.

7         THE COURT:  Okay.  And what is this person's name?

8    You are talking about the five-year --

9         MS. PLANTE-NORTHINGTON:  I was told there was a

11:07  10   five-year retention policy.  Dr. Shelton testified that they

11   did not contest Mr. Grant's unemployment at the time of

12   termination because they believed he was going to file a

13   lawsuit.  So they had full knowledge of that and failed to take

14   reasonable steps to retain the documents that we are now

11:07  15   complaining about have been destroyed.

16        THE COURT:  All right.  So that should take two

17   minutes, right?

18        MS. PLANTE-NORTHINGTON:  That should take two minutes,

19   yes.

11:08  20        THE COURT:  What is his name again?

21        MS. PLANTE-NORTHINGTON:  Dr. Matthew Shelton.

22        THE COURT:  Is he outside, as well?

23        MR. ADLER:  He is, Your Honor.

24        THE COURT:  Who else?

11:08  25        MS. PLANTE-NORTHINGTON:  Let's see.  I think that's

11:08   1   it.

2           THE COURT:  You are going to check to see where your

3   witnesses are.  I say "your witnesses," meaning the ones you

4   subpoenaed.  If they are not out there, then give the phone

11:08   5   number to Cynthia so we can put a call in to them to find out

6   what the problem is.

7           MS. PLANTE-NORTHINGTON:  Yes.

8           THE COURT:  And then we are going to take about a

9   10-minute break and we will come back and start with the

11:08   10   testimony.  All right.

11       *(Court recessed at 11:08 a.m.)*

12                                   * * * *

13       I certify that the foregoing is a correct transcript from

14   the record of proceedings in the above-entitled cause.

15

16   Date: May 1, 2018

17

18                           */s/ Mayra Malone*
                             ---------------------------------------
19                           Mayra Malone, CSR, RMR, CRR
                             Official Court Reporter

20

21

22

23

24

25